## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **NATIONSRENT, INC.,** *et al.,* | ) | **Case No. 01-11628(KG)** |
| | ) | |
| Debtors. | ) | **Jointly Administered** |

## <u>NOTICE OF APPEAL</u>

NR Investments LLC, which acquired the right, title and interest in and to proofs of claim filed by Finova Capital Corporation, GE Commercial Distribution Finance Corp., GE Capital Corporation and CNH Capital America LLC against the above-captioned Debtors, hereby appeals under 28 U.S.C. § 158(a) and pursuant to Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure, to the United States District Court for the District of Delaware from the *Order Granting With Modification the Motion of NationsRent Liquidating Trust for an Order Approving Initial Distribution to General Unsecured Creditors Pursuant to the Liquidating Trust Agreement Approving the Distribution Matrix* (the "Order"), entered by the United States Bankruptcy Court for the District of Delaware (Hon. Kevin Gross) on January 9, 2008 [Docket No. 3593].

The names of the parties to the Order appealed from, and the names, addresses, and telephone numbers of their respective attorneys, are each as follows:

## APPELLANTS:

- **NR Investments LLC**

  MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
  1201 North Market Street
  P.O. Box 1347
  Wilmington, DE 19899-1347
  Telephone: (302) 658-9200
  Facsimile: (302) 658-3989
  Derek C. Abbott (No. 3376)

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006
Kristopher M. Hansen, Esq.
Abby M. Beal, Esq.

**APPELLEES:**

- **NationsRent Liquidating Trust**

  THE BAYARD FIRM
  222 Delaware Avenue, Suite 900
  Wilmington, DE 19899
  PO Box 25130
  Telephone: (302) 655-5000
  Facsimile: (302) 658-6395
  Neil B. Glassman (No. 2087)
  Mary E. Augustine (No. 4477)

  LOWENSTEIN SANDLER PC
  65 Livingston Avenue
  Roseland, New Jersey
  Telephone: (973) 597-2500
  Facsimile: (973) 597-2400
  Paul Kizel, Esq.

Dated: Wilmington, Delaware
       January 10, 2008

                              Respectfully submitted,

                              **MORRIS, NICHOLS, ARSHT & TUNNELL, LLP**


                              _____
                              Derek C. Abbott (No. 3376)
                              1201 N. Market Street
                              P.O. Box 1347
                              Wilmington, Delaware 19899-1347
                              (302) 658-9200

2

-and-

**STROOCK & STROOCK & LAVAN LLP**

Kristopher M. Hansen, Esq.
Abby M. Beal, Esq.
180 Maiden Lane
New York, New York 10038-4982
(212) 806-5400

Counsel for NR Investments LLC

3

## CERTIFICATE OF SERVICE

I, Derek C. Abbott, certify that I am not less than 18 years of age, and that service of the foregoing **Notice Of Appeal** regarding the Order Granting with Modification the Motion of NationsRent Liquidating Trust for an Order Approving Initial Distribution to General Unsecured Creditors Pursuant to the Liquidating Trust Agreement Approving the Distribution Matrix was caused to be made on January 10, 2008, in the manner indicated upon the entities identified on the attached service list.

Date: January 10, 2008

_____
Derek C. Abbott (No. 3376)

1379593.2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number: <u>01-11628</u>          ● BK   O AP
     If AP, related BK Case Number: _____

Title of Order Appealed:

<u>Order Granting with Modification Initial Distribution to General Unsecured Creditors pursuant to
the Liquidating Trust Agreement Approving the Distribution Matrix.</u>

    Docket Number: <u>3593</u>          Date Entered: <u>1/9/08</u>


Item Transmitted:     ●Notice of Appeal          o Motion for Leave to Appeal

               o Amended Notice of Appeal     o Cross Appeal

               Docket Number: <u>3595</u>          Date Filed: <u>1/10/08</u>


*Appellant/Cross Appellant:          *Appellee/Cross Appellee

<u>NR Investments LLC</u>          <u>NationsRent Liquidating Trust</u>


Counsel for Appellant:          Counsel for Appellee:
<u>Morris, Nichols, Arsht & Tunnell, LLP</u>          <u>The Bayard Firm</u>
<u>1201 N. Market Street</u>          <u>222 Delware Avenue, Suite 900</u>
<u>P.O. Box 1347</u>          <u>P.O. Box 25130</u>
<u>Wilmington, DE 19899-1347</u>          <u>Wilmington, DE 19899</u>


Filing Fee paid?     ●Yes   o No

IFP Motion Filed by Appellant?     o Yes   ● No

Have Additional Appeals to the Same Order been Filed?     ● Yes   o No
    If so, has District Court assigned a Civil Action Number?     o Yes   ● No     Civil Action #_____

Additional Notes:
      <u>Appellant Designations only.</u>


<u>2/5/08</u>          By: <u>Nancy L'Heureux</u>
Date          Deputy Clerk

_____

Bankruptcy Court Appeal (BAP) Number: <u>BAP-08-02</u>
7/6/06

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NATIONSRENT, INC., | : | Case No. 01-11628(KG) |
| a Delaware Corporation, *et al.*, | : | (Jointly Administered) |
| | : | |
| Debtors. | : | |
| _____ | : | **Re Dkt. No. 3555** |

## <u>ORDER</u>

The Court has carefully considered the Motion of NationsRent Liquidating Trust for an Order Approving Initial Distribution to General Unsecured Creditors Pursuant to the Liquidating Trust Agreement Approving the Distribution Matrix ("the Motion") (D.I. 3555), the submissions of the interested parties and presided over oral argument. For the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion is granted with the modification described in the Memorandum Opinion.

Dated: January 9, 2008

KEVIN GROSS, U.S.B.J.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| NATIONSRENT, INC., | : | Case No. 01-11628(KG) |
| a Delaware Corporation, *et al.*, | : | (Jointly Administered) |
| | : | |
| Debtors. | : | **Re Dkt. No. 3555** |

### MEMORANDUM OPINION[1]

### BY:   KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE

### INTRODUCTION

NationsRent Unsecured Creditors Liquidating Trust ("the Trust") is proceeding on the "Motion of NationsRent Liquidating Trust for an Order Approving Initial Distribution to General Unsecured Creditors Pursuant to the Liquidating Trust Agreement Approving the Distribution Matrix" ("the Motion") (D.I. 3555). The Trust wants to make an initial distribution which it proposes in the Motion ("the Distribution"). Parties have objected to the Motion on two separate grounds. The first objectors are six trusts whose beneficiaries sold their companies to NationsRent, Inc. ("the Seller Claims" and "the Seller Claimants"). The second objector is a claimant by assignment of Claims Nos. 3513[2], 3518, 100002 and 100016 ("the Assigned Claims" and "the Assignee Claimant") whose claims have been allowed in the aggregate amount of $10,216,629.98, and which the Assignee Claimant

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052.

[2] The Assignee Claimant notified the Court that it became the holder of Claim No. 3513 on December 3, 2007, after oral argument on the Motion (D.I. 3590). The Assignee Claimant's arguments made on behalf of its previously owned claims are also applicable to Claim No. 3513.

alleges represent purchase money indebtedness. The Court is asked to opine on the nature of the claims of the Seller Claimants and the Assignee Claimants and if they have priority in the Distribution.

## BACKGROUND

### A. The Case[3]

NationsRent, Inc., and affiliates ("Debtors") filed petitions for relief under Chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*) on December 17, 2001. The cases are consolidated for procedural purposes only and are being jointly administered. The United States Trustee appointed a Committee of Unsecured Creditors on January 4, 2002. The Court entered an Order confirming the First Amended Joint Plan of Reorganization ("the Plan") on May 14, 2003, and the Plan became effective on June 13, 2003.

Under the Plan, the Trust was born on the effective date of the Plan. The Reorganized Debtors funded the Trust with $300,000, cash, securities and causes of action. The beneficiaries of the Trust are holders of general unsecured claims, members of Class C-4 under the Plan. The Plan defines the members of the C-4 Class as:

> Class C-4 (General Unsecured Claim): Allowed Unsecured Claims against any of the Debtors that are not otherwise classified in C–3 [Unsecured Priority Claims], C-5 [Intercompany Claims] or C-6 [Penalty Claims], including Claims on account of the Old Senior Subordinated Notes and Deficiency Claims (other than Deficiency Claims of the holders of Allowed Bank Loan Claims).

---

[3] The author of this opinion became the assigned Judge on March 16, 2006.

2

## B.  The Proposed Distribution

The Trust has presented to the Court in an attachment to the Motion a detailed matrix which identifies beneficiaries of the Trust, the amount of each claim and the amount the Trust proposes to distribute on account of each claim.  The Trust holds approximately $19.37 million in cash and seeks the Court's allowance to make an initial distribution of $19 million.

The amount to be distributed to each claimant will depend upon the total pool of allowed C-4 Claims and whether any claim is subordinated.  The total amount of allowed C-4 Claims is $431,653,040.47.  The pro rata distribution is dependent upon the Court's rulings on the objections of the Senior Note Claimants and the Assignee Claimants described below.  If the Court permits the Distribution on the terms the Trust proposes, each C-4 claimant will recover approximately 4.4% of the allowed claim amount.  At issue is the competition for the limited funds among subsets of the C-4 Class, *viz.*, the Senior Notes, the Seller Claimants, the Make- Whole Claims and the Assigned Claims, which are described below.

### 1.  Senior Notes

In December 1998, which predated the bankruptcies, Debtors issued 10-3/8% Senior Subordinated Notes due 2008 ("the Senior Notes"), governed by an indenture ("the Indenture") which provided for the issuance of the Senior Notes in the aggregate principal amount of $225 million.  The provisions of the Indenture which are discussed below, specifically those defining "indebtedness," "senior debt" and subordination, are central to the decision.

3

## 2.  The Seller Notes and Make-Whole Amount

Debtors engaged in a series of acquisitions of companies through mergers before the bankruptcy filing.  In exchange for transferring their interests in the acquired companies, the transferors received stock of Debtors, cash and a promissory note ("the Seller Notes").  The transferors also received additional deferred purchase price consideration ("the Make-Whole Amount") pursuant to a side letter agreement ("the Make-Whole Agreement").  The Make-Whole Amount is based upon the value of the common stock of Debtors on the third anniversary of the acquisition.

The Seller Claimants filed proofs of claim and the Trust has allowed their claims in the aggregate amount of $27,802,297.17, as the following chart describes.

| Claim/Claimant | Filed Amount of Claims | Allowed Amount of Claims | Break-Down of Allowed Amount of Claims |
|---|---|---|---|
| Proof of Claim No. 2934 June A. Rich Revocable Trust of 1986 | $2,886,338.69 | $2,886,338.69 | Seller Note Claim:  $2,265,954.17 Make-Whole Claim: $620,384.52 |
| Proof of Claim No. 2936 Joyia E. Rich Family Associates LLC | $399,998.54 | $86,383.48 | Seller Note Claim: $313,601.06 Make-Whole Claim: $86,383.48 |
| Proof of Claim No. 2935 James T. Rich Family Associates LLC | $399,984.54 | $86,383.48 | Seller Note Claim: $313,601.06 Make-Whole Claim: $86,383.48 |
| Proof of Claim No. 2933 Francis P. Rich, Jr. Revocable Trust of 1986 | $2,886,338.69 | $2,886,338.69 | Seller Note Claim: $2,265,954.17 Make-Whole Claim: $620,384.52 |
| Proof of Claim No. 3010 Bryan T. Rich | $21,337,617.96 | $17,497,002.96 | Seller Note Claim: $6,571,707.31 Make-Whole Claim: $10,925,295.18 |

4

| Proof of Claim No. 3011<br>Douglas M. Suliman, Jr. | $5,320,003.87 | $4,359,849.87 | Seller's Note Amount: $1,641,950.50<br>Make-Whole Claim:   $2,717,899.07 |
|---|---|---|---|
| **TOTALS** | <u>$33,230,268.29</u> | <u>$27,802,297.17</u> | Seller's Note Amount: <u>$13,372,768.27</u><br>Make Whole Claim:   <u>$15,056,730.25</u> |

### 3.  Assigned Claims

Prior to their bankruptcies, Debtors entered into secured financing agreements ("the Financing Agreements") with certain lenders[4] to enable the Debtors to purchase equipment for use in Debtors' businesses ("the Equipment").  The parties structured the Financing Agreements as purchase money secured debt transactions pursuant to which the Lenders retained a security interest in the purchased equipment.  The Lenders filed proofs of claim (Nos. 3513, 3518, 100062 and 100016) totaling $10,216,629.98.

Following commencement of the bankruptcy cases, Debtors and Lenders entered into settlement agreements, which the Court approved, whereby the Lenders' secured debt was restated. The parties dispute whether, as a result of the settlement agreements, the Lenders retained their purchase money security interest in the Equipment and were granted a deficiency claim equal to the difference between the original amount Debtors borrowed and the restated debt provided in the respective settlement agreements, or became general unsecured creditors.  The Lenders assigned their claims to the Assignee Claimant, NR Investments LLC, pursuant to assignment of claim agreements, the validity of which Debtors

---

[4] The lenders were Finova Capital Corporation, GE Commercial Distribution Finance Corp. and General Electric Capital Corporation.  The Court does not know the identity of the assignor of Claim No. 3513, which was recently assigned.  See f.n. 2, *supra*.  The Court will refer to the lenders collectively as  "The Lenders."

have not challenged.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## DISCUSSION

The objections are directed at a single issue, namely, whether and to what extent the Senior Notes are subordinated to the Assigned Claims and/or the Make- Whole Amounts. The starting point of the analysis is the Indenture.  The parties agree that the relevant provisions are as follows (emphasis added to highlight the most relevant positions):

### Section 1.01 - Definition of "Indebtedness"

"INDEBTEDNESS" means with respect to any Person, without duplication, (i) all Obligations of such Person  for borrowed money, (ii) all Obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (iii) all Capitalized Lease Obligations of such Person, **(iv) all Obligations of such Person issued or assumed as the deferred purchase price of property**, all conditional sale obligations and all Obligations under any title retention agreement (but excluding trade accounts payable, leases that are not Capitalized Lease Obligations and other accrued liabilities arising in the ordinary course of business), (v) all Obligations for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction, (vi) guarantees and other contingent obligations in respect of Indebtedness referred to in clauses (i) through (v) above and clause (viii) below, (vii) all Obligations of any other Person of the type referred to in clauses (i) through (vi) which are secured by any lien on any property or asset of such Person, **the amount of such Obligation being deemed to be the lesser of the fair market value of such property or asset or the amount of the**

6

**Obligation so secured**, (viii) all Obligations under Currency Agreements and all Interest Swap Obligations of such Person and (ix) all Disqualified Capital Stock issued by such Person with the amount of all Indebtedness represented by such Disqualified Capital Stock being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, but excluding accrued dividends, if any . . . .

### Section 1.01 - Definition of "Senior Debt"

"SENIOR DEBT" means the principal of, premium, if any, and interest (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable law) on any Indebtedness of the Company, whether outstanding on the Issue Date or thereafter created, incurred or assumed, unless, in the case of any particular Indebtedness, the instrument creating or evidencing the same or pursuant to which the same is outstanding expressly provides that such Indebtedness shall not be senior in right of payment to the Notes. Without limiting the generality of the foregoing, "Senior Debt" shall also include the principal of, premium, if any, interest (including any interest accruing subsequent to the filing of a petition of bankruptcy at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable law) on, and all other amounts owing in respect of, (x) all monetary obligations (including guarantees thereof) of every nature of the Company under the Credit Agreement, including, without limitation, obligations to pay principal interest, reimbursement obligations under letters of credit, fees, expenses and indemnities, (y) all Interest Swap Obligations (including guarantees thereof) and (z) all obligations (including guarantees thereof) under Currency Agreements, in each case whether outstanding on the Issue Date or thereafter incurred. Notwithstanding the foregoing, **"Senior Debt" shall not include**: (i) any Indebtedness of the Company to a Subsidiary of the Company or any Affiliate of the Company or any of such Affiliate's Subsidiaries, (ii) **Indebtedness to, or guaranteed on**

**behalf of, any shareholder, director, officer or employee of the Company** (including, without limitation, amounts owed for compensation, (iii) Indebtedness to trade creditors and other amounts incurred in connection with obtaining goods, materials or services (excluding Purchase Money Indebtedness), (iv) Indebtedness represented by Disqualified Capital Stock, (v) any liability for federal, state, local or other taxes owed or owing by the Company, (vi) that portion of any Indebtedness incurred in violation of the provisions of this Indenture set forth under Section 4.12, (vii) Indebtedness which, when incurred and without respect to any election under Section 1111(b) of Title 11, United States Code, is without recourse to the Company, and (viii) any Indebtedness which is, by its express terms, subordinated in right of payment to any other Indebtedness of the Company.

**SECTION 10.01.  Notes Subordinated to Senior Debt of the Company**

The Company covenants and agrees and the Trustee and each Holder of the Notes, by its acceptance thereof, likewise covenants and agrees, that all Notes shall be issued subject to the provisions of this Article Ten; and the Trustee and **each person holding any Note, whether upon original issue or upon transfer, assignment or exchange thereof, accepts and agrees that the payment of all Obligations on the Notes by the Company shall, to the extent and in the manner herein set forth, be subordinated and junior in right of payment in full in cash or Cash Equivalents of all Obligations on the Senior Debt** (other than Obligations under the Credit Agreement, which must be paid in full in cash); that the subordination is for the benefit of, and shall be enforceable directly by, the holders of Senior Debt, and that **each holder of Senior Debt whether now outstanding or hereinafter created, incurred, assumed or guaranteed shall be deemed to have acquired Senior Debt in reliance upon the covenants and provisions contained in this Indenture** and the Notes.

### Applicable Law

All of the parties agree that the Indenture is unambiguous and the Court concurs. The parties also agree that the Indenture provides[5] that it is to be "governed by and construed" in accordance with New York law, which requires subordination agreements to be given their plain, ordinary meaning without looking for extrinsic evidence. *In re Best Products Co., Inc.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994). Further, when the subordination agreement is unambiguous, as here, the parties' rights are to be determined from the express language of the agreement without resorting to extrinsic evidence or a well-meaning judge's subjective view. *Omni Quartz Ltd. v. CVS Corp.*, 287 F.3d 61, (2d Cir. 1990).

### The Seller Claims

The Seller Noteholders make challenging arguments. First, they argue that the Make-Whole Amounts are Senior Debt under the Indenture and, as such, trigger the Indenture's subordination provisions which gives the Make-Whole Amounts priority. Second, they contend that even if the Make-Whole Amounts are not Senior Debt, the Make-Whole Amounts are entitled to a pro rata share of the Distribution allocated to the Seller Notes.

The Trust counters with a number of equally serious arguments, the gravity of which are not lost on the Court. If the Seller Claimants are correct and the Senior Note Claims are subordinated to the Make-Whole Amounts, the holders of Senior Note Claims will receive a *de minimis* distribution while the Make-Whole Amounts receive $13 million of their $15

---

[5] See Indenture, Section 12.08.

9

million in claims. The decision hinges on whether the Trust is correct that the Make-Whole Amounts do not constitute Senior Debt because the Indenture precludes shareholders from subordinating the Senior Notes, and the Seller Claimants with Make-Whole Amounts were shareholders. The Trust takes the argument further and in a "turn about is fair-play" fashion, contends that the Make-Whole Amounts are themselves subordinated to the Seller Notes.

The Indenture clearly and unambiguously provides that "Senior Debt" does not include "(i) Indebtedness to. . .any shareholder. . . ." Indenture, Section 1.01. Thus, the Indenture provides that a shareholder of Debtors is not a holder of Senior Debt and therefore cannot subordinate the claims of the Senior Notes.

The Seller Claimants argue forcefully that applying the shareholder exclusion to them would be inequitable and would lead to an absurd result, while conceding that the language in the Indenture which excludes shareholders is "unequivocal." The Seller Claimants complain that enforcing the exclusion by applying its literal meaning means that the Indenture "would wipe out legitimate Senior Indebtedness claims of any party to the extent that they ever held as little as one share of [Debtors'] stock." Objection at page 2. The Seller Claimants suggest that the shareholder exclusion in the definition of "Senior Debt" is directed against insiders such as officers and directors, controlling shareholders, subsidiaries and affiliates. The Seller Claimants continue that "very rarely do subordinated note indentures exclude obligations to general shareholders from being considered senior debt," Objection at 13. They base their statement on a review of 150 subordinated note indentures

10

of which only one included a shareholder exclusion and the one was limited to excluding shareholders holding in excess of 15% of the company's voting power.

The Seller Claimants may be correct in their contention that general shareholder exclusions are out of the ordinary.  Nonetheless, the Indenture is unambiguous that all shareholders are excluded from eligibility for "Senior Debt" status.  In order for the Seller Claimants to prevail on their objection, the Court would have to ignore the "any shareholder" exclusion or rewrite the unambiguous language of the Indenture to limit the exclusion to a category of shareholders which would be the product of the Court's creativity.  The Court cannot do as the Seller Claimants implore when the term "any shareholder" leaves no room for doubt as to its meaning.

The Seller Claimants have submitted affidavits[6] to support their arguments.  In the affidavits, the Seller Claimants submit that when Debtors drafted the Indenture they did not negotiate the definition of "Senior Debt" and did not intend to exclude the Make-Whole Amount from the definition of "Senior Debt."  The averments in the affidavits are irrelevant, extrinsic evidence.

The Disclosure Statement, moreover, requires a different conclusion.  If as the Seller Claimants contend the Make-Whole Amounts are senior to the Senior Notes, their subordinating power would have had a material effect on the distributions to C-4 Claimants.

---

[6] The Seller Claimants filed affidavits of Joseph H. Izhakoff, Douglas M. Suliman, Bryan T. Rich and Francis P. Rich.  Mr Izhakoff was Debtors' general counsel when the Indenture was drafted.  The other affiants are Seller Claimants.

Yet, the Disclosure Statement makes no mention of the subordination issue now before the Court.

Finally, the Court notes that while its decision is not result-driven, the parties vigorously argue that the position they advocate leads to the only reasonable and equitable result. Here, "fairness"is in the pen of the proponent and the decision necessarily rests on the Court's objectivity rather than the parties' subjective views.

## Subordination of the Make-Whole Amounts

The Trust is not satisfied to defeat the Seller Claimants' effort to subordinate the Senior Note Claims to the Make-Whole Amounts, but seeks to subordinate the Make-Whole Amounts. The effort is premised upon Section 510 of the Bankruptcy Code which provides for the subordination of claims for damages arising from the purchase or sale of a debtor's security.[7] The Trust urges the Court to apply Section 510 liberally on the authority of the Third Circuit's decision in *In re Telegroup, Inc.*, 281 F.2d 133 (3d Cir. 2002). In *Telegroup*,

---

[7] Section 510 provides in pertinent part, that:

\*    \*    \*

(b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

\*    \*    \*

12

LeHeron Corporation sold its assets to the debtor in exchange for cash and common stock.

*Telegroup* agreed to register the common stock to enable LeHeron to sell the stock if

Telegroup's business failed.  *Telegroup* filed for bankruptcy without registering the stock.

LeHeron filed a proof of claim for the lost value of the stock.  The Third Circuit held that:

> a claim for breach of a provision in a stock purchase agreement
> requiring the issuer to use its best efforts to register its stock and
> ensure that the stock is freely tradeable "arises from" the
> purchase of the stock for purposes of § 510(b), and therefore
> must be subordinated.

*Telegroup*, 281 F.3d at 135.

The Third Circuit carefully reviewed the legislative history and concluded that the

claims were subordinated pursuant to § 510(b), stating:

> The claims in this case seek to recover a portion of claimants'
> equity investment.  In enacting § 510(b), Congress intended to
> prevent disaffected equity investors from recouping their
> investment losses in parity with general unsecured creditors in
> the event of bankruptcy.  Since claimants in this case are equity
> investors seeking compensation for a decline in the value of
> Telegroup's stock, we believe that the policies underlying
> § 510(b) require resolving the textual ambiguity in favor of
> subordinating their claims.  Put differently, because claimants
> retained the right to participate in corporate profits if Telegroup
> succeeded, we believe that § 510(b) prevents them from using
> their breach of contract to recover the value of their equity
> investment in parity with general unsecured creditors. Were we
> to rule in claimants' favor in this case, we would allow
> stockholders in claimants' position to retain their stock and
> share in the corporation's profits if the corporation succeeds,
> and to recover a portion of their investment in parity with
> creditors if the corporation fails.

*Id.* at 142.

The Third Circuit added that its ruling did not mean that every claim of a stockholder requires subordination.  Subordinating claims which lack any causal relationship to the purchase or sale of stock "would not further the policies underlying § 510. . . ."  *Id.* at 144, n.2.

The Trust also relies on *In re Kaiser Group Inten., Inc.*, 260 B.R. 684 (Bankr.D.Del. 2001).  There, the Court was faced with claimants who, as here, had make-whole claims from a merger with debtor whereby the claimants received stock in debtor with an adjustment feature based upon the performance of the stock.  The Court determined that the claims were subordinated pursuant to § 510(b).  The Court explained the ruling as follows:

> The [claimants] assert that their claims are not for damages relating to the issuance of stock in the Debtors.  Instead, they assert claims for breach of the Debtors' contractual obligation to pay cash or issue additional shares to assure the [claimants] the full Merger Value as of March 1, 2001.  However, these same arguments have been made to, and rejected by, many courts. See, e.g., *American Broadcast Syst., Inc. v. Nugent (In re Betacom of Phoenix, Inc.*), 240 F.3d 823 (9th Cir.2001) (claim for breach of contract to issue shares in debtor after audit was subordinated as damages relating to sale of security of debtor); *In re NAL Fin. Group, Inc.*, 237 B.R. 225, 230 (Bankr.S.D.Fla.1999) (breach of contract claim for debtor's failure to register debentures as required by securities purchase agreement was subordinated under § 510(b)); *In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr.S.D.N.Y.1997) (claims for fraudulent inducement and violations of securities acts were subordinated under § 510(b)).
>
> The [claimants] seek to distinguish those cases, and our opinion in *In re International Wireless Communications Holdings, Inc.*, 257 B.R. 739 (Bankr.D.Del.2001), by arguing that in this case the Merger Agreement required that the Debtors pay the

14

difference between the Merger Value and the price of their stock in cash. However, we do not find this distinction significant. The obligation to pay the Merger Value was an obligation undertaken by the Debtors in connection with the issuance of their stock and as a guarantee by the Debtors of the value of their stock. This is clearly a claim based on damages resulting from the sale or purchase of securities of the Debtors.

*Kaiser Group*, 260 B.R. at 687.

The Trust cites, as also being directly on point, *In re Response U.S.A., Inc.*, 288 B.R. 88 (D.N.J. 2003), in which the district court subordinated make-whole claims of claimants who had sold their businesses to debtors for cash and stock. The district court relied upon *Telegroup* for its ruling, and went further to hold that subordination was required because "the claims would not have arisen but for the purchase of [the] stock." *Response*, 288 B.R. at 90-91.

The Seller Claimants refute the Trust's arguments. First, they challenge the application of § 510(b) because this case does not rest upon Debtors' conduct for fraud, securities violations or damages arising from a breach of contract beyond the bargained-for amount. The Seller Claimants thus contend that *Telegroup*, *Response* and *Kaiser Group* are distinguishable and not controlling.

The Court is satisfied that the Make-Whole Amounts are not subject to § 510(b) subordination. The Make-Whole Amounts are not "damages" arising from or caused by fraud, a securities violation or as an obligation which Debtors undertook in connection with the issuance of stock. The Court is persuaded that the Make-Whole Amounts are simply that,

15

namely, claims to recover payment due under agreements of sale of businesses. The Make-Whole Claimants were not investors, nor were they speculating on the success of the Debtors. Instead, the Make-Whole Amounts exist to provide the Seller Claimants with their bargained for sales price. The Make-Whole Amounts are deferred compensation with a formula which serves as a damage buffer.

The Court is further convinced that the Make-Whole Amounts are immune from § 510 subordination. Two of the Seller Claimants entered into stipulations which the Court approved, allowing their claims, including the Make-Whole Amounts, as an "allowed unsecured claim." See D.I. Nos. 3348 and 3349. The Trust's agreement that the claims, including the Make-Whole Amounts, are "allowed unsecured claims" weakens the Trust's effort now to characterize the Make-Whole Amounts as equity interests. *See In re Insilco Technologies, Inc.*, 480 F.3d 212 (3d Cir. 2007) (allowance of lender's claim in a specified amount precluded liquidation trustee's attempt to recharacterize claim as equity). The two claims included in the Settlement Agreements comprise a majority of the Make-Whole Amounts and are additional support for the Court's ruling that § 510(b) is not controlling and does not mandate subordination of the Make-Whole Amounts.

The Make-Whole Amounts are entitled to a distribution prior to a distribution on the Seller Notes which provide that:

> 3.1 Senior Indebtedness. [Debtors] covenants and agrees, and [Seller Noteholder] likewise covenants and agrees. . .that the payment of principal of and interest on this Note. . .are hereby expressly made subordinate and subject in right of payment to.

16

> . .all Senior Indebtedness . . .."Senior Indebtedness means. . .all
> indebtedness, public or private of [Debtors] for money
> borrowed. . . . . The term "indebtedness of [Debtors] for money
> borrowed" means. . . .any deferred obligation for the payment of
> the purchase price of any property or assets. . . .

The foregoing provision establishes that as between the Seller Claims and the Make-Whole

Amounts, the latter are "Senior Indebtedness" under the Seller Notes because the Make-

Whole Amounts are deferred obligations of the purchase price of assets; and as "Senior

Indebtedness," as between the two, the Make-Whole Amounts are senior to the Seller Notes.

Their seniority over the Seller Notes means the Trustee must revise the Distribution formula

to provide for payment in full of the Make-Whole Amounts before payments to the Seller

Notes.

### The Assigned Claims

The issue presented by the Assignee Claimants is whether by operation of a

subordination provision the Assigned Claims are senior to the Senior Note Claims. The

answer will again require the Court to analyze and apply the provisions of the Indenture. As

described earlier, the Assigned Claims arise by assignment of the claims of the Lenders

(Finova, GE-CDFC and GECC) whose claims, in turn, were premised on Debtors' use of

Lenders' money to purchase the Equipment. In return for lending money, the Lenders

received a promissory note, a purchase money security interest in the Equipment and a

Deficiency Claim. The Assigned Claims total approximately $10.22 million. The loans are

governed by financing agreements, as supplemented by settlement agreements between

17

Debtors and Lenders.  The settlement agreements are the determining factor.

### Assignee Claimant's Arguments

The gist of the Assignee Claimant's argument in support of the seniority of the Assigned Claims is as follows:

1.      The original amounts the Lenders loaned to Debtors pursuant to the financing agreements constitute Purchase Money Indebtedness as defined in the Indenture, which provides (Indenture, Section 1.01):

> "PURCHASE  MONEY  INDEBTEDNESS"  means Indebtedness of the Company and its Restricted Subsidiaries incurred in the normal course of business for the purpose of financing all or any part of the purchase price, or the cost of installation, construction or improvement, or property or equipment.

The loans were made for the Equipment and clearly qualify as Purchase Money Indebtedness.

2.      The Settlement Agreements which the Lenders entered into post-petition and post-confirmation established the deficiency claims and Debtors' liabilities remained the same as for Purchase Money Indebtedness.  Accordingly, the deficiency claims are entitled to receive the payments that would have first been paid to the Senior Notes until the deficiency claims are paid in full.

3.      The Lenders and the Assignee Claimants never waived their subordination rights which are enforceable in a chapter 11 case.   *In re 203 North LaSalle Street Partnership*, 246 B.R. 325 (Bankr. N.D. Ill. 2000).  The Settlement Agreements did not eliminate Lenders' inter-creditor rights.

4.    In the Distribution, $8,077,321.41 of the $12,980,789.90 proposed for distribution to Senior Note Claims should be distributed to the Assigned Claims.

### Trust's Argument

The Trust takes a very different view of the Assignee Claimant's recovery.

1.    The Assigned Claims are not Purchase Money Indebtedness because they resulted from the Settlement Agreements, not the prepetition financing transactions.

2.    If the Assigned Claims are deemed to arise from the prepetition financing, they do not qualify as Purchase Money Indebtedness as defined in the Indenture because in the Indenture the amount of any Purchase Money Indebtedness obligation is limited to the lesser of the fair market value of the collateral securing the claim or the amount of the claim.  The Indenture thus provides (Section 1.01):

> "INDEBTEDNESS" means. . .all Obligations. . .which are secured by any lien on any property. . .the amount of such Obligation being deemed to be the lesser of the fair market value of such property or asset or the amount of the Obligation so secured. . . .

The Trust's point is that "Indebtedness" does not include the amount of any deficiency claim (the difference between the amount of the claim and the value of the collateral).  The Trust further relies upon the Settlement Agreements the Debtors entered into with the Lenders before the Lenders assigned of their claims.  The terms of the Settlement Agreements are identical for all the Lenders except for the amounts, as are the Orders authorizing them.  See Orders Authorizing the Debtors to Enter into Master Inventory Financing, Security and

19

Settlement Agreement, (D.I. Nos. 2263, 2273 and 2343). The Orders provide in relevant

part, that:

> \*    \*    \*

> 7.    The Bankruptcy Related Claims shall be allowed
> as an **unsecured nonpriority claim** against the Debtors.
> Subject to the satisfaction or waiver of the conditions precedent
> as set forth in the [Settlement] Agreement, the **Lender shall
> have no other allowed claim against the Debtors in respect
> of the Prepetition Agreements**. [emphasis added.]

The Settlement Agreements define "Bankruptcy Related Claims" as deficiency claims and

other general unsecured claims, and specifically terminate the prepetition agreements

between Debtors and the Lenders.

The Court has fully considered the Assignee Claimant's protest against the Trust's

argument that the Settlement Agreements transformed the nature of the Lenders' claims from

purchase money indebtedness to non-priority unsecured claims. The Assignee Claimant

argues that:

> As noted above, the Settlement Agreements do not change the
> fact that the Assigned Claims addressed therein arose from the
> issue of indebtedness by the Debtors in exchange for the
> delivery of equipment to the Debtors by the equipment
> manufacturers or financers. At the time of issuance, such
> indebtedness was secured by the equipment sold to the Debtors,
> and therefore, as Purchase Money Indebtedness, constituted
> Senior Debt under the Indenture. At the time of settlement, the
> claims representing such secured indebtedness existed with the
> only change being that the Debtors and the claimholders agreed
> on the value of the secured portion of the claim, which was less
> than the face value of the claim, leaving an unsecured deficiency
> claim. However, nothing in the Settlement Agreements changed

20

the nature of such claims as Senior Debt. By the Trust's argument, the Settlement Agreements somehow altered the original contractual relationship that gave rise to the Assigned Claims. The Trust's position, however, is totally unsupported by fact or law and therefore must fail.

The Court does not share the Assignee Claimant's view but, instead, clearly understands that the Settlement Agreements which it approved transformed the Debtors' obligations to the Lenders and the nature of the Lenders' claims. The Settlement Agreements expressly terminated the prepetition agreements with the Lenders and created new rights and obligations. Among the new rights and obligations, the deficiency claims became general unsecured claims - not priority claims, not claims in the nature of purchase money indebtedness. The Settlement Agreements, the Motions for authority to enter into the Settlement Agreements and the Orders are silent as to any priority for Lenders' claims. The Assigned Claims expressly and explicitly are non-priority, general unsecured claims. It is not Lenders as parties to the settlement agreements who are challenging the plain meaning of those agreements. It is black-letter law that as assignee of Lenders' rights, the Assigned Claimant, became a general, non-priority, unsecured claimant and nothing more. The Assignee Claimant, is not entitled to more than the rights Lenders had to assign. 6A C.J.S. *Assignments* § 110 (2007). What Lenders owned and assigned were non-priority, general unsecured claims, and the Assigned Claims are entitled to their pro rata share of the Distribution to other general, unsecured creditors.

21

## CONCLUSION

The Court finds that the Distribution is appropriate and the Court will grant the Motion, except that the Make-Whole Amounts are entitled to priority over the Seller Claims until paid in full. The Distribution must be amended to reflect that the Make-Whole Amounts are *pari passu* with the other allowed claims in Class C-4, but ahead of the Seller Claims. An Order will issue in conformity with this opinion.

Dated: January 9, 2008

KEVIN GROSS, U.S.B.J.

22