# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

*In re*: NationsRent, Inc. *et al.*

| | |
|---|---|
| NR Investments LLC, <br><br> Appellants, <br><br> v. <br><br> NationsRent Liquidating Trust, <br><br> Appellee. | Civil Action No. 08-76 (GMS) <br><br><br><br><br> Bankruptcy Case No. 01-11628 <br> Bankruptcy Appeal No. 08-02 |

## <u>OPENING BRIEF OF APPELLANT NR INVESTMENTS LLC</u>

**For the Appellants:**

**Morris Nichols Arsht & Tunnell LLP**
1201 North Market Street
Wilmington, Delaware 19801
302- 658-9200
Derek C. Abbott (No. 3376)
Thomas F. Driscoll III (No. 4703)

and

**Stroock & Stroock & Lavan LLP**
180 Maiden Lane
New York, New York 10038
212-806-5400
Kristopher M. Hansen
Sherry J. Millman
Abigail M. Beal

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ........................................................... 1

    I.    Nature of the Case........................................................................................ 1

    II.   Course of Proceedings ................................................................................. 3

SUMMARY OF ARGUMENT ................................................................................ 7

STATEMENT OF FACTS (with references to record)............................................ 8

ARGUMENT ..................................................................................................... 13

    I.    Express Language in the Indenture Provides that Subordination Remains Intact Regardless of an Agreement Involving Senior Debt Holders and the Debtor............ 14

    II.   The Settlement Agreements Did Not Transform the Relevant Claims From Senior Purchase Money Indebtedness Claims To Junior General Unsecured Claims .......... 20

RELIEF REQUESTED......................................................................................... 24

CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

In re 203 North LaSalle Street Partnership,
    246 B.R. 325 (Bankr. N.D. Ill. 2000) ...........................................................19, 20

Archer v. Warner,
    538 U.S. 314 (2003).............................................................................................20

In re Bank of New England Corp.,
    364 F.3d 355 (1st Cir. 2004)..............................................................................17

In re Buzzeo,
    365 B.R. 578 (W.D. Pa. 2007) ...........................................................................19

Chemical Bank N.Y. Trust Co. v. Kheel,
    369 F.2d 845 (2d Cir. 1966)...............................................................................17

In re Detrano,
    326 F.3d 319 (2d Cir. 2002)...............................................................................20

In re Kobak,
    280 B.R. 164 (Bankr. N.D. Ohio 2002) .............................................................17

Mellon Bank, N.A. v. Aetna Business Credit, Inc.,
    619 F.2d 1001 (3d Cir. 1980).............................................................................18

In re Permian Producers Drilling, Inc.,
    263 B.R. 510 (W.D. Tex. 2000)..........................................................................20

W. United Life Assurance Co. v. Hayden,
    64 F.3d 833 (3rd Cir. 1995)................................................................................14

## STATUTES

11 U.S.C. § 502(b) ....................................................................................................19

11 U.S.C. § 510..........................................................................................................18

## MISCELLANEOUS

4 Collier on Bankruptcy ¶ 507.02[1] (15th ed., rev. 2007)........................................22

## NATURE AND STAGE OF THE PROCEEDINGS

NR Investments LLC (the "**Appellant**" or "**NR Investments**"), by and through its undersigned counsel, hereby submits this opening brief in support of its appeal taken from the Memorandum Opinion (the "**Opinion**") [App., Ex. 1; Bankr. D.I. 3592][1] and Order (the "**Order**") [App., Ex. 2; Bankr. D.I. 3593] entered by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on January 9, 2008.

## I.    Nature of the Case

This appeal stems directly from the objection filed by NR Investments, the assignee and beneficial holder of certain proofs of claim (claim numbers 3513, 3518, 100002 and 100016 collectively, the "**Relevant Claims**")[2] [App., Ex. 3, 4, 8 fn.1, 9 fn.1] filed against NationsRent, Inc. ("the "**Debtor**"), to the Motion of Liquidating Trust for an Order Approving Initial Distribution to General Unsecured Creditors Pursuant to the NationsRent Liquidating Trust Agreement and Approving a Distribution Matrix (the "**Motion**") [App., Ex. 5; Bankr. D.I. 3555] filed by NationsRent Liquidating Trust (the "**Liquidating Trust**").  The Appellant objected to the distributions set forth in the Motion, because the proposed distributions violated (i) the subordination provisions in that certain Indenture, dated as of December 11, 1998, with NationsRent, Inc. as Issuer and The Bank of New York as Trustee (the "**Indenture**")[App., Ex. 6; Bankr. D.I. 3567-1] and issued in connection with the 10 3/8% Senior Subordinated Notes due

---

[1]    References to the Appendix to the Appellant's brief, filed contemporaneously herewith, are as follows: "App., Ex.___." References to the Bankruptcy Court docket, are herein referred to as "Bankr.D.I.___."

[2]    The Appellant holds claim numbers 3513, 3518, 100002 and 100016 (the "**Proofs of Claim**"), which have been allowed in the aggregate amount of $10,216,629.98.  The Objection related to only a portion of Proof of Claim number 3518, the $3,383,266.90 amount as indicated in Section III of the Proof of Claim number 3518.  Therefore, for purposes of this appeal, all references to Proof of Claim number 3518 will refer only to the $3,383,266.90 portion of that claim.  Claim number 100002 is a result of a settlement between the Debtor and GE Commercial Distribution Finance [D.I. 2263], transferred to the Appellant.  Claim number 100016 is a result of a settlement between the Debtor and Finova Capital Corporation [D.I. 2343], transferred to the Appellant.

NY 71218910

2008 (the "**Senior Sub Notes**") and (ii) section 510(a) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**").

The Appellant holds claims against the Liquidating Trust for purchase money indebtedness, which are deemed "Senior Debt" under the terms of the Indenture and are entitled to seniority over the claims of Senior Sub Notes. On January 9, 2008, the Bankruptcy Court issued the Opinion and Order, whereby it determined that when the Relevant Claims were issued, they constituted purchase money indebtedness to which the Senior Sub Notes were expressly subordinated, but that later settlement agreements entered into between the holders of the Relevant Claims and the Debtor, "transformed the nature" of the Relevant Claims into general unsecured claims no longer entitled to the benefit of the subordination provisions contained in the Indenture. However, nothing within these settlement agreements "transformed" the nature of the claims – in fact, the purpose of the settlement agreements was to reflect an agreement between the Debtor and certain lender parties as to the value of the secured portion of the Relevant Claims, based on the depreciated market value of the underlying security and to preserve the remaining deficiency portion as an unsecured claim. In reaching its conclusion that the settlement agreements changed the subordination rights of the Relevant Claims, the Bankruptcy Court ignored the most critical fact about the subordination provisions in the Indenture (and subordinated indebtedness generally): they govern the relationship between creditors, and not the Debtor and its creditors. Indeed, the Indenture expressly states that the subordination of the Senior Sub Notes to Senior Debt remains intact regardless of any agreement between the Debtor and Senior Debt creditors. Unfortunately, the Bankruptcy Court never took the specific language of the Indenture and the general legal principles regarding subordination into consideration when arriving at its conclusion that a senior claim can be altered into a *pari*

NY 71218910

*passu* claim without the express agreement of the Senior Debt holders. The Bankruptcy Court also ignored the simple factual premise that the Relevant Claims were created through the financing of equipment to run the Debtor's business and nothing in the settlement agreements changed the genetic makeup of those claims as purchase money indebtedness — in fact, it was just the opposite as the settlement agreements expressly preserved the underlying nature of the Relevant Claims. In so doing, the Bankruptcy Court upheld the Liquidating Trust's proposed Distribution Scheme (as defined below) and deprived the Appellant of its contractual right to be paid in full prior to any distribution to the holders of the Senior Sub Notes. The Bankruptcy Court erred as a matter of law.

## II.    Course of Proceedings

In and around 1998, the Debtors entered into a series of agreements with owners of regional equipment rental enterprises to acquire the assets, properties and businesses of such enterprises. In connection with these acquisitions, the shareholders of the selling enterprises received, among other things, promissory notes (the **"Seller Notes"**) [App., Ex.7; Bankr. D.I. 3565-21] from the Debtor.

On December 11, 1998, the Debtor issued the Senior Sub Notes under the Indenture. The Indenture provided that certain debt, including "purchase money indebtedness," was senior to the Senior Sub Notes.

In order to obtain certain equipment (the **"Equipment"**) to operate the Debtors' business, the Debtor entered into secured financing agreements (the **"Financing Agreements"**) [App., Ex. 8-11; Bankr. D.I. 3567-8, 3567-9, 3567-10 & 1851] with certain lenders, Finova Capital Corporation, GE Commercial Distribution Finance Corp, FE Capital Corporation, and

New Holland Credit Company, LLC[3] (collectively, the "**Lenders**"). The Financing Agreements were structured as purchase money indebtedness debt agreements, giving the Lenders a security interest in the Equipment, to secure the repayment of the amount financed by the Lenders to purchase the Equipment.

On December 17, 2001, the Debtor and several of its direct and indirect affiliates (collectively, the "**Debtors**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "**Petition Date**").

The Debtors continued to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code until June 13, 2003.

On January 10, 2002, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Official Committee of Unsecured Creditors**") pursuant to section 1102(a)(1) of the Bankruptcy Code.

On February 11, 2003, the Debtors filed their First Amended Joint Plan of Reorganization of NationsRent, Inc. and Its Debtor Subsidiaries (the "**Plan**") [App., Ex. 12; Bankr. D.I. 1824] and the Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code for the First Amended Joint Plan of Reorganization of NationsRent, Inc. and Its Debtor Subsidiaries (the "**Disclosure Statement**") [App., Ex. 13; Bankr. D.I. 1825]. As stated below, both the Plan and the Disclosure Statement include provisions that preserve the subordination rights among creditors. (Plan, §XI(C))[4]; (Discl. St., p.58)[5]. On May 14, 2003, the Bankruptcy

---

[3]   New Holland Credit Company, LLC was the original owner of claim no. 3513, which was transferred to CNH America LLC, and then to Appellant.

[4]   References to the "Plan, ___ " are to the Plan [App., Ex. 12; Bankr. D.I. 1824].

[5]   References to "Discl. St., p.__" are to the Disclosure Statement [App., Ex. 13; Bankr. D.I. 1825].

NY 71218910

Court entered the Order Confirming First Amended Joint Plan of Reorganization of NationsRent, Inc. and Its Debtor Subsidiaries (the "**Confirmation Order**") [App., Ex.14; Bankr. D.I. 2151].

In May of 2003, the Debtor and the Lenders entered into certain Master Equipment Financing, Security, and Settlement Agreements and that certain Master Inventory Financing, Security and Settlement Agreement (together, the "**Settlement Agreements**") [App., Ex. 8-11; Bankr. D.I. 3567-8, 3567-9, 3567-10 & 1851]. The Settlement Agreements were entered into in order to settle the value of the secured portion of the Lenders' claims, which were less than the face value of the original secured indebtedness due to the depreciation of the Equipment that was the collateral for the loans. Thus, under the Settlement Agreements, the secured debt issued under the Financing Agreements was reduced to an amount equal to the depreciated market value of the Equipment and the Lenders (or their successors in interest) retained their purchase money security interests in the Equipment (and the proceeds thereof). The Settlement Agreements also specifically preserved the balance of the Lenders' claims as deficiency claims equal to the difference between the original amount borrowed by the Debtor under each Lender's Financing Agreement and the reduced secured debt amount set forth in such Lender's Settlement Agreement.[6] The Settlement Agreements were filed with the Bankruptcy Court, with notice to the Official Committee of Unsecured Creditors. The Official Committee of Unsecured Creditors did not object to the Settlement Agreements, and the Settlement Agreements were approved by the Bankruptcy Court in June and August of 2003.

On or about June 13, 2003, the Debtors' Plan went effective.

---

[6]    The Finova Capital Corporation ("**Finova**") Relevant Claim (which is defined in the Finova Settlement Agreement as the "Bankruptcy Related Claim") is allowed in the amount of $2,242,160.00 and the GE-Commercial Distribution Finance Corp. ("**GE-CDFC**") Relevant Claim (which is defined in the GE-CDFC Settlement Agreement as the "Bankruptcy Related Claim") is allowed in the amount of $2,823,799.70, and the GE Capital Corp. ("**GECC**") Relevant Claim (which is defined in the GECC Settlement Agreement as the "Retained Claims") is allowed in the amount of $3,383,266.90. The CNH America LLC ("**CNH**") Relevant Claim is allowed in the amount of $1,767,403.38.

5

On or about April 30, 2007, the Liquidating Trust filed the Motion seeking to obtain the Bankruptcy Court's approval of an initial distribution to beneficiaries of the Liquidating Trust in accordance with the terms the Motion and distribution matrix contained therein (together, the "**Distribution Scheme**"). The Distribution Scheme provides for a recovery for the Senior Sub Notes of approximately 7% as compared to a recovery for other unsecured creditors of approximately 4.4%, including the Relevant Claims to which the Senior Sub Notes were expressly subordinated. To arrive at these distribution percentages, the Liquidating Trust gave effect to the subordination provisions contained in the Seller Notes for the benefit of the Senior Sub Notes, but did not give effect to the subordination contained in the Indenture for the benefit of claims constituting Senior Debt under the Indenture. Thus, the recovery that would have been paid to the Seller Notes is being paid over to the Senior Sub Notes under the Distribution Scheme, but the distributions to be made to the Senior Sub Notes is not being paid over to the holders of claims constituting Senior Debt.

On August 23, 2007, NR Investments filed its Objection to the Motion (the "**Objection**") [App., Ex. 15; Bankr. D.I. 3567] stating that the Distribution Scheme violated the Indenture and section 510 of the Bankruptcy Code. The Liquidating Trust filed its Reply to the Objection (the "**Reply**") [App., Ex. 16; D.I. 3575] on October 18, 2007. NR Investments filed a Sur-Reply to the Reply [App., Ex. 17; Bankr. D.I. 3577] on October 26, 2007.

On January 9, 2008 the Bankruptcy Court issued the Opinion and Order granting the Motion.

On January 10, 2008, NR Investments filed a timely notice of appeal [App., Ex. 18; Bankr. D.I. 3595].

NY 71218910

On March 13, 2008, the Bankruptcy Court entered a Stipulation [App., Ex. 19; Bankr. D.I. 3606] between NR Investments and the Liquidating Trustee, to stay the Order, pending a final order on this Appeal.

On March 18, 2008, the Bankruptcy Court entered an Order Clarifying the Order and Opinion [App., Ex. 20; Bankr. D.I. 3609], which had no impact on this Appeal or the arguments presented by the Appellants.

## SUMMARY OF ARGUMENT

1.        The Bankruptcy Court erroneously approved the Motion by ignoring the express subordination provisions contained in the Indenture and the general legal nature of contractual subordination.   Further, the Bankruptcy Court misinterpreted the effect of the Settlement Agreements on the Relevant Claims by holding that the Relevant Claims were "transformed" into junior claims, and that somehow subordination provisions contained in the Indenture were waived, even though the Settlement Agreements did not provide for a waiver of the Relevant Claims' subordination rights, and in fact, preserved the rights of the holders of the Relevant Claims.

2.        The Relevant Claims constitute Purchase Money Indebtedness (as defined in the Indenture) and thus are defined as Senior Debt under the Indenture.   As a result, the Relevant Claims must be paid in full before any distribution may be made to the Senior Sub Notes from the Liquidating Trust. The Distribution Scheme failed to provide for the effect of the contractual subordination of the Senior Sub Notes to the Relevant Claims, however, such scheme did manage to apply the contractual subordination in the Seller Notes for the benefit of the Senior Sub Notes, such that all distributions that would have otherwise been made to the Seller Notes are being made to the Senior Sub Notes. After the Appellant objected to the Distribution

7

Scheme, the Liquidating Trust asserted that the Relevant Claims were not Senior Debt entitled to priority in payment over the Senior Sub Notes because the Settlement Agreement between the Debtors and the original holders of the Relevant Claims operated as a novation, changing the Relevant Claims from PMI claims to garden variety general unsecured claims no longer entitled to the benefit of the subordination provisions of the Indenture. The Bankruptcy Court agreed with the Liquidating Trust, finding that the Settlement Agreements removed the Relevant Claims from the definition of Senior Debt.

3.        In reaching its conclusion, the Bankruptcy Court ignored express language in the Indenture providing that the subordination of the Senior Sub Notes remained regardless of any agreements entered into by the Debtors and the holders of Senior Debt. The Bankruptcy Court also misread the Settlement Agreements and ignored the general legal principles of contractual payment subordination, even though it recognized them with respect to the subordination of the Seller Notes.

## STATEMENT OF FACTS (WITH REFERENCES TO RECORD)

The Bankruptcy Court's Opinion leaves no room for doubt that prior to entering into the Settlement Agreements, the Relevant Claims constituted Senior Debt under the Indenture as purchase money indebtedness claims. Pursuant to the Indenture, the Senior Sub Notes are subordinated and junior in right of payment to all Senior Debt.

Further, the Indenture specifically provides that regardless of actions between the Debtors and other creditors, the subordination provisions in the Indenture will continue in effect:

> Without in any way limiting the generality of this Section 10.10, the holders of Senior Debt may, at any time and from time to time, without the consent of or notice to the Trustee, without incurring responsibility to the Trustee or the Holders of the Notes *and without impairing or releasing the subordination provided in this Article 10 or the obligations hereunder of the Holders of the Notes to the holders of the Senior Debt*, do any one or more of the

NY 71218910

following: (i) change the manner, place, or terms of payment or extend the time of payment of, or renew or alter, Senior Debt, or otherwise amend or supplement in any manner Senior Debt, or any instrument evidencing the same or any agreement under which Senior Debt is outstanding; (ii) sell, exchange, release, foreclose against or otherwise deal with any property pledged, mortgaged or otherwise securing Senior Debt; (iii) release any Person liable in any manner for the payment [of][or] collection of Senior Debt; and (iv) exercise or refrain from exercising any rights against the Company, any Subsidiary thereof and any other Person.

(Ind. § 10.10)[7] (emphasis added).

Prior to the Petition Date, the Debtor entered into the Financing Agreements with the Lenders (and/or the lenders' predecessors-in-interest) in order to obtain the Equipment to operate the Debtors' business. (Obj. ¶5)[8]. The Equipment could not be obtained without granting the Lenders a security interest in the Equipment, and thus, the Financing Agreements were structured as purchase money secured debt agreements. (Obj. ¶5). Pursuant to their respective Financing Agreements, each Lender retained a security interest in the equipment held by the Debtor to secure the repayment of the amount financed by the Lenders and used by the Debtor to purchase such Equipment. (Obj. ¶6). The Financing Agreements were entered into after the date of the Indenture, such that the Lenders would have been aware that their debt constituted "Senior Debt" over the Senior Sub Notes. The Lenders filed proofs of claim in the Debtor's chapter 11 case to preserve their claims under the Financing Agreements. (Obj. ¶5).

After the Petition Date, the Debtor commenced discussions with each of the Lenders in order to renegotiate the terms of the Financing Agreements. (Obj. ¶6). As a result of the depreciation of the Equipment and the general decline in market values of equipment, the Lenders' original claims were under-secured since the value of the Equipment underlying such

---

[7]    References to "Ind. §___" are to the Indenture [App., Ex.6; Bankr. D.I. 3567-1].

[8]    References to "Obj. ¶___" are to the Objection [App., Ex. 15; Bank. D.I. 3567].

9

claims was less than the remaining obligations to the Lenders. Accordingly, section 506(a) and other provisions of the Bankruptcy Code, the Lender as holder of an under-secured claim would be entitled to the return of the Equipment or to be paid the market value of such Equipment, plus a general unsecured claim for the difference between the original obligation and the secured portion thereof. In May of 2003, the Debtor and the Lenders entered into the Settlement Agreements, approved by the Bankruptcy Court, pursuant to which the Debtor and the Lenders agreed on the value of the secured portion of the claims based on the depreciated market value of the Equipment, and the Lenders retained their purchase money security interest in the Equipment (and the proceeds thereof). (Obj. ¶6). In doing so, the Debtors were able to retain the Equipment for use in its operations, and the Lenders were able to retain a security interest in the Equipment at the current market value. In addition, the Settlement Agreements specifically preserved the deficiency claim equal to the difference between the original amount owed under each Lender's Financing Agreement and the restated secured amount set forth in the Lender's Settlement Agreements.[9] (Obj. ¶6). It is clear that prior to the Settlement Agreements, the Lenders' entire claims (the secured portion and the deficiency portion) were entitled to the benefits of the subordination provisions of the Indenture since they constituted Senior Debt. Nothing in the Settlement Agreements altered in any way the relationship among the Debtor's creditors, specifically the Lenders and the holders of Senior Sub Notes. The Settlement Agreements simply allowed the Debtor and the Lenders to agree on the underlying value of the Equipment in order to establish the secured portion of the Lenders' claims, thus avoiding costly litigation. By

---

[9]    The Relevant Finova Claim (which is defined in the Finova Settlement Agreement as the "Bankruptcy Related Claim") is allowed in the amount of $2,242,160.00. The Relevant GE-CDFC Claim (which is defined in the GE-CDFC Settlement Agreement as the "Bankruptcy Related Claim") is allowed in the amount of $2,823,799.70. The Relevant GECC Claim (which is defined in the GECC Settlement Agreement as the "Retained Claims") is allowed in the amount of $3,383,266.90. The Relevant CNH Claim is allowed in the amount of $1,767,403.38.

specifically preserving the deficiency claim and not waiving any of the rights associated

therewith, the Settlement Agreements preserved the nature of that claim as Senior Debt.

Section 1.1 of the Settlement Agreements is entitled "Termination and Release" and

provides that the Financing Agreements were deemed terminated as of the effective date of the

Settlement Agreements.    (SA §1.1)[10].   The Relevant Claims (defined in the Settlement

Agreements as "Bankruptcy Related Claims") are expressly carved-out from application of the

"Termination and Release" section:

> As of the Effective Date, Borrowers and Lenders agree that the
> Pre-Petition Agreements are terminated and that no Person will be
> entitled to any rights or claims arising under the Pre-Petition
> Agreements; ***provided, however, that such termination shall not
> affect Lender's Bankruptcy Related Claims***…

(SA § 1.1) (emphasis added).[11]   In addition, Section 1.4 of the Settlement Agreements, entitled

"Limitation" states:

> Notwithstanding anything in this Agreement to the contrary, the
> provisions of Sections 1.1 [Termination and Release], 1.2 [Release
> of Borrowers] and 1.3 [Release of Lender] ***do not apply*** to any and
> all Claims arising under this Agreement or to the ***Bankruptcy
> Related Claims***.

(SA § 1.4).  After the execution of the Settlement Agreements, the Lenders assigned the Relevant

Claims to Appellants pursuant to assignment of claim agreements.  (Obj. ¶10, fn.6).

On or about April 30, 2007, the Liquidating Trust filed the Motion seeking to obtain

the Bankruptcy Court's approval of an initial distribution to beneficiaries of the Liquidating

Trust in accordance with the terms the Distribution Scheme.  (DM)[12].   The Motion and the

---

[10]    References to "SA §__" are to the Settlement Agreements [App., Ex. 8-11; Bankr. D.I. 3567-8, 3567-9, 3567-10 & 1851].

[11]    Certain Settlement Agreements contain non-material variations of this language.

[12]    References to "DM" are to the Motion [App., Ex. 5; Bankr. D.I. 3555].

NY 71218910

Distribution Scheme provide for a recovery for the Senior Sub Notes of approximately 7% as compared to a recovery for other unsecured creditors of approximately 4.4%, but fail to give effect to the subordination provisions of the Indenture by subordinating the Senior Sub Notes to the Relevant Claims.   (Obj. ¶7).   The Liquidating Trust gave effect to the subordination provisions contained in the Seller Notes, for the benefit of the Senior Sub Notes, but failed to give effect to the subordination in the Indenture, to benefit the claims constituting Senior Debt. Thus, while the Distribution Scheme provides that the recovery that would have been paid to the Seller Notes is instead paid over to the Senior Sub Notes, it does not provide that the distributions to be paid to the Senior Sub Notes are instead to be paid over to the holders of Senior Debt claims.

On January 9, 2008 the Bankruptcy Court issued the Opinion and Order to which the Appellant and the Liquidating Trust agreed to stay the effect of until the conclusion of this appeal.  (Op., Ord.)[13]  In the Opinion, the Bankruptcy Court ignores the express preservation of subordination rights and holds that the Settlement Agreements "transformed" the nature of the Relevant Claims.  The Court held:

> The Court . . . clearly understands that the Settlement Agreements which it approved transformed the Debtors' obligations to the Lenders and the nature of the Lenders' claims.  The Settlement Agreements expressly terminated the prepetition agreements with the Lenders and created new rights and obligations.  Among the new rights and obligations, the deficiency claims became general unsecured claims – not priority claims, not claims in the nature of purchase money indebtedness.  The Settlement Agreements, the Motions for authority to enter into the Settlement Agreements and the Orders are silent as to any priority for the Lenders' claims.  The [Relevant] Claims expressly and explicitly are non-priority, general unsecured claims.  It is not Lenders as parties to the Settlement Agreements who are challenging the plain meaning of

---

[13]   References to "Op." are to the Opinion [App., Ex. 1; Bankr. D.I. 3592].  References to "Ord." are to the Order [App., Ex. 2; Bankr. D.I. 3593].

those agreements. It is black-letter law that as assignee of Lenders' rights, the Assigned Claimant, is not entitled to more than the rights Lenders had to assign. 6A C.J.S. Assignments §110 (2007). What Lenders owed and assigned were non-priority, general unsecured claims, and the [Relevant] Claims are entitled to their pro rata share of the Distribution to other general unsecured creditors.

(Op., 21).

## ARGUMENT

The Bankruptcy Court erroneously approved the Motion by ignoring the express subordination provisions contained in the Indenture, Settlement Agreements, Disclosure Statement, Plan and by misinterpreting the effect of the Settlement Agreements on the nature of the Relevant Claims.

Provisions in the Indenture, Settlement Agreement, Disclosure Statement, and Plan, as well as section 510 of the Bankruptcy Code, all preserve subordination rights with respect to agreements between debtors and creditors. Under these provisions, the subordination rights of parties are preserved, such that a senior claim cannot be transformed into a junior claim without an express agreement of the senior claim holder.

The Relevant Claims constitute Purchase Money Indebtedness (as defined in the Indenture) and thus are defined as Senior Debt under the Indenture. As a result, the Relevant Claims must be paid in full before any distribution may be made to the Senior Sub Notes from the Liquidating Trust. The Distribution Scheme failed to provide for the effect of the contractual subordination of the Senior Sub Notes to the Relevant Claims. Ironically, the Distribution Scheme does provide, pursuant to the express language in the Indenture, for the subordination of the Seller Note Claims to the Senior Sub Notes. Thus the Liquidating Trust has arbitrarily chosen to correctly apply the subordination rights under the Indenture to provide for senior

13

recovery to the Senior Sub Notes over the Seller Notes, but has failed to recognize the subordination rights of the Relevant Claims over the Senior Sub Notes.

Additionally, the Bankruptcy Court incorrectly held that the Relevant Claims were not Senior Debt entitled to priority in payment over the Senior Sub Notes because the Settlement Agreements between the Debtors and the original holders of the Relevant Claims "transformed" the underlying nature of the Relevant Claims from senior PMI claims to junior general unsecured claims no longer entitled to the benefit of subordination.

By granting the Motion, approving the Distribution Scheme and authorizing distributions to be made in accordance therewith, the Bankruptcy Court approved the Liquidating Trust's violation of the Indenture and section 510 of the Bankruptcy Code, thereby infringing upon the Appellant's contractual subordination rights and depriving the Appellant of funds to which it is rightfully entitled as a holder of Senior Debt, as defined under the Indenture.

The Appellant requests that this Court reverse the Bankruptcy Court's Opinion and Order such that the Appellant is paid in full with respect to the Proofs of Claim before the holders of Senior Sub Notes claims (the "**Senior Sub Note Holders**") recover anything.

I.      **Express Language in the Indenture Provides that Subordination Remains Intact Regardless of an Agreement Involving Senior Debt Holders and the Debtor**

The Indenture, as well as the Settlement Agreements, Plan and Disclosure Statement all contain language that expressly preserves subordination rights of creditors.

It is the terms of the Indenture that dictate the seniority between the holders of Senior Debt and the holders of Senior Sub Notes.  Indeed, the Indenture preserves the subordination rights of holders of Senior Debt, even in the incredible event where the holders of Senior Debt release the Debtor from repaying it.

> Without in any way limiting the generality of this Section 10.10,
> the holders of Senior Debt may, at any time and from time to time,

without the consent of or notice to the Trustee, without incurring responsibility to the Trustee or the Holders of the Notes *and without impairing or releasing the subordination provided in this Article 10 or the obligations hereunder of the Holders of the Notes to the holders of the Senior Debt*, do any one or more of the following: (i) change the manner, place, or terms of payment or extend the time of payment of, or renew or alter, Senior Debt, or otherwise amend or supplement in any manner Senior Debt, or any instrument evidencing the same or any agreement under which Senior Debt is outstanding; (ii) sell, exchange, release, foreclose against or otherwise deal with any property pledged, mortgaged or otherwise securing Senior Debt; (iii) release any Person liable in any manner for the payment [of][or] collection of Senior Debt; and (iv) exercise or refrain from exercising any rights against the Company, any Subsidiary thereof and any other Person.

(Ind. § 10.10) (emphasis added).

More importantly, according to *the plain language of the Indenture*, the holders of Senior Debt were permitted to "renew or alter" and "amend or supplement" their agreements with the Debtor and transfer their Relevant Claims without "impairing or releasing" the benefits of subordination provisions of the Indenture. When contract terms are clear and unambiguous, a court must interpret the contract in accordance with its plain meaning. W. United Life Assurance Co. v. Hayden, 64 F.3d 833, 837 (3rd Cir. 1995) (citations omitted).

The Debtor's Plan and the Confirmation Order also specifically preserve all subordination among the Debtors' creditors, stating as follows:

Except as set forth in Section III.B.1.a,[14] the classification and manner of satisfying Claims and Interests under the Plan does not take into consideration subordination rights, and *nothing in the Plan or Confirmation Order shall affect any subordination rights that a holder of a Claim may have with respect to any distribution* to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

(Plan, §XI(C)); (Confirmation Order, 14-15) [App., Ex.14; Bankr. D.I. 2151].

---

[14]  Section III.B.1.a addresses the holders of "Allowed Bank Loan Claims" under the Plan and does not apply here.

The Settlement Agreements themselves preserve the senior status of the Relevant Claims, and the Settlement Agreements do not affect or alter in any way the subordination provisions of the Indenture. The Settlement Agreements were reached between the Debtor and the Lenders to settle the claims due under the Financing Agreements, which claims were secured by the Equipment. Although the Debtor sought to settle these claims after the Petition Date, the Equipment was still useful in the operation of the Debtor's business, and the Equipment had significantly depreciated in value such that the Lenders did not want to possess the Equipment and have to make a resale to recover a portion of their claims. Thus, in the Settlement Agreements, the Debtor and Lenders agreed to write down the secured portion of the claims to the current market value of the Equipment and grant an unsecured deficiency claim to the Lenders for the remainder of the claims under the Financing Agreements. Nothing in the Settlement Agreements removed the status of the Relevant Claims from the scope of Senior Debt. Instead, the Settlement Agreements maintained the senior status of the Relevant Claims to the Senior Sub Notes. To find otherwise would mean that the holders of purchase money indebtedness would have waived their right to recover the full amount of their claims (and the amounts loaned to the Debtors) in the event that there was a partial distribution to unsecured creditors in the Chapter 11 Cases – an odd result.

In the Settlement Agreements, the Lenders did not give up their original senior purchase money indebtedness status and waive their right to benefit from the subordination provisions contained in the Indenture. The Settlement Agreements altered what the Debtor had to pay upfront to continue its use of the Equipment for the operation of its reorganized business, and in exchange, the Lenders avoided having to take possession of the Equipment in order to

16

resell the Equipment in hopes of recovering a portion of the debt owed under the Financing Agreements.

Thus, due to the terms of the Settlement Agreements, the seniority rights of the Relevant Claims are preserved, and the Settlement Agreements do not affect or alter in any way the subordination provisions of the Indenture. Indeed, the Settlement Agreements protect the senior status of the Relevant Claims in two separate provisions:

> As of the Effective Date [of the Settlement Agreement], Borrowers and Lenders agree that the Pre-Petition Agreements are terminated and that no Person will be entitled to any rights or claims arising under the Pre-Petition Agreements; ***provided, however, that such termination shall not affect Lender's Bankruptcy Related Claims***…

(SA § 1.1) (emphasis added). In addition, Section 1.4 of the Settlement Agreements, entitled "Limitation" states:

> Notwithstanding anything in this Agreement to the contrary, the provisions of Sections 1.1, 1.2 and 1.3 ***do not apply*** to any and all Claims arising under this Agreement or to the ***Bankruptcy Related Claims***.

(SA § 1.4). As such, the Settlement Agreements specifically carved-out the Relevant Claims (referred to as Bankruptcy Related Claims in the Settlement Agreements) from the provisions of the Settlement Agreements. Accordingly, the Relevant Claims clearly retained their senior status as claims derived from purchase money secured debt agreements and therefore constitute Indebtedness and Senior Debt under the Indenture.[15]

---

[15] The Liquidating Trustee has argued that the fact that the Relevant Claims are "general unsecured claims" under the Settlement Agreements and pursuant to the Plan is dispositive. However, as described below, the fact that the Relevant Claims are general unsecured claims does nothing to affect the seniority of these claims relative to other general unsecured claims. General unsecured creditors such at the Relevant Claim holders are still entitled to their subordination rights, and nothing in the Settlement Agreements affects the seniority status of the Relevant Claims, nor do the Settlement Agreements contain any waiver of the subordination rights. In fact the Senior Sub Note claims are also general unsecured claims and yet the Liquidating Trustee seems to have no trouble giving effect to the subordination provisions contained in the Seller Notes for the benefit of the Senior Sub Notes.

NY 71218910

This result is consistent with the policy of subordination as a contractual arrangement. Subordination should remain intact so that the original benefit of the bargain between creditor parties is kept in place. "The result [of keeping subordination rights intact] promotes positive economic benefits and fosters commercial transactions and economic efficiency." See In re Kobak, 280 B.R. 164, 170 (Bankr. N.D. Ohio 2002).

The language of the Indenture, Settlement Agreements, Plan and Disclosure Statement all enforce the concept of contractual subordination rights. In addition, section 510(a) of the Bankruptcy Code provides that subordination rights between creditors are unaffected by a bankruptcy filing and are strictly applied therein. In addressing the continuing effectiveness of subordination agreements, courts have noted that "[e]nforcing such agreements was necessary to prevent junior creditors from receiving windfalls after having explicitly agreed to accept less lucrative payment agreements. Equity dictated enforcement because '[e]quality among creditors who have lawfully bargained for different treatment is not equity but its opposite." In re Bank of New England Corp., 364 F.3d 355, 362 (1st Cir. 2004) (quoting Chem. Bank N.Y. Trust Co. v. Kheel, 369 F.2d 845, 848 (2d Cir. 1966)). Thus the subordination provisions in the Indenture, which specifically preserve the seniority rights of the Relevant Claims, support the importance of the preservation of subordination rights. Indeed, the terms of the Plan, section 510(a) and the Settlement Agreements themselves keep in place the very standard and necessary effect of subordination that ensures that a creditor who subordinated itself to another does not ever get around the effect of its binding contract unless it enters into an agreement with the holder of a senior claim.

Finally, the seniority status of the Relevant Claims as Senior Debt remains intact because no party has waived the subordination rights of the Relevant Claims. Under section 510

18

of the Bankruptcy Code, "a subordination agreement is enforceable in a [chapter 11] case to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510. Unless parties to a subordination agreement expressly waive their subordination rights, such subordination rights should be recognized and enforced in the context of a chapter 11 case. Further, "[i]n the context of complex commercial dealings, courts must be careful not to take single acts or isolated correspondence out of the context of the entire situation and construe them as separate contracts or waivers of important contract rights unless such an intent is explicitly and clearly expressed." Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1015 (3d Cir. 1980); See also, e.g., In re 203 North LaSalle Street Partnership, 246 B.R. 325 (Bankr. N.D. Ill. 2000).

Since the Relevant Claims fall squarely within the Indenture's definition of Indebtedness and Senior Debt, such claims must be accorded the status provided for therein, namely seniority in right of payment to the Senior Sub Note Holders. Thus, by operation of the express provisions of the Indenture, distributions that would have been paid to the Senior Sub Note Holders must be turned over to the Appellant until the Relevant Claims are paid in full.

NY 71218910

II.    **The Settlement Agreements Did Not Transform the Relevant Claims From Senior Purchase Money Indebtedness Claims To Junior General Unsecured Claims**

The Debtors utilized the Lenders' money obtained pursuant to the Financing Agreements to purchase Equipment needed to operate its businesses. In exchange for providing such financing, each of the Lenders obtained and/or retained a promissory note and their purchase money security interest in the Equipment. Without question, the amounts owed to the Lenders under the Financing Agreements constitute Purchase Money Indebtedness because such amounts constitute indebtedness incurred in the normal course of business to finance the purchase price of equipment.

Because the claims arising under the Financing Agreements are for Purchase Money Indebtedness, the fact that the Equipment securing such claims declined in value, leaving portions of the claims unsecured, does not affect the nature of how these claims arose. Further, the Settlement Agreements represent agreements reached between the Debtors and the Lenders to settle on the value of the secured portions of the Lenders' claims, which were less than the face value of the original secured indebtedness, and establish the unsecured portion, the Relevant Claims. However, nothing in the Settlement Agreements affected the nature the Relevant Claims as Senior Debt; nor did the Settlement Agreements alter the original contractual relationship that gave rise to the Relevant Claims. See In re 203 North LaSalle Street Partnership, 246 B.R. 325, 329-330 (Bankr. N.D. Ill. 2000) (stating that "a deficiency claim is simply part of the general class of "liabilities" arising under [a loan] as to which senior status is accorded….However, there is no requirement under the Bankruptcy Code that any special degree of explicitness is required to accord senior status to a deficiency claim"). Bankruptcy law and myriad cases support this position. See 11 U.S.C. § 502(b) (claims are determined as of the date of the filing of the petition); In re Buzzeo, 365 B.R. 578, 583   (W.D. Pa. 2007) (court rejects argument that

20

"Settlement Agreement constitutes a novation of the Plaintiffs' original common law fraud claims and transfers [the claim] . . . into a dischargeable contractual claim."); see also Archer v. Warner, 538 U.S. 314 (2003) (underlying nature of fraud claim not changed due to settlement); In re Detrano, 326 F.3d 319 (2d Cir. 2002) (settlement of fraud claim did not change the nature of the claim from fraud to contract claim); In re Permian Producers Drilling, Inc., 263 B.R. 510, 520 (W.D. Tex. 2000) (with respect to section 510(b), "[t]he fact that [the] claim is predicated on the settlement agreement does not alter the fact that the underlying claim is a claim for damages arising from the purchase of a security").

Neither the Appellant nor the Lenders waived their subordination rights as holders of the Relevant Claims. As mentioned above, under Section 10.01 of the Indenture, the payment of all obligations on the Senior Sub Notes is subordinated and junior in right of payment to the prior payment in full of all obligations constituting Senior Debt thereunder.  (Ind. §10.01).  In addition, Section 10.03(a) of the Indenture provides that:

> "[u]pon any payment or distribution of assets or securities of the [Debtor] of any kind . . . in a reorganization . . . all obligations with respect to all senior debt shall first be paid in full . . . before any payment or distribution of any kind or character is made on account of any [Senior Sub] Notes."

(Ind. § 10.03(a)).

In fact, just a few months prior to the execution of the Settlement Agreements, the Debtors, the Official Committee of Unsecured Creditors (represented by Lowenstein Sandler PC) and the majority holders of the Debtor's bank debt (the "**Bank Loan Claim Holders**"), entered into a settlement agreement (the "**Bank Loan Settlement**") for the purpose of facilitating the uncontested confirmation of the Plan.  Under the Bank Loan Settlement, which, in relevant part is embodied in the Plan and the Disclosure Statement, the Bank Loan Claim Holders expressly

waived their right to enforce subordination of their deficiency claims against the holders of

Senior Sub Notes under certain circumstances as follows:

> To the extent that either the Class of Allowed General Unsecured
> Claims has voted to accept the Plan, or if the Class of Allowed
> General Unsecured Claims, other than the holders of Deficiency
> Claims [Relevant Claims] under the Prepetition Credit Facility,
> have voted to accept the Plan, then *the holders of Allowed Bank*
> *Loan Claims shall waive distribution on their respective*
> *Deficiency Claims [Relevant Claims] and shall waive*
> *enforcement of all subordination provisions as they pertain to the*
> *Deficiency Claims  Relevant Claims]*, but shall retain the right to
> vote those Deficiency Claims [Relevant Claims].

(Discl. St., p.5) (emphasis added).

The Bank Loan Settlement demonstrates that the Debtor and the Official Committee

of Unsecured Creditors were familiar with the concept of having a party waive its subordination

rights for deficiency claims in the context of a claims settlement.  However, the Debtor, who

negotiated the Settlement Agreements, did not include such a waiver of subordination rights in

the Settlement Agreements, nor did the Official Committee of Unsecured Creditors object or

demand any such waiver language in the Settlement Agreements when the Settlement

Agreements were filed with the Bankruptcy Court.

Because the Settlement Agreements contain no waiver of the subordination rights of

the Relevant Claims, the subordination rights remain intact under applicable bankruptcy and

nonbankruptcy law.

Further, the fact that the Relevant Claims are deemed "general unsecured claims"

under the Settlement Agreements does not affect the seniority status of the Relevant Claims

within the class of general unsecured claims.  The purpose of the priority provisions of the

Bankruptcy Code is to "reflect a decision by Congress to prefer certain categories of claims over

other categories of claims.  The preferred categories of claims are designated as having priority

22

over other categories of claims and are entitled to payment in full before those not granted priority." 4 <u>Collier on Bankruptcy</u> ¶ 507.02[1] (15th ed., rev. 2007). However, within a class or category of claims, there is a further seniority scheme and those claims that rank senior to other claims within a specific class of claims are entitled to payment ahead of those with a lower seniority. <u>See id</u>.

With respect to the Relevant Claims, the Settlement Agreements have no effect whatsoever on the seniority of claims within classes. The Relevant Claims, though treated as general, unsecured claims under the Plan of Reorganization pursuant to the terms of the Settlement Agreements, encompass the same legal liability of the Debtor and the same inter-creditor rights as among the Debtor's creditors as the original amounts under the Financing Agreements for purposes of seniority and subordination under the Indenture.

Pursuant to the terms of the Settlement Agreements, the Relevant Claims are treated as "general unsecured claims" in varying aggregate amounts depending upon the Lender that is a party thereto. (SA §§1.5, 11.1(f)).[16] The Plan sets forth the priority scheme of the various claims. Class C-4 (General Unsecured Claims) contains both the Relevant Claims and the claims for the Senior Sub Notes (as well as the Bank Loan Deficiency Claims that did expressly waive their right to recover in that class). (Discl. St., p.7). It is the Indenture, and not the Plan nor the Settlement Agreements, that governs the seniority of the Relevant Claims versus the claims for the Senior Sub Notes. Pursuant to the express terms of the Indenture, distributions that would have been paid to the Senior Sub Note Holders, must be turned over to the Appellant until the Relevant Claims are paid in full.

---

[16]    The relevant sections of the GECC Settlement Agreement are §§ 1.5 and 11.1(oo).

23

For purposes of approving the Distribution Scheme, the Opinion's discussion of the "priority" of the Relevant Claim has no bearing on the seniority of the Relevant Claims. "Priority" is a term of art, defined in the Plan, which has nothing to do with the seniority of claims within a class of claims. In fact, the Plan defines "Priority Claim," as a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim." (Plan, §1(a)(77)). This type of "priority" has nothing to do with the subordination rights among creditors that the Appellant is seeking. Instead, the Appellant is seeking the Court to enforce the subordination rights under the Indenture, with respect to general unsecured creditors, including the Senior Sub Notes.

In the Opinion, the Bankruptcy Court failed to discuss the relevant seniority issues, as discuss above, but nonetheless proceeded to grant the Motion. It is the seniority of the Relevant Claims versus the Senior Sub Notes, both within Class C-4 under the Plan, that is the central issue put in dispute by the Motion and serves as the basis for the Objection. Thus, because the seniority of the Relevant Claims is unaffected by the Settlement Agreements, the Appellants' Objection to the Motion based on the Relevant Claims' Senior Debt status, should have been sustained by the Bankruptcy Court.

In light of the foregoing, the Relevant Claims are entitled to Senior Debt status under the Indenture and are entitled to a distribution prior to the Senior Sub Note Holders.

## RELIEF REQUESTED

The Appellant believes the Bankruptcy Court erred as a matter of law by approving the Motion and respectfully requests that this Court (i) reverse the Bankruptcy Court's Opinion and Order (ii) deny the approval of the Distribution Scheme, (iii) deny the Liquidating Trust authorization to distribute funds in accordance with the Distribution Scheme unless the Distribution Scheme is revised to reflect that $10,216,629.98 of the distribution amounts that

NY 71218910

would otherwise be paid to the Bank of New York on account of the Senior Sub Notes will be paid directly to the Appellant in order to fully satisfy the Relevant Claims, and (iv) grant such other and further relief as the Court deems just and proper.

## CONCLUSION

The Relevant Claims fall squarely within the Indenture's definition of Indebtedness and Senior Debt. Due to express language in the Indenture preserving the subordination rights of the Relevant Claims, such claims must be accorded the seniority status provided for therein, namely seniority in right of payment to the Senior Sub Note Holders. In addition, the Settlement Agreements contain no waiver of the subordination rights of the Relevant Claims, providing additional evidence that the subordination rights of the Relevant Claims remain intact under applicable bankruptcy and nonbankrupcy law. Lastly, the Bankruptcy Court misread the Settlement Agreements and their effect on the nature of the Relevant Claims. Nothing within the Settlement Agreements changed the nature of the Relevant Claims from senior claims to junior claims. Thus, by operation of the express provisions of the Indenture, distributions that would have been paid to the Senior Sub Note Holders must be turned over to the Appellant until the Relevant Claims are paid in full. As such, the Opinion and Order must be reversed as clearly erroneous.

25

Dated:  April 16, 2008

MORRIS, NICHOLS, ARSHT & TUNNELL
LLP

Derek C. Abbott (No. 3376)
Thomas F. Driscoll III (No. 4703)
1201 North Market Street
Wilmington, Delaware  19801
(302) 658-9200

and

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen, Esq.
Sherry J. Millman, Esq.
Abigail M. Beal, Esq.
180 Maiden Lane
New York, New York  10038-4982
(212) 806-5400

Counsel for the Appellant

NY 71218910