## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

*In re*: NationsRent, Inc. *et al.*

| | |
|---|---|
| NR Investments LLC, | |
| Appellants, | Civil Action No. 08-76 (GMS) |
| v. | |
| NationsRent Liquidating Trust, | |
| Appellee. | |
| | Bankruptcy Case No. 01-11628 <br> Bankruptcy Appeal No. 08-02 |

## AUTHORITIES APPENDIX
## SUBMITTED ON BEHALF OF APPELLANT NR INVESTMENTS LLC

**For the Appellants:**

**Morris Nichols Arsht & Tunnell LLP**
1201 North Market Street
Wilmington, Delaware  19801
302- 658-9200
Derek C. Abbott (No. 3376)
Thomas F. Driscoll III (No. 4703)

and

**Stroock & Stroock & Lavan LLP**
180 Maiden Lane
New York, New York 10038
212-806-5400
Kristopher M. Hansen
Abigail M. Beal

# Table of Contents

| | |
|---|---|
| | **CASES** |
| 1. | W. United Life Assurance Co. v. Hayden, 64 F.3d 833, 837 (3rd Cir. 1995) |
| 2. | In re Kobak, 280 B.R. 164, 170 (Bankr. N.D. Ohio 2002) |
| 3. | In re Bank of New England Corp., 364 F.3d 355, 362 (1st Cir. 2004) |
| 4. | Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1015 (3d Cir. 1980) |
| 5. | In re 203 North LaSalle Street Partnership, 246 B.R. 325 (Bankr. N.D. Ill. 2000) |
| 6. | In re Buzzeo, 365 B.R. 578, 583  (W.D. Pa. 2007) |
| 7. | Archer v. Warner, 538 U.S. 314 (2003) |
| 8. | In re Detrano, 326 F.3d 319 (2d Cir. 2002) |
| 9. | In re Permian Producers Drilling, Inc., 263 B.R. 510, 520 (W.D. Tex. 2000) |
| | **MISCELLANEOUS** |
| 10. | 4 Collier on Bankruptcy  507.02[1] (15th ed., rev. 2007) |



64 F.3d 833
64 F.3d 833, 64 USLW 2192
**(Cite as: 64 F.3d 833)**

Page 1

▷
Western United Life Assur. Co. v. Hayden
C.A.3 (Pa.),1995.

United States Court of Appeals,Third Circuit.
WESTERN UNITED LIFE ASSURANCE COM-
PANY
v.
Debra Ann HAYDEN; David Gerard Hayden; Reli-
ance Insurance Company; United Pacific Life In-
surance Company; Western United Life Assurance
Company Appellant.
**No. 94-3548.**

Argued March 9, 1995.
Decided Aug. 30, 1995.
Sur Petition for Rehearing Sept. 22, 1995.

Chapter 13 debtor filed adversary proceeding, seek-
ing determination that periodic payments made to
her belonged to bankruptcy estate because her as-
signment of right to receive payments was not ef-
fective. The Bankruptcy Court entered summary
judgment in favor of debtor. Assignee appealed.
The United States District Court for the Western
District of Pennsylvania, Donald E. Ziegler, Chief
Judge, affirmed. Appeal was taken. The Court of
Appeals, Alito, Circuit Judge, held that debtor's
right to receive periodic payments under settlement
agreement, executed in conjunction with annuity
contract, was assignable.

Reversed and remanded with directions.

West Headnotes

**[1] Contracts 95 €⟶143.5**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
       95k143.5 k. Construction as a Whole.
Most Cited Cases

**Contracts 95 €⟶147(1)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
       95k147 Intention of Parties
         95k147(1) k. In General. Most Cited
Cases
Under Pennsylvania law, when interpreting con-
tract, court must determine intent of parties and ef-
fect must be given to all provisions in the contract.

**[2] Contracts 95 €⟶143(1)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
       95k143 Application to Contracts in Gen-
eral
         95k143(1) k. In General. Most Cited
Cases
Under Pennsylvania law, if written contract is clear
and unambiguous, then court construes contract as
matter of law by its contents alone.

**[3] Contracts 95 €⟶143(4)**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
       95k143 Application to Contracts in Gen-
eral
         95k143(4) k. Subject, Object, or Pur-
pose as Affecting Construction. Most Cited Cases

**Contracts 95 €⟶169**

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
       95k169 k. Extrinsic Circumstances. Most
Cited Cases
Under Pennsylvania law, if contract is ambiguous,
then to ascertain intention of parties, court may
consider surrounding circumstances, parties' situ-
ation, objects they apparently have in view and
nature of subject-matter of agreement.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
(Cite as: 64 F.3d 833)

Page 2

**[4] Assignments 38 ⚖️41**

38 Assignments
    38II Mode and Sufficiency of Assignment
        38k40 Assignments in Writing
            38k41 k. Form and Contents. Most Cited
Cases
Document stating that Chapter 13 debtor "does
hereby assign" all her right, title and interest in an-
nuity contract and related release and settlement
agreement created effective assignment, and was
not contract to make future assignments of a right
or to transfer proceeds to be received in the future,
where debtor manifested intention to transfer
present ownership of the right, rather than merely
binding himself contractually to make future as-
signments. Restatement (Second) of Contracts §
330 comment.

**[5] Compromise and Settlement 89 ⚖️11**

89 Compromise and Settlement
    89I In General
        89k10 Construction of Agreement
            89k11 k. In General. Most Cited Cases
Because language of settlement agreement was am-
biguous, court had to look to surrounding circum-
stances, parties' situation, and the objects they ap-
parently had in view to determine parties' intent.

**[6] Internal Revenue 220 ⚖️3123**

220 Internal Revenue
    220V Income Taxes
        220V(D) Incomes Taxable in General
            220k3123 k. Compromise of Claim or Li-
ability. Most Cited Cases
"Structured settlements" are type of settlement de-
signed to provide certain tax advantages; in struc-
tured settlement, claimant receives periodic pay-
ments rather than lump sum, and all of these pay-
ments are considered damages received on account
of personal injuries or sickness and are, thus, ex-
cludable from income. 26 U.S.C.A. § 104(a)(2).

**[7] Contracts 95 ⚖️164**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k164 k. Construing Instruments To-
gether. Most Cited Cases
When construing ambiguous contract which by ne-
cessary implication refers to another document,
court may look to such document as additional
evidence to ascertain parties' intentions.

**[8] Contracts 95 ⚖️164**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k164 k. Construing Instruments To-
gether. Most Cited Cases
Under Pennsylvania law, when two or more writ-
ings are executed as part of one transaction, they
should be construed together.

**[9] Internal Revenue 220 ⚖️3123**

220 Internal Revenue
    220V Income Taxes
        220V(D) Incomes Taxable in General
            220k3123 k. Compromise of Claim or Li-
ability. Most Cited Cases
Settlement agreement between Chapter 13 debtor
and medical defendants, whom debtor sued for
medical malpractice, was structured settlement that
gave debtor legal right to receive monthly payments
where settlement was structured to conform with
Internal Revenue Code requirements for sheltering
such settlements from taxation by requiring medical
defendants to purchase annuity contract, which was
then assigned to third party to fulfill medical de-
fendants' obligation to make periodic payments to
debtor. 26 U.S.C.A. §§ 104, 130.

**[10] Assignments 38 ⚖️10**

38 Assignments
    38I Property, Estates, and Rights Assignable
        38k10 k. Money Due or to Become Due.
Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
(Cite as: 64 F.3d 833)

Contractual right to receive future stream of payments is typically assignable.

**[11] Contracts 95 ☞164**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k164 k. Construing Instruments Together. Most Cited Cases
Under Pennsylvania law, when two or more writings are executed at same time and involve same transaction, they should be construed as a whole, and if writings pertain to same transaction, it does not matter that parties to each writing are not the same.

**[12] Contracts 95 ☞164**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k164 k. Construing Instruments Together. Most Cited Cases
Under Pennsylvania law, general rule that two or more writings involving same transaction should be construed as whole also applies if several agreements are made as part of one transaction, even though they are executed at different times.

**[13] Assignments 38 ☞18**

38 Assignments
   38I Property, Estates, and Rights Assignable
      38k17 Executory Contracts
         38k18 k. In General. Most Cited Cases

**Contracts 95 ☞164**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k164 k. Construing Instruments Together. Most Cited Cases
Clause in annuity contract purporting to protect annuity payments from creditors did not bar Chapter 13 debtor from receiving her right to receive peri-

odic payments provided for under her settlement agreement, which was executed in conjunction with the annuity contract which provided for the periodic payments, where protection-from-creditors clause applied to involuntary attachments and did not bar voluntary assignments, and did not proscribe debtor from voluntarily assigning her right to receive payments under the settlement agreement.

**\*834** George M. Cheever (argued), Catherine L. Welsh, Kirkpatrick & Lockhart, Pittsburgh, PA, for Western United Life Assur. Co., appellant.
Mary Reitmeyer, Joseph R. Lawrence (argued), Pittsburgh, PA, for Debra A. Hayden and David G. Hayden, appellees.

Before HUTCHINSON, ALITO, and SAROKIN, Circuit Judges.

### OPINION OF THE COURT.

ALITO, Circuit Judge:
This appeal concerns an adversary proceeding filed by Debra and David Hayden, who are the debtors in a Chapter 13 bankruptcy proceeding. The subject of the adversary proceeding is a prior transaction in which Debra Hayden, in return for a cash payment, purported to assign to Western United Life Assurance Company her right to receive certain future periodic payments. In the adversary proceeding, the Haydens maintained that these periodic payments belonged to the bankruptcy estate because Debra Hayden's transaction did not constitute an effective assignment. The bankruptcy court agreed and entered summary judgment in favor of the Haydens. The district court affirmed the bankruptcy court's order. We now reverse and remand for further proceedings consistent with this opinion.

### I.

In 1984, Debra Hayden sustained injuries as a result of allegedly negligent medical treatment. App. 52. She subsequently filed a malpractice suit against the treating physicians, the hospital and their re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
(Cite as: 64 F.3d 833)

Page 4

spective liability insurance company (collectively the "medical defendants").[FN1] *Id.*

> FN1. The settlement agreement to the malpractice action contains a provision proscribing the Haydens from publicizing the facts or terms of the settlement. The Haydens have moved this court to maintain the confidentiality of this agreement. We will therefore refer to the defendants only as the medical defendants.

**\*835** In February 1988, Ms. Hayden settled her suit with the medical defendants. *Id.* She executed a settlement agreement that stated:

> For and In Consideration of the sum of three hundred ten thousand dollars ($310,000) to me paid in hand by [the medical defendants] ... the receipt of which is hereby acknowledged,* * I, being of lawful age, hereby fully and forever release, acquit and discharge the said [medical defendants] ... from any and all actions ... on account of any and all known and unknown injuries ... sustained by me ... as a result of medical treatment received by [me] from [the medical defendants].

> * * (and the payment of $290,000 to United Pacific Life Ins. Co. for the purchase of an annuity contract)

Western's Br. at Exhibit 1. The medical defendants then entered into a qualified assignment and assumption agreement with Reliance Insurance Company ("Reliance"). In pertinent part, this agreement stated:
> Whereas, the Settlement Agreement provides for the [defendants] to make certain periodic payments to or for the benefit of [Ms. Hayden].

> Whereas, the [defendants] desires to assign to [Reliance] its liability to make such periodic payments pursuant to the conditions of Internal Revenue Code [§] 130(c)....

> NOW, THEREFORE, ... the parties hereto agree as follows:

> 1. Liabilities Assigned. The [defendants] hereby assigns and [Reliance] hereby assumes all of the [defendants'] liability to make the periodic payments to [Ms. Hayden]....

> 2. Funding of Periodic Payments. [Reliance] may fund the periodic payments ... by purchasing a "qualified funding asset" within the meaning of I.R.C. [§] 130(d), in the form of an annuity contract from United.... All rights of ownership and control of such annuity shall be vested in [Reliance]. However, for [Reliance's] convenience, [Reliance] directs United ... to make the payments to ... [Ms. Hayden]....

*Id.* at Exhibit 2. With funds provided by the medical defendants, Reliance then purchased a $290,000 annuity from United Pacific Life Assurance Company ("United"). *Western Life Assurance Co. v. Hayden,* No. 93-1850, 94-517, 94-518, at 2 (W.D.Pa. Sept. 20, 1994); App. 53. The annuity provided for monthly payments of $2,159.37 for the longer of 30 years or the remainder of Ms. Hayden's life. App. 63. The annuity designated Reliance as the owner and Ms. Hayden as the payee. *Id.* at 60.

In January 1989, the Haydens were experiencing financial difficulties. *In re Hayden,* No. 92-2261,Adv. No. 92-0301, at 3 (Bankr.W.D.Pa. Oct. 13, 1993). To alleviate these difficulties, the Haydens contacted Donald Bach, who arranged for at least five loans in various amounts totalling more than $50,000. App. 53-54. In consideration for these loans, the Haydens agreed to pay back double the amount of the principal in 60 equal monthly payments. *Western* at 3.

Despite these loans, the Haydens continued to experience financial difficulties. *In re Hayden* at 4. In early 1990, Ms. Hayden asked Bach to consolidate the loans so as to reduce the monthly payments. App. 54. Bach advised Ms. Hayden that although consolidation was not possible, he might be able to arrange for the purchase of the annuity contract. *Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
(Cite as: 64 F.3d 833)

In July 1990, Bach contacted Western United Life Assurance Company ("Western") to inquire whether Western had an interest in purchasing Ms. Hayden's annuity. *Id.* Western indicated an interest. On July 24, 1990, Western prepared a letter from Ms. Hayden addressed to Reliance. *Id.* This letter stated that Ms. Hayden had entered into an arrangement with Western and that pursuant to this arrangement she had conveyed her rights under the settlement agreement, including her right to receive the monthly annuity payments. *Id.* at 77. The letter asked Reliance to request that United change the annuity beneficiary to Western and to send future payments directly to Western. *Id.*

**\*836** On August 10, representatives of Reliance and Western spoke. *Id.* at 55. Reliance informed Western that it would not honor Ms. Hayden's request. *Id.* at 79. Reliance explained that it was the owner of the annuity and that Ms. Hayden had no assignable rights in the policy. *Id.* After subsequent discussions between Reliance and Western, the two settled on the following mutually acceptable method of executing the assignment. Although Reliance insisted that the checks remain payable to Ms. Hayden, it agreed to honor a request from Ms. Hayden to change irrevocably the address to which the checks were sent to that of Western. *Id.* at 81.

In September 1990, the parties executed a series of documents in an attempt to assign to Western Ms. Hayden's rights to the monthly payments.[FN2] In pertinent part, Ms. Hayden executed a document entitled "Annuity (Payment) Assignment Agreement." The document stated:

> FN2. Other documents included beneficiary consents by David Hayden and by Ms. Hayden's daughter and various option agreements. App. 90-93.

FOR VALUE RECEIVED ... [Debra A. Hayden] does hereby assign, transfer, and set over to Western ... all Assignor's right, title and interest in and to the periodic payments described below together with Assignor's existing rights and in-

terest ... in and to the following described annuity contract/policy and related release and/or settlement agreement....

Western's Br. at Exhibit 5. The document then identified with specificity the monthly payments, the annuity contract, and the settlement agreement. Ms. Hayden also directed Reliance to have United irrevocably change the address to which the checks were sent to that of Western. *Id.* at Exhibit 4. Finally, because the annuity checks remained payable to Ms. Hayden, she executed an irrevocable special power of attorney empowering Western to endorse and cash the checks. *Id.* at Exhibit 6. In return, Western paid Ms. Hayden $178,395.63, of which $92,420.63 was used to satisfy the loans. App. 58; *Western* at 4. Pursuant to these arrangements, the monthly payments were received and deposited by Western from the end of 1990 until August 1992. App. 58.

On May 14, 1992, Debra and David Hayden filed a voluntary bankruptcy petition under Chapter 13 of the bankruptcy code. *Western* at 5. Subsequently, the Haydens filed a six-count adversary complaint against Western, United, and Reliance.[FN3] In this complaint, the Haydens alleged that the September 1990 documents executed by Ms. Hayden did not create an effective assignment. Thus, the Haydens argued that the annuity checks were property of the estate and that the court should order Western to turn over these checks to the estate. Similarly, the Haydens maintained that Western was only an unsecured creditor of the estate for a sum equal to the value of its bargain with Ms. Hayden less any prepetition annuity checks it received and cashed.

> FN3. Count I requested a determination of Western's secured status pursuant to 11 U.S.C. § 506 or an avoidance of a lien pursuant to 11 U.S.C. § 522. Count II sought to void, under 11 U.S.C. § 552, any security interest asserted by Western in the annuity payments. Count III alleged that Western violated that automatic stay provisions of 11 U.S.C. § 362. Count IV sought,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
**(Cite as: 64 F.3d 833)**

Page 6

pursuant to 11 U.S.C. § 542, the turnover of the postpetition annuity payments received by Western on the ground that they were property of the bankruptcy estate. Count V maintained that by receiving the checks Western benefitted from a preference proscribed by 11 U.S.C. § 547. Finally, Count VI alleged that Reliance and United, in violation of 11 U.S.C. § 543, disbursed to Western funds belonging to the bankruptcy estate.

The parties moved for summary judgment on the adversary complaint. *In re Hayden* at 1. The bankruptcy court entered partial summary judgment in favor of the Haydens.[FN4] *Id.* at 14. The court held that the documents executed by Ms. Hayden did not create an effective assignment and that the monthly annuity payments were the property of the bankruptcy estate. Thus, the court ruled that Western was an unsecured creditor and ordered Western to surrender the postpetition annuity payments to the Chapter 13 trustee. *Id.*

> FN4. The court made no determination regarding Counts III and V.

The bankruptcy court subsequently confirmed the Hayden's Chapter 13 plan. In pertinent part, the plan provided that all monthly annuity payments from the commencement*837 of the case to the date of consummation would be surrendered to the trustee for distribution to the creditors. *Western* at 5. For the first six months after consummation, the Haydens were to receive the monthly annuity checks, from which $870 would be given to the trustee for distribution to the creditors. *Id.* The remaining portion of the annuity checks for this six-month period, as well as the full amount of all subsequent annuity checks, was excluded as a payment reasonably necessary for the support of the debtor under 11 U.S.C. § 522(d)(10)(E). Thus, the effect of the bankruptcy court's ruling in the adversary proceeding and its approval of the plan was that the Haydens continued to receive the annuity payments while Western received only a small percentage of

the sum it paid to Ms. Hayden for her purported assignment.

Western separately appealed to the district court the bankruptcy court's decisions to grant summary judgment and to approve the plan.[FN5] The district court affirmed the bankruptcy court's holding that the documents executed by Ms. Hayden failed to create an effective assignment. The district court focused on Ms. Hayden's rights under the annuity contract. It explained that because Ms. Hayden was not the owner of the annuity she did not possess the legal right to change the designated beneficiary of the annuity. *Western* at 8. Therefore, the court concluded, "it is a simple matter to conclude that she could not assign the right to receive the annuity payments...." *Id.* The district court also affirmed the bankruptcy court's confirmation of the plan. *Id.* at 10.

> FN5. Western also appealed a third bankruptcy court decision not relevant to this appeal.

Western then appealed both decisions to this court. The present appeal concerns only the bankruptcy court's ruling with respect to the adversary action.[FN6] Western contends that it, rather than the Haydens' estate, possesses the right to receive the monthly payments. Western believes that the district court improperly focused only on Ms. Hayden's rights under the annuity contract. It argues that Ms. Hayden assigned all her rights under the annuity contract *and* settlement agreement and that these rights included the right to receive the monthly annuity payments. The Haydens respond by arguing that Ms. Hayden could not have executed an effective assignment because she did not have any assignable rights under either document and that even if she did, Pennsylvania law prevented the assignment of these rights.[FN7]

> FN6. Western filed two appeals with this court. The present appeal, No. 94-3548, concerns only the adversary proceeding. Appeal No. 94-3549 challenges the con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
(Cite as: 64 F.3d 833)

firmation of the plan. In light of our holding in the present appeal, we need not, and do not, consider the merits of appeal No. 94-3549.

FN7. Western raised several alternative arguments. In light of our holding, we need not and do not reach these arguments.

## II.

[1][2][3] We exercise plenary review over an appeal from an order granting summary judgment. *Rosen v. Bezner,* 996 F.2d 1527, 1530 (3d Cir.1993). We look to Pennsylvania law to determine whether the documents executed by Ms. Hayden constituted an effective assignment.[FN8] Under Pennsylvania law, "when interpreting a contract a court must determine the intent of the parties and effect must be given to all provisions in the contract." *Dept. of Transp. v. Manor Mines, Inc.,* 523 Pa. 112, 565 A.2d 428, 432 (1989) (citations omitted). If a written contract is clear and unambiguous, then the court construes the contract as a matter of law by its contents alone. *Id.; Allegheny International v. Allegheny Ludlum Steel Corp.,* 40 F.3d 1416, 1424 (3d Cir.1994). If, however, the contract is ambiguous, then "in order to ascertain th[e intention of the parties], the court may consider the surrounding circumstances, the situation of the parties, the objects they apparently have in view and the nature of the subject-matter of the agreement." *International Organization Masters, Mates and Pilots of America, Local No. 2 v. International Organization Master, Mates and Pilots of America, Inc.,* 497 Pa. 102, 439 A.2d 621, 624 (1981).

FN8. All parties agree that Pennsylvania law governs this case. We agree. We note that the relevant documents were executed in Pennsylvania and that the Haydens reside in Pennsylvania.

### *838 A.

[4] We begin our inquiry by considering whether the annuity assignment agreement executed by Ms. Hayden in September of 1990 created an effective assignment. According to the language of that document, Ms. Hayden agreed to "assign, transfer, and set over to Western ... all [her] right, title and interest ... in and to the ... annuity contract/policy and related release and/or settlement agreement...." Western's Br. at Exhibit 5. We find that this language inescapably and unambiguously expresses an intent by Ms. Hayden to assign to Western all her rights under the annuity contract and the settlement agreement.

The Haydens argue that despite this clear language, the document is not an assignment. Rather, they contend that the document is merely a contract to transfer funds to be received in the future. Under the Restatement (Second) of Contracts § 330, a contract to make a future assignment of a right or to transfer proceeds to be received in the future is not an assignment.

Our review of section 330, however, convinces us that the September 1990 document created an effective assignment. Section 330 distinguishes between, on the one hand, an obligee's intention to bind himself contractually to make a future assignment and, on the other, an intention to make a present assignment. *See* Restatement (Second) of Contracts § 330, comments a-b. The former is merely a contract, but the latter is an assignment. The test is whether the obligee manifests an intention to transfer present ownership of the right. *Id.; see also Melnick v. Pennsylvania Co. for Banking and Trusts,* 180 Pa.Super. 441, 119 A.2d 825, 826 (1956) (in banc) (finding that the statement "I ... hereby authorize and empower you ... to ... assign" was not an assignment because "these words indicate[d] no present intent to transfer or divest oneself from the right to demand possession of the [subject matter of the agreement]."); *Daymut v. Commonwealth Dept. of Public Welfare,* 49 Pa.Cmwlth. 332, 410 A.2d 1318, 1319 (1980) (finding document not to be an assignment because it did not "indicate a present intent of the obligor to divest himself of any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
**(Cite as: 64 F.3d 833)**

right to demand possession of [the subject matter of the agreement].").[FN9]

> FN9. Although Pennsylvania courts have not explicitly adopted § 330, we believe that *Melnick* and *Daymut* indicate that Pennsylvania does follow this section.

In the present case, the document executed by Ms. Hayden used the present tense and stated that Ms. Hayden "does hereby assign...." We believe that this language clearly. indicates an intent to make a present assignment. Thus, we find that this document was intended to create an effective assignment and not a contract to make a future assignment. We conclude, therefore, that the September 1990 documents executed by Ms. Hayden created an effective legal assignment of Ms. Hayden's rights under the annuity contract and settlement agreement. This conclusion does not end our inquiry, however, because we must determine exactly what rights Ms. Hayden was empowered to assign under these two agreements. We next turn to this issue.

B.

To determine whether Ms. Hayden had assignable rights under the annuity contract or the settlement agreement, we must consider each of these documents. With respect to the annuity contract, Western concedes that Ms. Hayden did not have a legally assignable right under this contract.[FN10] Western's Br. at 15. Western and the Haydens agree that Reliance is the undisputed owner of the annuity. *Id.* As owner, the annuity contract vests Reliance with the right to change the payee and to direct the annuity payments to whomever it desires. App. 65. Because Ms. Hayden did not have an enforceable right to remain as the annuity payee, Western concedes that she could not assign a right to receive those payments. Western's Br. at 15, 27. Thus, we consider Ms. Hayden's rights under the settlement agreement.

> FN10. Although Western concedes that

Ms. Hayden did not have a legally assignable right, it argues that Ms. Hayden's assignment of her expectancy interest in the annuity payments is enforceable in equity. Western's Br. at 28. In light of our holding, we need not and do not consider this issue.

***839** Western argues that under the settlement agreement Ms. Hayden had a legally assignable right to receive the monthly payments. Western interprets this agreement as requiring Reliance, as the medical defendants' assignee, to pay Ms. Hayden the periodic payments from the annuity *or* from another source. Western's Br. at 29. Because the agreement created a right to receive the periodic payments, Western argues that Ms. Hayden could assign this right to receive the payments.

The Haydens, however, contend that Ms. Hayden had no assignable rights under the settlement agreement. Although their exact interpretation of the settlement agreement is unclear, they appear to argue that it required only the purchase of an annuity for the benefit of Ms. Hayden and nothing more. The Haydens reject Western's claim that the settlement agreement created a contractual obligation to make the periodic payments independent of the purchase of the annuity. Ms. Hayden, they observe, released the medical defendants from liability in consideration of a cash payment and "the payment of $290,000 to United Pacific Life Ins. Co. for the purchase of an annuity contract...." Western's Br. at Exhibit 1. Thus, the Haydens maintain that because the settlement agreement did not require more than the purchase of an annuity and because the annuity was purchased, Ms. Hayden did not have any remaining assignable rights under the agreement.

We believe that the language of the settlement agreement is ambiguous and could support either of these interpretations. The ambiguity arises from the fact that the literal language of the agreement does not define the relationship between Ms. Hayden and the annuity. Thus, one can imply various relationships between them. We offer a few illustrative ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

amples: (1) the medical defendants must purchase the annuity and assign it to Ms. Hayden; (2) the medical defendants must purchase the annuity and irrevocably name Ms. Hayden as payee; (3) the medical defendants must purchase the annuity and use it as security for their obligation to Ms. Hayden; or (4) the medical defendants must purchase the annuity but need not use it even as security for their obligation to Ms. Hayden.

[5] Because the language of the settlement agreement is ambiguous, to determine the intent of the parties we look to the surrounding circumstances, the situation of the parties, and the objects they apparently have in view. *International Organization Master, Mates and Pilots of America,* 439 A.2d at 624. Western argues that when these factors are considered, it is clear as a matter of law that the medical defendants, Reliance, and Ms. Hayden intended to enter into a "structured settlement" in accordance with §§ 104(a)(2) and 130 of the Internal Revenue Code ("I.R.C."), 26 U.S.C. §§ 104(a)(2), 130. Western further maintains that a structured settlement would require Ms. Hayden to retain a right to periodic payments under the settlement agreement. Thus, contends Western, the parties to that agreement intended to vest Ms. Hayden with an assignable right to receive the payments under the agreement. We consider each prong of Western's argument in turn.

[6] Structured settlements are a type of settlement designed to provide certain tax advantages. In a typical personal injury settlement, a plaintiff who receives a lump-sum payment may exclude this payment from taxable income under I.R.C. § 104(a)(2) (providing that the amount of any damages received on account of personal injuries or sickness are excludable from income). However, any return from the plaintiff's investment of the lump-sum payment is taxable investment income. In contrast, in a structured settlement the claimant receives periodic payments rather than a lump sum, and all of these payments are considered damages received on account of personal injuries or sickness

and are thus excludable from income. Accordingly, a structured settlement effectively shelters from taxation the returns from the investment of the lump-sum payment. *See*Rev.Rul. 79-220, 1979-2 C.B. 74. *See also* Sen.Rep. No. 97-646, 97th Cong., 2d Sess. *reprinted in* 1982 U.S.C.C.A.N. 4580, 4583 (explaining that Pub.L. No. 97-473, 96 Stat. 2605, codified Rev.Rul. 79-220 at 26 U.S.C. § 104(a)(2)).

A key characteristic of a structured settlement is that the beneficiary of the settlement *840 must not have actual or constructive receipt of the economic benefit of the payments. Rev.Rul. 79-220. In a structured settlement, the settling defendant's "purchase of a[n] ... annuity contract from the other insurance company [is] merely an investment by [the settling defendant] to provide a source of funds for [him] to satisfy [his] obligation to [the plaintiff]." *Id.* The arrangement is *"merely a matter of convenience to the [defendant] and d[oes] not give the recipient any right in the annuity itself." Id.* (emphasis added). Because the recipient never had actual or constructive receipt of the lump-sum amount, the recipient need not include the investment yield on that amount as taxable income. *Id.* Thus, the exclusion applies to the full amount of the annuity payments because the full amount is received as damages on account of personal injuries. *Id.*

Before 1983, the utility of structured settlements was diminished by the credit risk that the recipient would have to assume. William Winslow, *Tax Reform Preserves Structured Settlements,*65 Taxes 22, 24 (1987). Because the annuity was merely a matter of convenience and did not give the recipient any right in the annuity, in the case of the settling defendant's default the plaintiff could not seek redress from the annuity issuer. *Id.* This presented a problem if the settling defendant's general credit risk was high.

Congress addressed this problem by enacting I.R.C. § 130. *See* Sen.Rep. No. 97-646, 97th Cong., 2d Sess. *reprinted in* 1982 U.S.C.C.A.N. 4580, 4583.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
**(Cite as: 64 F.3d 833)**

As we detail in subsection C of this opinion, section 130 allows a tax-neutral transaction in which the settling defendant assigns and a third party assumes the obligation to make periodic payments under most section 104(a)(2) structured settlements. When the third party assignee, such as Reliance, has a credit rating superior to that of the settling defendant, such an assignment and assumption agreement benefits a plaintiff, such as Ms. Hayden, by allowing her to rely on the assignee's superior credit. Winslow, *supra.*

[7][8][9] In the instant case, it is apparent that Ms. Hayden, the medical defendants and Reliance structured the settlement to conform with the requirements of sections 104 and 130. Indeed, the parties to the present case agree that the assignment and assumption agreement was designed to "follow [ ] the road map laid out in I.R.C. § 130..." and that the annuity was purchased as part of a structured settlement agreement. *See* Hayden's Br. at 19, 28; Western's Br. at 4. The language of the assignment and assumption agreement confirms this.[FN11] The agreement expressly stated that it was intended to create an assignment pursuant to the conditions of section 130. Moreover, the assignment and assumption agreement complied with the requirements of a section 104(a)(2) structured settlement. The agreement stated that

> FN11. Although Ms. Hayden was not a signatory to this the assignment and assumption agreement, this agreement provides evidence of her intent in executing the settlement agreement. When construing an ambiguous contract which by necessary implication refers to another document, the court may look to such document as additional evidence in order to ascertain the intention of the parties. *International Organization Master, Mates and Pilots,* 439 A.2d at 625. Moreover, as we explain below, under Pennsylvania law when two or more writings are executed as part of one transaction they should be con-

strued together. Finally, we also observe that in the assignment and assumption agreement, the medical defendants "warrant[ed] that [Ms. Hayden ... consented to the assumption of [the] obligation as direct obligation of Reliance ... and in substitution of the Assignor." Western's Br. at Exhibit 2. The Haydens do not argue that Ms. Hayden did not consent to the agreement as warranted.

Reliance *may* fund the periodic payments ... by purchasing a[n] ... annuity contract from United.... All rights of ownership and control of such annuity shall be vested in [Reliance]. However, for [Reliance's] convenience, [Reliance] directs United to make the payments to ... [Ms. Hayden]....

Western's Br. at Exhibit 2 (emphasis added). Thus, the agreement explicitly complied with the Revenue Ruling by stating that the annuity was merely a convenient method by which Reliance could fund the obligation and that Reliance, and not Ms. Hayden, exercised ownership and control over the annuity.

Our conclusion that the medical defendants, Reliance and Ms. Hayden intended to *841 enter into a structured settlement clarifies the scope of Ms. Hayden's rights under the structured settlement. As previously explained, under a structured settlement the obligor has a continuing obligation to pay the periodic payments to the recipient. The annuity is merely a convenient funding mechanism and does not alter this obligation. Thus, we believe it is clear as a matter of law that under the settlement agreement the medical defendants had a continuing obligation to pay Ms. Hayden the monthly payments.

The Haydens' arguments to the contrary are contradictory. While conceding that the parties followed the "roadmap laid out in I.R.C. § 130" and that the annuity "was purchased as the most significant part of a very specific structured settlement agreement," the Haydens argue that the annuity contract was not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

merely an accommodation to Reliance and that Reliance has no obligation to make periodic payments independent of the annuity. Hayden's Br. at 19, 28. The Haydens' argument reveals a misunderstanding of structured settlements. If the parties intended to structure the transaction pursuant to I.R.C. §§ 104 and 130, then they must have intended that the annuity be merely an accommodation and that Reliance have a general obligation to make the periodic payments. Furthermore, the Haydens' interpretation would render the assignment and assumption agreement meaningless. If the sole obligation under the settlement agreement was to purchase the annuity, there would be no point in inserting Reliance into the transaction; the medical defendants could have purchased the annuity themselves and thereby fulfilled all their obligations. It is thus apparent that the defendants executed the assignment because under the settlement agreement they had a continuing obligation that they wished to assign, namely, the obligation to make periodic payments. We conclude, therefore, that the settlement agreement gave Ms. Hayden a legal right to receive monthly payments of $2159.37. We next consider whether this right was assignable.

C.

[10] A contractual right to receive a future stream of payments is typically assignable. E. Allan Farnsworth, *Farnsworth on Contracts* § 11.2 (1990). The Haydens argue, however, that even if the settlement agreement vested Ms. Hayden with a legal right to receive the monthly payments, this right was not assignable. The Haydens support this assertion with two arguments.

First, the Haydens argue that the parties to the structured settlement must have intended impliedly to restrict the assignment of Ms. Hayden's right to receive the monthly payments. They premise this argument on their belief that an assignment by Ms. Hayden would cause negative tax consequences for Reliance and that to avoid such a result the parties must have intended to restrict the assignment of the

payments. According to the Haydens, in order for Reliance to exclude from income the amount it received for agreeing to the assignment, the periodic payments it agreed to make must be excludable from the payee's gross income under section 104(a)(2). *See* I.R.C. § 130(a), (c)(2)(E). Thus, they conclude that the agreement must impliedly restrict assignments because the payments are excludable only if Ms. Hayden is the payee.

We consider the operation of section 130 for the limited purpose of assessing whether the parties intended impliedly to restrict assignments. The Internal Revenue Code defines gross income broadly to include "all income from whatever source derived...." I.R.C. § 61. Under section 130(a), however, an assignee may exclude from gross income "[a]ny amount received for agreeing to a qualified assignment ... to the extent that such amount does not exceed the aggregate cost of a qualified funding asset." A qualified assignment is one that satisfies certain criteria, one of which requires that the periodic payments assigned must be excludable from the recipient's gross income under I.R.C. § 104(a)(2). *See* I.R.C. § 130(c)(2)(E). Furthermore, a qualified funding asset is an annuity contract meeting certain requirements and purchased by the assignee within 60 days of the assignment. *See* I.R.C. § 130(d).

*842 When an assignee receives an amount for agreeing to a qualified assignment, the assignee may use that amount to purchase an annuity that satisfies the criteria of a qualified funding asset. I.R.C. § 130(a). If the assignee does so, the assignee can exclude the amount used to purchase the annuity from income. Because this amount was excluded, the basis of the annuity is then reduced by that amount. I.R.C. § 130(b). In the future, the income from the annuity is offset, presumably by a business expense deduction, when these payments are distributed to the payee. *See* C.C.H. Standard Federal Tax Reports ¶ 7383 (1994). *See generally* I.R.C. §§ 61, 162.[FN12]

FN12. An example may be helpful. As-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sume a settling defendant pays a third party $100,000 for its agreement to assume an obligation to make periodic payments under a structured settlement. Assume further that the assignment is a qualified assignment under I.R.C. § 130(c). If the third party purchases a $95,000 qualified funding asset then it has $5000 of income. The basis of the annuity is reduced to $0. All future income from the annuity is taxable income, which presumably is offset by a business expense. *See generally* C.C.H. Standard Federal Tax Reports ¶ 7383.03 (1994).

In the present case, Reliance presumably exercised its section 130 exclusion when it assumed the medical defendants' obligation. The Haydens would have us conclude that Reliance would retroactively lose this exclusion if Ms. Hayden assigned her right to receive the periodic payments under the settlement agreement. Thus, they would have us infer that, upon Ms. Hayden's assignment of the payments, the original cost of the annuity less the annuity payments already received as income by Reliance becomes income to Reliance and the basis of the annuity is increased accordingly. The Haydens, however, do not cite, and our research has failed to reveal, any support for this novel proposition. We are therefore unpersuaded by the Haydens' theory, and we decline to infer that the settlement agreement was intended to limit assignment of Ms. Hayden's right to receive the periodic payments.

The Haydens present a second reason why they believe that even if Ms. Hayden had a legal right to receive the monthly payments, this right was not assignable. They contend that the settlement agreement must be read together with the annuity contract and that a provision of the annuity contract prevents the assignment of Ms. Hayden's rights under both that contract and the settlement agreement.

[11][12] Under Pennsylvania law,

when two or more writings are executed at the

same time and involve the same transaction, they should be construed as a whole. If the writings pertain to the same transaction, it does not matter that the parties to each writing are not the same.

*Black v. T.M. Landis, Inc.,* 280 Pa.Super. 621, 421 A.2d 1105, 1107 (1980) (citations omitted). This general rule also applies where several agreements are made as part of one transaction even though they are executed at different times. *Neville v. Scott,* 182 Pa.Super. 448, 127 A.2d 755, 757 (1956).

[13] In the present case, the Haydens maintain that Pennsylvania law requires the settlement agreement and the annuity contract to be read together. Both documents were executed as part of the structured settlement. The settlement agreement specifically referred to the purchase of an annuity from United. Although Ms. Hayden was not a party to the annuity contract, she was the annuitant and the payee of the contract. Furthermore, the settlement agreement and the annuity contract were executed within two weeks of each other. Because Western agrees with this argument, we will assume that the two documents should be read together. *See* Western's Reply Br. at 4. Thus, we turn to consider whether the annuity contract contained a clause proscribing assignments by Ms. Hayden.

The Haydens contend that the following clause in the annuity contract proscribed assignments by Ms. Hayden:

> Protection from Creditors-The Annuity payments will not be subject to the debts, contracts or engagements of any person entitled to such payments by the terms of the Contract. Nor will any such payments be subject to any judicial process to levy or attach them. This protection is given to the extent allowed by law.

*Id.*

For at least three reasons, we reject the Haydens' argument. First, the plain language of the clause

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
(Cite as: 64 F.3d 833)

refers only to involuntary *843 attachments. As the title of the clause implies, the clause acts to protect the payee from creditors by preventing them from attaching the annuity payments. The clause, however, does not expressly bar a voluntary assignment. If the parties to the annuity contract intended to proscribe voluntary assignments, it would have been simple to add a clause to accomplish that purpose. *See Bank of New England v. Strandlund,* 402 Mass. 707, 529 N.E.2d 394, 395 (1988) (interpreting clause, which stated: "no income or principal ... payable to any beneficiary ... shall be attachable, trusteeable or in any manner liable for or to be taken for any debts, contracts or obligations of ... beneficiary," to restrict only involuntary alienation because there were no "words that indicate [d] ... [an] inten[t] to prohibit ... beneficiaries from voluntarily assigning their interests in the [trust].").

Second, other provisions of the contract imply that this clause does not prevent voluntary assignments. The annuity contract explicitly states that "the owner may assign an interest in th[e annuity] contract." Western's Br. at Exhibit 3. The owner can also be the payee. If the protection-from-creditors clause prevents an assignment by "*any person* entitled to such payments by the terms of the [c]ontract," then it would prevent assignments by the owner when the owner was also the person entitled to such payments. Thus, reading the protection-from-creditors clause to bar voluntary assignments would contradict the owner's right to assign an interest in the annuity when the owner was also a payee.

Third, even if the annuity contract's protection-from-creditors clause proscribed the payee from voluntarily assigning her rights to receive payments under the annuity, this would not imply that in the instant case it prevents Ms. Hayden from assigning her rights to receive periodic payments under the settlement agreement. Reading the annuity contract and the settlement agreement as a whole, it is clear that the protection-from-creditors clause of the annuity applies only to the annuity payments. The clause plainly states that it applies to "[t]he

[a]nnuity payments." We find no evidence to support the proposition that this clause was intended also to apply to payments made under the settlement agreement. Consequently, we reject the Haydens' argument that Ms. Hayden's right to receive periodic payments under the settlement agreement was not assignable.

### III.

For the reasons stated we hold that, as a matter of law, the documents executed by Ms. Hayden in September 1990 constituted an effective legal assignment to Western of her right to receive the periodic payments provided for in the settlement agreement. Thus, we hold that Western now has a right to receive the periodic payments from Reliance and that Ms. Hayden no longer has a right to receive these payments. In light of this holding we must reverse the order of the district court in the adversary proceeding. We need not and do not consider the additional arguments raised by the parties. Rather, we remand this case for further proceedings consistent with this opinion.

Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE, and SAROKIN, Circuit Judges.

### SUR PETITION FOR REHEARING

Sept. 22, 1995

The petition for rehearing filed by appellees in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

64 F.3d 833
64 F.3d 833, 64 USLW 2192
**(Cite as: 64 F.3d 833)**

Page 14

rehearing by the Court in banc, the petition for re-
hearing is denied. Judge Mansmann would grant re-
hearing.

C.A.3 (Pa.),1995.
Western United Life Assur. Co. v. Hayden
64 F.3d 833, 64 USLW 2192

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



280 B.R. 164
280 B.R. 164
(Cite as: 280 B.R. 164)

Page 1

**C**

In re Kobak
Bkrtcy.N.D.Ohio,2002.

United States Bankruptcy Court,N.D. Ohio,Eastern Division.
In re Robert Anthony KOBAK and Elizabeth Ann Kobak, Debtors.
Robert Anthony Kobak and Elizabeth Ann Kobak, Plaintiffs,
v.
National City Bank, et al., Defendants.
Bankruptcy No. 01-63660.
Adversary No. 01-6192.

June 28, 2002.

Chapter 11 debtor-mortgagors filed complaint for determination of lien priority. The Bankruptcy Court, Russ Kendig, J., held that lien subordination agreement between first and third mortgagees, whereby first mortgagee relinquished priority that it would otherwise have vis-a-vis third mortgagee, did not improve position of second mortgagee, which was not party to, nor mentioned in, subordination agreement.

So ordered.

West Headnotes

**[1] Mortgages 266 ⟫159**

266 Mortgages
   266III Construction and Operation
      266III(D) Lien and Priority
         266k159 k. Priority as Affected by Provisions of Mortgage or by Agreement. Most Cited Cases
Under Ohio law, lien subordination agreement between first and third mortgagees, whereby first mortgagee relinquished priority that it would otherwise have vis-a-vis third mortgagee, did not improve position of second mortgagee, which was not party to, nor mentioned in, subordination agreement, either by placing first mortgage behind both second and third mortgages in order of priority, or by substituting third mortgagee's

lesser mortgage for that of first mortgagee in first priority position; subordination agreement did not affect second mortgagee, either positively or negatively, but simply required that, in event property was sold, those proceeds that would otherwise have been paid to first mortgagee would be paid initially to third mortgagee to extent of its claim and only then to first mortgagee, with second mortgagee taking next, followed by first mortgagee to extent of its remaining claim.

**[2] Bankruptcy 51 ⟫2952**

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2952 k. Liens. Most Cited Cases
To determine effects of lien subordination agreement between first and third mortgagee's on priority of second mortgagee's lien, bankruptcy court had to look to applicable non-bankruptcy law.

**[3] Secured Transactions 349A ⟫147**

349A Secured Transactions
   349AIII Construction and Operation
      349AIII(B) Rights as to Third Parties and Priorities
         349Ak147 k. Agreements Affecting Priority. Most Cited Cases
Under Ohio law, subordination agreement cannot adversely affect the interest of entity not a party to the agreement.

**[4] Secured Transactions 349A ⟫147**

349A Secured Transactions
   349AIII Construction and Operation
      349AIII(B) Rights as to Third Parties and Priorities
         349Ak147 k. Agreements Affecting Priority. Most Cited Cases
Under Ohio law, subordination agreements are to be interpreted in accordance with ordinary contract principles.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[5] Contracts 95 ☞143(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(1) k. In General. Most Cited Cases
Under Ohio law, when contract is unambiguous, contracting parties rights are governed exclusively by contract.

**\*165** Edwin Breyfogle, Massillon, OH, for Plaintiffs-Debtors.
Jon J. Liebermann, Lerner, Sampson & Rothfuss, Cincinnati, OH, for Fifth Third Bank.
Alan C. Hochheiser, Stacie Wittenberg, Weltman, Weinberg & Reis, Cleveland, OH, for National City Bank.

### MEMORANDUM OF DECISION

RUSS KENDIG, Bankruptcy Judge.
Robert Anthony Kobak and Elizabeth Ann Kobak (hereafter "Debtors") filed a complaint, pursuant to Federal Rule of Bankruptcy Procedure 7001(2), to determine the extent, priority and amount of liens held against Debtors' real property. Defendants National City

|  | Approx. Balance |
|---|---|
| Fifth Third Bank | $146,844.94 |
| National City Bank | $142,192.00 |
| National City Bank | $264,000.00 |

The parties agree the liens arose in the following manner. NCB filed an open-end mortgage on January 12, 1998. The original amount of the mortgage was $600,000. Following NCB's recording, Strongsville Savings Bank recorded a mortgage on October\*166 27, 1998. Fifth Third now holds the October 27, 1998 mortgage as successor to Strongsville Savings Bank.

Bank (hereafter "NCB") and Fifth Third Bank (hereafter "Fifth Third") answered the complaint, each asserting it held the first and best lien.

Now before the court are cross-motions for summary judgment, and responses, filed by NCB and Fifth Third. Jurisdiction of this proceeding is premised in 28 U.S.C. § 1334 and the general order of reference entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K). In accordance with Federal Rule of Bankruptcy Procedure 7052, the court's findings of facts and conclusions of law are set forth in this opinion.

### I. FACTS

The facts are undisputed. Debtors filed a bankruptcy petition on August 28, 2001. Listed as an asset was real property located at 1263 Tupela Lane, West Salem, Ohio. According to schedule A, the property has a value of $200,000.00. Schedule D identified the following secured claims on the property:

Thereafter, NCB recorded a mortgage on September 25, 2000. At that point in time, the liens were held in the following priority:

Mort-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 B.R. 164
280 B.R. 164
(Cite as: 280 B.R. 164)

| Priority: | Mort-gagee: | at Petition Date: | Record Date: | gage Face Amount: | Recorder's Cite: |
|---|---|---|---|---|---|
| First | NCB | $264,000.00 | 01/12/1998 | $600,000.00 | Vol. 82, Page 586 |
| Second | Fifth Third | $147,000.00 | 10/27/1998 | $157,300.00 | Vol. 114, Page 209 |
| Third | NCB | $142,000.00 | 09/25/2000 | $150,000.00 | Vol. 184, Page 179 |

On October 17, 2000, NCB filed a subordination agreement with the county recorder. The agreement states:

This agreement is entered into this 7th day of September, 2000 by and between National City Bank (Bank) Ashland, Ohio and Robert A. Kobak and Elizabeth Kobak, West Salem, Ohio (Debtor).

Recitals:

Whereas, Robert A. Kobak and Elizabeth A. Kobak have executed their mortgage deed to National City Bank to secure a loan dated December 29, 1997 in the amount of $600,000.00 which mortgage was filed for record January 12, 1998 and recorded in Volume 82, Page 586-588 of the Ashland County Mortgage Records; and

Whereas Robert A. Kobak and Elizabeth Kobak have executed an additional mortgage deed to National City Bank to secure a loan dated September 7, 2000 in the amount of $150,000.00, which mortgage was filed for record September 25, 2000 and recorded in Volume 184, Page 179-181 of the Ashland County Mortgage Records;

Now therefore, for good and valuable consideration by National City Bank to Robert A. Kobak and Elizabeth A. Kobak for the granting of the secured loan, the parties hereby agree that the mortgage recorded in Volume 82, Page 586-588 is hereby subordinated as to priority to the mortgage recorded in Volume 184, Pages 179-181.

(typeface partially altered). The agreement subordinates the January 1998 mortgage to the September 2000 mortgage, but NCB and Fifth Third are unable to agree how the subordination agreement affects priority of the liens.

## II. ARGUMENTS

Defendant NCB argues that it holds the first and best lien on the property. According to NCB, the subordination agreement subordinates the January 12, 1998 mortgage to the September 25, 2000 mortgage. Therefore, the lien arising from the September 25, 2000 mortgage is the first and best lien on the property because it steps in front of the January 1998 lien which was first in line prior to the subordination agreement. The essence of NCB's argument is that the liens exchanged positions. Because Fifth Third was not a party to the subordination agreement, NCB argues that the subordination agreement does not affect, adversely or nonadversely, Fifth Third's interest.

Fifth Third argues that it holds the first and best lien on the property. It is Fifth Third's position that the filing of the subordination agreement on September 25, 2000 resulted in placing the NCB liens in second and third positions, behind Fifth Third. Fifth Third reasons: since the earlier*167 recorded lien was subordinated to the later recorded lien, the filing date of the later recorded lien controls. Since Fifth Third's interest was recorded earlier than the lien given priority through the subordination agreement, Fifth Third holds the first and best lien. en.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### III. STANDARD OF REVIEW

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, as adopted by Federal Rule of Bankruptcy Procedure 7056. The rule provides that a motion for summary judgment should be granted "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in the [moving party's] materials must be viewed in the light most favorable to the party opposing the motion." *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (quoting *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). If the evidence as presented "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party "bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thereafter, the nonmoving party must come forward and demonstrate the existence of genuine issues of material fact. The nonmoving party cannot merely rely on the pleadings or a mere scintilla of evidence to demonstrate the existence of such facts but instead must specifically set forth evidence sufficient to demonstrate the existence of disputed material facts. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Cities Serv.,* 391 U.S. at 288, 88 S.Ct. 1575. Only facts which could conceivably impact the outcome of the litigation are material. *See Liberty Lobby,* 477 U.S. at 248, 106

S.Ct. 2505.

### IV. LAW AND ANALYSIS

[1] The question before the court is rooted in an issue often referred to as "circular priority." *See Duraflex Sales & Serv. Corp. v. W.H.E. Mech. Contractors,* 110 F.3d 927 (2nd Cir.1997); *In re Cliff's Ridge Skiing Corp.,* 123 B.R. 753 (Bankr.W.D.Mich.1991). Because of the subordination agreement, lien priority is not a simple question of who was "first-in-time." Rather, the court must determine the effect of a subordination agreement on a lienholder not party to the agreement.

Prior to the agreement, NCB held first and third positions, while Fifth Third occupied the second. Following execution of the agreement, Fifth Third's position can either remain unchanged, or, as Fifth Third argues, improve.

Judge Sellers in the Bankruptcy Court for the Southern District of Ohio set forth a comprehensive review of subordination agreements:

A subordination agreement is an agreement by which a party having a superior right of some sort agrees with someone *168 having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior. Feinstein and Kayles, *Foreclosure: Subordination, Non-Disturbance and Attornment Agreements,* Prob. and Prop., July/August 1989, at 38. In the context of commercial financing, subordination agreements may be generally classified as being one of two types: debt subordinations or property interest subordinations. (footnote omitted).

In debt subordination, the agreement provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant. If the debt subordination is "complete," the subordinated creditor is barred from receiving payments until the superior debt is paid in full.

Debt subordinations are routinely utilized when a corporate or partnership borrower seeks financing from a commercial lender. The commercial lender will insist

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 B.R. 164
**(Cite as: 280 B.R. 164)**

that all indebtedness of the corporation or partnership to management or other insiders be subordinated to the lender's proposed financing. The lender demands subordination for reasons more than just security; the lender wants its loans to be used as working capital in the borrower's business and not just to repay insider debts.

Debt subordination should be contrasted to property interest subordination. In a property interest subordination, the agreement affects only the relative rights of parties in particular real or personal property. Property interest subordination does not concern any rights the parties may have to receive payments.

The most common type of property interest subordination is lien subordination. By executing a lien subordination agreement, the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse until the other party's secured claim has been satisfied. *See*, U.C.C. § 9-316. In a pure lien subordination, the subordinating party's right to receive payments is not limited.

*In re The Lantana Motel,* 124 B.R. 252, 255-56 (Bankr.S.D.Ohio 1990). Upon review, the court concludes the agreement between NCB and Debtors was a lien subordination. NCB demoted the priority of the January 1998 lien to the lien recorded in September 2000.

[2] The parties do not challenge the validity or enforceability of the agreement. The Bankruptcy Code provides, at 11 U.S.C. § 510(a), that "[a] subordination agreement is enforceable in a case under this title to the same extent that such an agreement is enforceable under non-bankruptcy law." The issue presented concerns the impact execution had on the existing lien interests. Thus, the court must look to controlling non-bankruptcy law to determine the subordination agreement's effect.

[3] As set forth in the Ohio Revised Code, priority interests are subject to subordination. *See*O.R.C. § 1309.339. The right to subordinate interests is not unfettered, however. A subordination agreement cannot adversely affect the interest of an entity not party to the agreement. *See In re Smith,* 77 B.R. 624

(Bankr.N.D.Ohio 1987) (citing *Pioneer-Cafeteria Feeds, Ltd. v. Mack (In re Wyse),* 340 F.2d 719, 723 (6th Cir.1965)); *In re Henzler Mfg. Corp.,* 36 B.R. 303, 305 (Bankr.N.D.Ohio 1984) (citation omitted). The subordination agreement was executed between the Debtors and NCB; Fifth Third was not a signatory to the contract. Since Fifth Third was not a party, Fifth Third's interests cannot be harmed by execution of *169 the subordination agreement between Debtors and NCB. The question is whether Fifth Third's position can be improved as a result of the subordination agreement.

[4][5] Under Ohio law, subordination agreements are "to be interpreted in accordance with ordinary contract principles ... When a contract is unambiguous, the parties rights are governed exclusively by the contract." *Miller v. MIF Realty (In re Perrysburg Marketplace Co.),* 208 B.R. 148, 160 (Bankr.N.D.Ohio 1997) (citing *In re General Homes Corp., FGMC,* 134 B.R. 853, 864 (Bankr.S.D.Tex.1991) (citations omitted)). The subordination agreement specifically states that the first mortgage is subordinated as to priority to the third mortgage. Subordinate is defined as "[p]laced in a lower order, class, or rank; occupying a lower position in a regular descending series; inferior in order, nature, dignity, power, importance, or the like; belonging to an inferior order in classification, and having a lower position on a recognized scale; secondary, minor." Black's Law Dictionary 994 (6th ed.1991). At no point does the subordination agreement evidence an intent to subordinate the NCB interest to Fifth Third's interest.

Clearly, if the first NCB mortgage is to be subordinated to the second NCB mortgage, it must assume a lower priority status than the first mortgage. However, there is more than one way that this may be conceptualized. The court poses three examples. First, the January 1998 lien could become junior to both the Fifth Third and September 2000 lien. This would improve Fifth Third's position as it would be entitled to payment in full before any other lienholder. Second, the lien could simply trade places with the January 1998 lien. This also would improve Fifth Third's position because the September 2000 lien is a smaller obligation. In the event of foreclosure, less money would be allocated to the claim of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 B.R. 164
280 B.R. 164
**(Cite as: 280 B.R. 164)**

Page 6

the first lienholder, putting the second lienholder in a better position. The third alternative would truly keep Fifth Third in the exact same position:

A, B and C have claims against the debtor which are entitled to priority in alphabetical order. "A" subordinates his claim to "C." After foreclosure of the secured interest, the resulting fund is insufficient to satisfy all three claims. The proper distribution of the fund is as follows.

1. Set aside from the fund the amount of "A" 's claim.

2. Out of the money set aside, pay "C" the amount of its claim, pay "A" to the extent of any balance remaining after "C" 's claim is satisfied.

3. Pay "B" the amount of the fund remaining after "A" 's claim has been set aside.

4. If any balance remains in the fund after "A" 's claim has been set aside and "B" 's claim has been satisfied, distribute the balance to "C" and "A".

*See* Gilmore, *Security Interests in Personal Property* § 391.1 at 1021 (1965).

Thus, "C", by virtue of the subordination agreement, is paid first, but only to the amount of "A" 's claim, to which "B" was in any event junior. "B" receives what it had expected to receive, the fund less "A" 's prior claim. If "A" 's claim is smaller than "C" 's, "C" will collect the balance of its claim, in its own right, only after "B" has been paid in full. "A", the subordinator, receives nothing until "B" and "C" have been paid, except to the extent that its claim, entitled to first priority, exceeds the amount of "C" 's claim, which, under its agreement, is to be paid first.

**\*170** *Cliff's Ridge,* 123 B.R. at 767 (citing *ITT Diversified Credit Corp. v. First City Capital Corp.,* 737 S.W.2d 803, 804 (Tex.1987) (citations omitted)).

Upon review of the authorities, the court concludes that the third alternative, and the one advanced in *ITT Diversified,* is the stronger position. Fifth Third was not a party to the subordination agreement and therefore its

position should not be impaired or enhanced by that agreement. *See Duraflex,* 110 F.3d at 935; *Cliff's Ridge,* 123 B.R. at 767. Through the subordination agreement, NCB affected a partial lien subordination similar to that presented in both *Duraflex* and *Cliff's Ridge.* Since the September 2000 lien secured a smaller obligation, the first priority lien was not completely subjugated. This approach maintains Fifth Third's original position without change. Since Fifth Third was not a party to the subordination agreement, this conclusion is rational and equitable.

Further, the result promotes positive economic benefits and fosters commercial transactions and economic efficiency. NCB's two separate loans may be sold or transferred independently, thus enhancing the efficiency of capital markets. Fifth Third's interpretation is one of "legal gotcha" which does not enhance the efficiency of anything and discourages lending to distressed parties. The nonparty to the subordination agreement is left in the same position it was prior to the execution and with the same potential expectation of recovery. When Fifth Third entered into the mortgage agreement with Debtors, it knew what was in front of it, an open-end mortgage for $600,000, and the maximum which could be covered by that mortgage. Since the mortgage was open-ended, and contained a future addance clause, Fifth Third also knew that the balance could be increased to as much as $600,000 at any time. *See* O.R.C. § 5301.232. It entered into the transaction knowing the ceiling of the first mortgage and the risk created thereby.

The subordination could not extend priority to amounts by which both loans exceed the limit of the highest ranking open-end mortgage. That is not an issue in this case. Fifth Third continues to receive the benefit of its bargain and maintains its priority position in spite of the subordination agreement. NCB's position changes only to the extent it agreed to through subordination.

The result does not restrict transferability, so there is no disincentive to avoid these types of transactions. The benefits to subordination agreements was noted in *Duraflex:* "such agreements accelerate the flow of cash to troubled projects-financial relief that promotes the de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

280 B.R. 164
280 B.R. 164
(Cite as: 280 B.R. 164)

velopment of assets that secure payments to all lien-holders." *Duraflex,* 110 F.3d at 936.

This decision is in accord with statements made by the Sixth Circuit: "[i]t is to be noted, however, that the enforcement of subordination agreements between creditors of the same bankrupt, affects only their rights and does not interfere with or change the rights of other creditors." *Pioneer-Cafeteria Feeds, Ltd. v. Mack (In re Wyse),* 340 F.2d 719, 723 (6th Cir.1965); *see also In re Smith,* 77 B.R. 624 (Bankr.N.D.Ohio 1987); *Hunter v. Ohio Citizens Bank (In re Henzler Mfg. Corp.),* 36 B.R. 303, 305 (Bankr.N.D.Ohio 1984). Through adoption of the above approach, Fifth Third's position is neither improved nor impaired. NCB was free to loan up to $600,000.00 from a first lien position prior to Fifth Third granting its loan, which Fifth Third knew from the public record. This decision preserves and advances the reasonable expectations of the parties. The goal of the law is preserving*171 and advancing reasonable expectations.

## V. CONCLUSION

Debtors and NCB executed a subordination agreement whereby NCB agreed to subordinate its first priority lien to its third priority lien. Fifth Third's secured interest held second priority when the subordination agreement was recorded. The subordination agreement is valid and enforceable pursuant to 11 U.S.C. § 510(a) and state law. Fifth Third was not a party to the agreement nor did the agreement evince an intent to subordinate any of NCB's interest to Fifth Third. NCB's September 2000 lien merely took senior status and "displaced" the first priority lien in an amount equal to the obligation secured by the September 2000 lien. The recording of the subordination agreement did not result in a positive or negative change to Fifth Third's position, thereby leaving Fifth Third in the exact same position as it was prior to the recording of the agreement.

Bkrtcy.N.D.Ohio,2002.
In re Kobak
280 B.R. 164

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



364 F.3d 355                                                                      Page 1
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
**(Cite as: 364 F.3d 355)**

**H**In re Bank of New England Corp.
C.A.1 (Mass.),2004.

United States Court of Appeals,First Circuit.
In re BANK OF NEW ENGLAND CORP., Debtor.
HSBC Bank USA and JPMorgan Chase Bank, as
Indenture Trustees, Appellants,
v.
Dr. Ben S. BRANCH, Trustee in Bankruptcy, et al.,
Appellees.
**No. 03-1321.**

Heard Jan. 6, 2004.
Decided April 13, 2004.

**Background:** Chapter 7 trustee moved for leave to
make distribution to junior bondholders, and
indenture trustees for senior bondholders objected on
ground that they should first be paid for any interest
that accrued postpetition. The United States
Bankruptcy Court for the District of Massachusetts,
William C. Hillman, Chief Judge, 269 B.R. 82,
granted trustee's motion, and indenture trustees
appealed. The District Court, Richard G. Stearns, J.,
295 B.R. 419, affirmed, and indenture trustees
appealed.

**Holdings:** The Court of Appeals, Selya, Circuit
Judge, held that:
(1) pursuant to the Bankruptcy Code, the
enforceability of subordination agreements in
bankruptcy must be judged by reference to generally
applicable state contract law, and states may not
create special rules applicable only in bankruptcy;
(2) addressing an issue of apparent first impression in
the circuit, the rule of explicitness, which provides
that only unequivocal language in a subordination
agreement can overcome the generic bar on recovery
of postpetition interest, was not part of New York's
general contract law outside the bankruptcy context
and, thus, could not be applied in construing the
subordination agreements in question; and
(3) under New York's general contract law, the
instant subordination clauses, which required full
payment of "interest due or to become due," were
ambiguous as to whether they provided for the

priority payment of postpetition interest on senior
debt.

Vacated and remanded with instructions.

West Headnotes

[1] Bankruptcy 51  3779

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3779 k. Scope of Review in General.
Most Cited Cases

Bankruptcy 51  3782

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases

Bankruptcy 51 3786

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear Error. Most Cited
Cases
Court of Appeals cedes no special deference to a
district court's initial review of a bankruptcy court's
decision; rather, the Court of Appeals looks directly
to the bankruptcy court's decision, examining that
court's findings of fact for clear error and its
conclusions of law de novo.

[2] Bankruptcy 51 3782

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases
Insofar as a bankruptcy court's decision hinges on an
interpretation of the Bankruptcy Code, it presents a
question of law and, thus, engenders de novo review.

[3] Bankruptcy 51  2970

51 Bankruptcy
  51VII Claims
    51VII(F) Priorities
      51k2967 Subordination
        51k2970 k. Subordination Agreements.
Most Cited Cases
"Subordination agreements" are essentially inter-
creditor arrangements, designed to operate in a wide
range of contingencies, one of which is insolvency,
which, as a hedge against the ravages of a future
bankruptcy, typically provide that one creditor will
subordinate its claim against the debtor, the putative
bankrupt, in favor of the claim of another creditor,
thereby altering the normal priority of the junior
creditor's claim so that it becomes eligible to receive
a distribution only after the claims of the senior
creditor have been satisfied.

[4] Bankruptcy 51  2836

51 Bankruptcy
  51VII Claims
    51VII(A) In General
      51k2835 Interest
        51k2836 k. Post-Petition Interest. Most
Cited Cases
Accrual of interest on an unsecured or undersecured
claim generally stops upon the debtor's filing of a
bankruptcy petition. Bankr.Code, 11 U.S.C.A. §
502(b)(2).

[5] Bankruptcy 51  2836

51 Bankruptcy

51VII Claims
  51VII(A) In General
    51k2835 Interest
      51k2836 k. Post-Petition Interest. Most
Cited Cases

Bankruptcy 51  2970

51 Bankruptcy
  51VII Claims
    51VII(F) Priorities
      51k2967 Subordination
        51k2970 k. Subordination Agreements.
Most Cited Cases
Equitable doctrine known as the "rule of
explicitness" has evolved into a requirement that only
unequivocal language in a subordination agreement
may overcome the generic bar on recovery of
postpetition interest.

[6] Bankruptcy 51 2970

51 Bankruptcy
  51VII Claims
    51VII(F) Priorities
      51k2967 Subordination
        51k2970 k. Subordination Agreements.
Most Cited Cases
Bankruptcy Code's subordination provision, which
provides that a subordination agreement is
enforceable in bankruptcy to the same extent as under
"applicable nonbankruptcy law," supplants the judge-
made doctrine through which the courts previously
had dealt with subordination agreements.
Bankr.Code, 11 U.S.C.A. § 510(a).

[7] Bankruptcy 51 2125

51 Bankruptcy
  51II Courts; Proceedings in General
    51II(A) In General
      51k2124 Power and Authority
        51k2125 k. Equitable Powers and
Principles. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Bankruptcy 51**  **2970**

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2967 Subordination
            51k2970 k. Subordination Agreements.
Most Cited Cases
Because equitable powers possessed by bankruptcy
courts must and can only be exercised within the
confines of the Bankruptcy Code, enactment of the
section of the Code governing subordination means
that the enforcement of subordination provisions is
no longer a matter committed to the bankruptcy
courts' notions of what may or may not be equitable.
Bankr.Code, 11 U.S.C.A. § 510(a).

**[8] Statutes 361**  **190**

361 Statutes
   361VI Construction and Operation
      361VI(A) General Rules of Construction
         361k187 Meaning of Language
            361k190 k. Existence of Ambiguity.
Most Cited Cases
Language of an unambiguous statute normally
determines its meaning.

**[9] Bankruptcy 51**  **2021.1**

51 Bankruptcy
   51I In General
      51I(B) Constitutional and Statutory
Provisions
         51k2021 Construction and Operation
            51k2021.1 k. In General. Most Cited
Cases
Phrase "applicable nonbankruptcy law," as used
generally in the Bankruptcy Code, can refer to either
federal or state law.

**[10] Federal Courts 170B**  **412.1**

170B Federal Courts
   170BVI State Laws as Rules of Decision

      170BVI(C) Application to Particular Matters
         170Bk412 Contracts; Sales
            170Bk412.1 k. In General. Most Cited
Cases
Construction of private contracts is usually a matter
committed to state law.

**[11] Bankruptcy 51**  **2970**

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2967 Subordination
            51k2970 k. Subordination Agreements.
Most Cited Cases
Phrase "applicable nonbankruptcy law," as used in
section of the Bankruptcy Code governing
subordination, refers to state contract law.
Bankr.Code, 11 U.S.C.A. § 501(a).

**[12] Federal Courts 170B**  **412.1**

170B Federal Courts
   170BVI State Laws as Rules of Decision
      170BVI(C) Application to Particular Matters
         170Bk412 Contracts; Sales
            170Bk412.1 k. In General. Most Cited
Cases
Resort to a federal common law of contract
enforcement ordinarily is justified only when
required by a distinct national policy or interest.

**[13] Federal Courts 170B** **412.1**

170B Federal Courts
   170BVI State Laws as Rules of Decision
      170BVI(C) Application to Particular Matters
         170Bk412 Contracts; Sales
            170Bk412.1 k. In General. Most Cited
Cases
Interpretation and enforcement of financial
arrangements between private parties does not
constitute a distinct national policy or interest
sufficient to justify resorting to a federal common
law of contract enforcement.

**[14] Bankruptcy 51**  2970

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2967 Subordination
            51k2970 k. Subordination Agreements.
Most Cited Cases
By requiring in the Bankruptcy Code that the enforceability of subordination agreements be subject to applicable nonbankruptcy law, Congress determined that such agreements should be interpreted using non-uniform principles. Bankr.Code, 11 U.S.C.A. § 510(a).

**[15] Bankruptcy 51**  2534

51 Bankruptcy
   51V The Estate
      51V(C) Property of Estate in General
      51V(C)1 In General
         51k2534 k. Effect of State Law in General. Most Cited Cases
In the absence of specific statutory provisions to the contrary, property interests should not be analyzed differently as a result of a party's involvement in a bankruptcy case.

**[16] Bankruptcy 51**  2534

51 Bankruptcy
   51V The Estate
      51V(C) Property of Estate in General
      51V(C)1 In General
         51k2534 k. Effect of State Law in General. Most Cited Cases
In the context of property rights, bankruptcy courts should only modify the usual state-law compendium of rights and remedies if and to the extent that such modifications are specifically authorized or directed by the Bankruptcy Code.

**[17] Bankruptcy 51** 2970

51 Bankruptcy

51VII Claims
   51VII(F) Priorities
      51k2967 Subordination
         51k2970 k. Subordination Agreements.
Most Cited Cases
In keeping with the principle that bankruptcy is an area of distinct federal competence, Congress has conferred on the federal courts the power to apply any and all generally applicable state rules of contract interpretation in construing subordination agreements. Bankr.Code, 11 U.S.C.A. § 510(a).

**[18] Bankruptcy 51**  2970

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2967 Subordination
            51k2970 k. Subordination Agreements.
Most Cited Cases
Enforceability of subordination agreements in bankruptcy must be judged by reference to generally applicable state contract law; the Bankruptcy Code's clear directive for the use of applicable nonbankruptcy law leaves no room for state legislatures or state courts to create special rules pertaining strictly and solely to bankruptcy matters. Bankr.Code, 11 U.S.C.A. § 510(a).

**[19] Bankruptcy 51** 2970

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2967 Subordination
            51k2970 k. Subordination Agreements.
Most Cited Cases
Rule of explicitness, which provides that only unequivocal language in a subordination agreement can overcome the generic bar on recovery of postpetition interest, was not part of New York's general contract law outside the bankruptcy context and, thus, could not be applied in construing subordination clauses contained in debt instruments issued by Chapter 7 debtor. Bankr.Code, 11 U.S.C.A. § 510(a).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
**(Cite as: 364 F.3d 355)**

[20] **Bankruptcy 51**  2002

51 Bankruptcy
    51I In General
        51I(A) In General
            51k2002 k. Application of State or Federal
Law in General. Most Cited Cases

**Federal Courts 170B**  382.1

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(B) Decisions of State Courts as
Authority
            170Bk382 Court Rendering Decision
                170Bk382.1 k. In General. Most Cited
Cases

**Federal Courts 170B**  412.1

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk412 Contracts; Sales
                170Bk412.1 k. In General. Most Cited
Cases
While a federal court must defer when the highest
court of a state interprets the state's general contract
law, no such deference is due to a state court's
importation of a bankruptcy-specific rule into its own
jurisprudence.

[21] **Courts 106**  489(1)

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(B) State Courts and United States
Courts
            106k489 Exclusive or Concurrent
Jurisdiction
                106k489(1) k. In General. Most Cited
Cases
State courts have the power to interpret federal law.

[22] **Bankruptcy 51**  2970

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2967 Subordination
                51k2970 k. Subordination Agreements.
Most Cited Cases
If a state, as part of its general contract law,
enunciates an interpretive principle that applies to
subordination agreements generally, such as
"construe all subordination provisions strictly and
enforce them only if the intent to subordinate is, on a
particular set of facts, super-clear," that principle
would be enforceable under the Bankruptcy Code's
subordination provision. Bankr.Code, 11 U.S.C.A. §
510(a).

[23] **Bankruptcy 51**  2970

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2967 Subordination
                51k2970 k. Subordination Agreements.
Most Cited Cases
Whether subordination provisions contained in debt
instruments issued by Chapter 7 debtor were
ambiguous with respect to the relative priority of the
payment of postpetition interest on senior debt was a
question of New York law; clearly worded choice of
law provisions tied the construction and
interpretation of the instruments to the law of New
York. Bankr.Code, 11 U.S.C.A. § 510(a).

[24] **Contracts 95**  143(4)

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(4) k. Subject, Object, or
Purpose as Affecting Construction. Most Cited Cases

**Contracts 95** 169

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355

364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079

(Cite as: 364 F.3d 355)

Page 6

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k169 k. Extrinsic Circumstances. Most Cited Cases

Under New York law, contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish.

[25] Contracts 95  143.5

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143.5 k. Construction as a Whole. Most Cited Cases

Contracts 95  169

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k169 k. Extrinsic Circumstances. Most Cited Cases

Under New York law, in interpreting a contract, court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.

[26] Contracts 95  143.5

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143.5 k. Construction as a Whole. Most Cited Cases

Contracts 95  147(1)

95 Contracts
    95II Construction and Operation

        95II(A) General Rules of Construction
            95k147 Intention of Parties
                95k147(1) k. In General. Most Cited Cases

Under New York law, particular words in a contract should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.

[27] Contracts 95  154

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k151 Language of Instrument
                95k154 k. Reasonableness of Construction. Most Cited Cases

Under New York law, form should not prevail over substance in the interpretation of a contract, and a sensible meaning of words should be sought.

[28] Contracts 95  143(2)

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(2) k. Existence of Ambiguity. Most Cited Cases

Under New York law, a contract is "ambiguous" when its provisions are susceptible of two or more reasonable interpretations.

[29] Bankruptcy 51  2970

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2967 Subordination
            51k2970 k. Subordination Agreements. Most Cited Cases

Under New York's general contract law, subordination clauses contained in debt instruments issued by Chapter 7 debtor, which required full payment of "interest due or to become due" upon the occurrence of a number of events, including

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355                                                                                                              Page 7
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
**(Cite as: 364 F.3d 355)**

bankruptcy, were ambiguous as to whether they provided for the priority payment of postpetition interest on senior debt; in light of special rules applicable to payment of interest in bankruptcy, words at issue reasonably could be interpreted to apply only to triggering events outside of the bankruptcy context, where they had an unambiguous meaning, or, on the other hand, words reasonably could be interpreted to apply to all triggering events, including bankruptcy, in which case the words had no clear meaning and court would face further ambiguity in trying to determine their contours. Bankr.Code, 11 U.S.C.A. § 510(a).

**[30] Bankruptcy 51**  2970

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2967 Subordination
            51k2970 k. Subordination Agreements.
Most Cited Cases
Where subordination clauses contained in debt instruments issued by Chapter 7 debtor lacked in certitude as to whether they actually provided for the payment of postpetition interest on senior debt prior to any payment referable to junior debt, New York law required that the ambiguity be resolved through a contextual examination of the parties' intent, taking full account of the surrounding facts and circumstances. Bankr.Code, 11 U.S.C.A. § 510(a).

**[31] Bankruptcy 51**  2970

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2967 Subordination
            51k2970 k. Subordination Agreements.
Most Cited Cases
Under New York law, a trial concerning the parties' intent with respect to ambiguous subordination clauses contained in debt instruments issued by Chapter 7 debtor could be avoided only if such intent was made manifest within the four corners of the contract itself. Bankr.Code, 11 U.S.C.A. § 510(a).

**[32] Bankruptcy 51**  2970

51 Bankruptcy
   51VII Claims
      51VII(F) Priorities
         51k2967 Subordination
            51k2970 k. Subordination Agreements.
Most Cited Cases
Where subordination clauses contained in debt instruments issued by Chapter 7 debtor were ambiguous under New York law, thus requiring a contextual examination of the parties' intent, the backdrop of bankruptcy could inform the examination of such intent. Bankr.Code, 11 U.S.C.A. § 510(a).

\*359 Douglas B. Rosner, with whom Goulston & Storrs, Sarah L. Reid, Joseph N. Froehlich, Kelley Drye & Warren LLP, David S. Rosner, Daniel N. Zinman, and Kasowitz, Benson, Torres & Friedman LLP were on brief, for appellants.
Robin Russell, with whom Hugh M. Ray and Andrews Kurth LLP were on brief, for appellee Branch.
Patrick J. McLaughlin, with whom Katherine A. Constantine, Monica L. Clark, Dorsey & Whitney LLP, Dianne F. Coffino, and Dewey Ballantine LLP were on brief, for remaining appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and SMITH,[FN*] District Judge.

     FN* Of the District of Rhode Island, sitting by designation.

SELYA, Circuit Judge.
This is a case that straddles a crossroads formed by the intersection of federal and state law. It requires us to decide an issue of first impression in this circuit regarding the enforceability in bankruptcy of agreements that allow the subordination of certain indebtedness. Our decision partially contradicts the decision of the only other court of appeals to have grappled with this same set of questions, see Chem. Bank v. First Trust of N.Y. (*In re Southeast Banking Corp.*), 156 F.3d 1114 (11th Cir.1998), and to that extent creates a circuit split.

The precise dispute between the parties focuses on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
(Cite as: 364 F.3d 355)

Page 8

the priority (if any) that attaches to payment of post-petition interest on indebtedness that benefits from the contractual subordination of other indebtedness. As the question has been framed by the litigants and the lower courts, the answer depends on whether the subordination provisions at issue comply with the Rule of Explicitness. So phrased, the question assumes the continued vitality of that rule. Because we doubt the accuracy of that assumption, we step back to the beginning and inquire into the basis for believing that the Rule of Explicitness remains alive and well.

That step places us at the head of a long and winding path. After traveling it, we conclude that the enactment of section 510(a) of the Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 92 Stat. 2549, 2586 (codified at 11 U.S.C. § 510(a)), extinguished the Rule of Explicitness in its classic form. We further conclude that states are not free to adopt rules of contract interpretation that apply only in bankruptcy. For purposes of this case, then, the Rule of Explicitness is a dead letter.

**\*360** Faced with this reality, we proceed to analyze the effect of the subordination provisions under New York's generally applicable principles of contract law-principles that do not embody any canon that operates in the same manner as the Rule of Explicitness. That analysis reveals an ambiguity in the language of the subordination provisions. The resolution of this ambiguity requires an inquiry into the parties' intent. That inquiry is fact-based and the bankruptcy court has not made the necessary findings. Consequently, we vacate the judgment below and remand for further proceedings.

## I. BACKGROUND

The underlying facts are largely undisputed. In its halcyon days, the Bank of New England (BONE) issued six separate series of debt instruments.[FN1] Clearly worded choice of law provisions tie the construction and interpretation of these instruments to the law of New York. Three of these offerings (the Senior Debt) are entitled to the benefit of contractual subordination provisions. They include (i) a series of debentures bearing interest at 7.625% per annum, due in 1998, in the aggregate principal amount of $25,000,000; (ii) a series of debentures bearing interest at 8.85% per annum, due in 1999, in the

aggregate principal amount of $20,000,000; and (iii) a series of notes bearing interest at a rate of 9.5% per annum, due in 1996, in the aggregate principal amount of $150,000,000. HSBC Bank USA and JPMorgan Chase Bank, appellants here, serve as Indenture Trustees for the Senior Debt. The remaining three offerings (the Junior Debt) are subordinated to the Senior Debt. They include (i) a series of floating rate debentures, due in 1996, in the aggregate principal amount of $75,000,000; (ii) a series of debentures bearing interest at 8.75% per annum, due in 1999, in the aggregate principal amount of $200,000,000; and (iii) a series of debentures bearing interest at 9.875% per annum, due in 1999, in the aggregate principal amount of $250,000,000. Each trust indenture referable to Junior Debt contains a subordination provision that is substantially similar to the following:

> FN1. Two of these were actually issued by BONE's predecessors in interest, but this technicality in no way affects our analysis. Thus, we disregard it.

[E]ach Holder likewise covenants and agrees by his acceptance thereof, that the obligations of the Company to make any payment on account of the principal of and interest on each and all of the Notes shall be subordinate and junior, to the extent and in the manner hereinafter set forth, in right of payment to the Company's obligations to the holders of Senior indebtedness of the Company.
Each of these indentures also specifies that:

The Company agrees that upon ... any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership, conservatorship or other proceedings, all principal (and premium, if any), sinking fund payments and interest due or to become due upon all Senior Indebtedness of the Company shall first be paid in full, or payment thereof provided for in money or money's worth in accordance with its terms, before any payment is made on account of the principal of or interest on the indebtedness evidenced by the [Junior] Notes due and owing at the time....

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
(Cite as: 364 F.3d 355)

Page 9

\*361 On January 7, 1991, BONE filed a voluntary petition for bankruptcy. See11 U.S.C. §§ 701-766. At that time, much of the Senior and Junior Debt was still outstanding. Everyone agrees that, in bankruptcy, the holders of the Senior Debt are contractually entitled to priority. Withal, the parties fiercely dispute whether that priority extends to the payment of post-petition interest.

Since filing for bankruptcy, BONE, under the careful stewardship of its Chapter 7 trustee, has made three distributions to creditors. Through these distributions, the bankruptcy estate has paid the holders of the Senior Debt the full amount of all unpaid principal and pre-petition interest, together with all approved fees and expenses incurred through the date of the last distribution (October 26, 1999). The trustee then created an ample reserve for future fees and expenses and, at that point, concluded that he had satisfied the obligations owed to the holders of the Senior Debt. When, thereafter, the trustee determined that there existed sufficient unencumbered funds, he sought permission to make a distribution in the amount of $11,000,000 to the holders of the Junior Debt. The appellants objected on the ground that the trustee had not yet paid post-petition interest on the Senior Debt.

The bankruptcy court overruled this objection and authorized the proposed distribution. *In re Bank of New Engl. Corp.*, 269 B.R. 82, 86 (Bankr.D.Mass.2001). The court based its decision on the Rule of Explicitness, holding that New York law recognized the rule and that the language of the subordination provisions failed to satisfy it. *Id.* at 85-86. The district court affirmed. *HSBC Bank USA v. Bank of New Engl. Corp. (In re Bank of New Engl. Corp.),* 295 B.R. 419, 424-25 (D.Mass.2003). The court's analysis differed somewhat from that of the bankruptcy court, but it too deemed the Rule of Explicitness controlling. *Id.* at 424. This appeal ensued.

## II. DISCUSSION

[1][2] We cede no special deference to the district court's initial review of the bankruptcy court's decision. *See Gannett v. Carp (In re Carp ),* 340 F.3d 15, 21 (1st Cir.2003). Rather, we look directly to the bankruptcy court's decision, examining that court's findings of fact for clear error and its conclusions of law de novo. *Id.* Insofar as the bankruptcy court's decision hinges on an interpretation of the Bankruptcy Code, it presents a question of law (and, thus, engenders de novo review). *United States v. Yellin (In re Weinstein ),* 272 F.3d 39, 42 (1st Cir.2001).

As the litigants and the lower courts have framed the issue, the pivotal question is whether the language of the subordination provisions satisfies the Rule of Explicitness. We do not agree that this is the correct question. Thus, we retreat to first principles.

[3] Subordination agreements are essentially inter-creditor arrangements. 4 Lawrence P. King et al., Collier on Bankruptcy ¶ 510.03[2], at 510-7 (15th rev. ed.2003). They are designed to operate in a wide range of contingencies, one of which is insolvency. As a hedge against the ravages of a future bankruptcy, subordination agreements typically provide that one creditor will subordinate its claim against the debtor (the putative bankrupt) in favor of the claim of another creditor. This subordination alters the normal priority of the junior creditor's claim so that it becomes eligible to receive a distribution only after the claims of the senior creditor have been satisfied. *Id.* at ¶ 510.01, at 510-3.

Prior to 1978, the Bankruptcy Act contained no specific mention of subordination agreements. *See* Alan N. Resnick & Brad \*362 Eric Scheler, *The Right of a Senior Creditor to Receive Post-Petition Interest from a Subordinated Creditor's Distributions: Did the Rule of Explicitness Survive the Enactment of the Bankruptcy Code?,* 32 Uniform Comm.Code L.J. 466, 466 (2000). Accordingly, subordination provisions were enforced in bankruptcy through the bankruptcy court's equitable powers. *See, e.g., Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortg. Corp.),* 514 F.2d 400, 401-02 (2d Cir.1975) (per curiam); *Matter of Time Sales Fin. Corp.,* 491 F.2d 841, 844 (3d Cir.1974); *Bird & Sons Sales Corp. v. Tobin,* 78 F.2d 371, 373 (8th Cir.1935). Enforcing such agreements was necessary to prevent junior creditors from receiving windfalls after having explicitly agreed to accept less lucrative payment arrangements. *See Matter of Credit Indus. Corp.,* 366 F.2d 402, 410 (2d Cir.1966); *In re Hinderliter Indus., Inc.,* 228 B.R. 848, 853 (Bankr.E.D.Tex.1999). Equity dictated enforcement because "[e]quality among creditors who have lawfully bargained for different treatment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
**(Cite as: 364 F.3d 355)**

is not equity but its opposite." *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir.1966).

[4] Defining the outer limits of this equitable rule, especially with respect to post-petition interest, posed a thorny problem. Generally, the accrual of interest on an unsecured or undersecured claim stops upon the debtor's filing of a bankruptcy petition. *See, e.g., Nicholas v. United States*, 384 U.S. 678, 682, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966); *Sexton v. Dreyfus*, 219 U.S. 339, 344, 31 S.Ct. 256, 55 L.Ed. 244 (1911); *see also* 11 U.S.C. § 502(b)(2); Bankruptcy Act of 1898, § 63(a). Yet, subordination agreements sometimes contain language that prioritizes (or, at least, arguably prioritizes) the payment of post-petition interest on senior indebtedness over any recovery on junior indebtedness. From the outset, courts have been uncomfortable with enforcing this type of prioritization for fear that cases would arise "where a senior creditor may potentially recover more under a subordination agreement than its allowable claim against the estate." 4 Collier on Bankruptcy, *supra* ¶ 510.03[3], at 510-8.

[5] To ease this discomfiture, judges fashioned an equitable doctrine to deal with (and, essentially, limit) the prioritization of post-petition interest payments. *See* Resnick & Scheler, *supra* at 467-68. In its simplest form, this equitable doctrine, called the Rule of Explicitness, required that a subordination agreement show clearly "that the general rule that interest stops on the date of the filing of the petition is to be suspended." *Time Sales*, 491 F.2d at 844. Over time, this evolved into a requirement that only unequivocal language could overcome the generic bar on recovery of post-petition interest.

[6][7] That was the state of the law when Congress enacted the Bankruptcy Code in 1978. Pub.L. No. 95-958, 92 Stat. 2549. Unlike the earlier Bankruptcy Act, the Code deals explicitly with subordination agreements. Section 510(a) provides that a subordination agreement is enforceable in bankruptcy to the same extent as under "applicable nonbankruptcy law." 11 U.S.C. § 510(a). This statutory provision supplants the judge-made doctrine through which the courts previously had dealt with such agreements. Because equitable powers possessed by bankruptcy courts "must and can only be exercised within the confines of the Bankruptcy

Code," *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), the enactment of section 510(a) means that the enforcement of subordination provisions is no longer a matter committed to the bankruptcy courts' notions of what may (or may not) be equitable. *First Fid. Bank v. Midlantic Nat'l Bank* (*363In re Ionosphere Clubs, Inc.*), 134 B.R. 528, 533 (Bankr.S.D.N.Y.1991).

[8] That Congress cabined the bankruptcy courts' equitable powers while providing an alternate means for preserving the viability of subordination agreements does not resolve the further question of whether the Rule of Explicitness, through some other medium, survived the enactment of section 510(a). To answer that query, we begin, as always, with the text of the relevant statute. *See* 229 Main St. Ltd. P'ship v. Mass. Dep't of Envtl. Prot.(In re 229 Main St. Ltd. P'ship ), 262 F.3d 1, 5 (1st Cir.2001). We are mindful, of course, that the language of an unambiguous statute normally determines its meaning. *Id.*

[9][10][11] In terms, section 510(a) provides that a "subordination agreement is enforceable in a [bankruptcy] case ... to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). It is clear beyond peradventure that the phrase "applicable nonbankruptcy law" can refer to either federal or state law. *See Patterson v. Shumate*, 504 U.S. 753, 757-59, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Since the construction of private contracts is usually a matter committed to state law, *Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468, 474, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), the presumption is that state law will furnish the proper benchmark. That presumption is especially robust here because we can find no federal statute that might guide us in interpreting subordination agreements. *Accord Southeast Banking*, 156 F.3d at 1121.

[12][13] Of course, it might be possible to argue for the use of federal common law in this context. But resort to a federal common law of contract enforcement ordinarily is justified only when required by a distinct national policy or interest. *See Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 153 (2d Cir.1968). The interpretation and enforcement of financial arrangements between

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
**(Cite as: 364 F.3d 355)**

private parties does not fill that bill. *See Southeast Banking,* 156 F.3d at 1121 n. 8.

[14][15][16] To be sure, there is an important federal interest in the uniform application of the bankruptcy law-but that interest will not suffice in this instance to justify resort to federal common law. By requiring that the enforceability of subordination agreements be subject to applicable nonbankruptcy law, Congress determined that such agreements should be interpreted using non-uniform principles. It is not our province to second-guess this determination. To cinch matters, the Supreme Court has instructed us that in the absence of specific statutory provisions to the contrary, property interests should not be analyzed differently as a result of a party's involvement in a bankruptcy case. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). We take this to mean that bankruptcy courts should only modify the usual state-law compendium of rights and remedies if and to the extent that such modifications are specifically authorized or directed by the Bankruptcy Code.

For these reasons, we conclude that the applicable nonbankruptcy law referred to in section 510(a) is state law (and, particularly, state contract law). *Accord In re Best Prods. Co.,* 168 B.R. 35, 69 (Bankr.S.D.N.Y.1994); 9E Am.Jur.2d Bankr.§ 3113 (2000). It follows inexorably that if the Rule of Explicitness retains any vitality, it does so only as part and parcel of state law. *See* 4 Collier on Bankruptcy, *supra* ¶ 510.03[3], at 510-9, 10 ("[T]he Rule of Explicitness cannot be found in the Code, but resort must be had to the state law governing the contractual subordination*364 agreement."); *see also Southeast Banking,* 156 F.3d at 1124.

[17][18] This brings us to the parameters of the authority delegated by section 510(a). One thing seems very clear: in keeping with the principle that bankruptcy is an area of distinct federal competence, Congress has conferred on the federal courts the power to apply any and all generally applicable state rules of contract interpretation in construing subordination agreements. But section 510(a) does not vest in the states any power to make bankruptcy-specific rules: the statute's clear directive for the use of applicable *nonbankruptcy* law leaves no room for state legislatures or state courts to create special rules pertaining strictly and solely to bankruptcy matters.

*See In re Cross,* 255 B.R. 25, 34 n. 5 (Bankr.N.D.Ind.2000); *cf. Int'l Shoe Co. v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 73 L.Ed. 318 (1929) (clarifying that states are not free to enact laws that interfere with federal bankruptcy law or that provide additional or auxiliary regulation with respect to bankruptcy matters).

Formulation of the bankruptcy law requires Congress carefully to balance competing considerations. That effort is manifest here. On the one hand, bankruptcy highly values equitable distribution that is in line with the priorities embodied in the Code itself. On the other hand, equity typically operates to enforce voluntarily bargained-for positions (some of which may contradict the Code's normal priorities). Section 510(a) encapsulates Congress's reconciliation of this conflict. A state's creation of a bankruptcy-only rule of enforcement would outstrip the authority that Congress conferred (and, thus, upset the equilibrium that section 510(a) was designed to achieve). We conclude, therefore, that such a course is not open to the states.

If the Rule of Explicitness is an interpretive principle unique to bankruptcy, it offends this principle. *See Ionosphere Clubs,* 134 B.R. at 533 (suggesting that the old Rule of Explicitness cases may "be inconsistent with the Code's new mandate that subordination provisions be enforceable in bankruptcy to the same extent that they are enforceable under nonbankruptcy law"). A contrary holding-one that allowed a state to adopt a bankruptcy-only Rule of Explicitness-would require certain contractual provisions (those arguably entitling senior noteholders to the payment of interest becoming due at future dates) to achieve a heightened degree of clarity only if the effort to enforce them arose in bankruptcy rather than in some other context. Such a holding would go well beyond the intended reach of section 510(a).

The short of it is that the enforceability of subordination agreements in bankruptcy must be judged by reference to generally applicable state contract law. As it pertains here, this holding limits our consideration to the general principles of New York contract law. If-and only if-the Rule of Explicitness is such a general principle can it be given effect in this case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[19] The New York courts do not appear to have developed any rules of interpretation that apply specifically to subordination agreements. *See Best Prods.,* 168 B.R. at 69-70;*see also Finest Invs. v. Sec. Trust Co.,* 96 A.D.2d 227, 468 N.Y.S.2d 256, 258 (N.Y.Sup.Ct.1983) (applying generic rules of construction to subordination clause); *cf.*N.Y.U.C.C. § 1-209 off'l cmt. 4 (stating that the "enforcement of subordination agreements is largely left to supplementary principles under Section 1-103," which codifies the application of the general law of contracts). Moreover, reported decisions from the New York state courts reveal only a single mention of the *365 Rule of Explicitness. *See Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.),* 93 N.Y.2d 178, 688 N.Y.S.2d 484, 710 N.E.2d 1083, 1084-88 (1999) (a case which, for reasons that we shortly shall explain, does not help our inquiry). Although we are in something of an epistemological quandary-it is always difficult to prove a negative-the near-total absence of authority is compelling proof that the Rule of Explicitness is not part of New York's general contract law.

The decision in *Chemical Bank* does not alter this conclusion. The opinion in that case was a response to a question certified by the United States Court of Appeals for the Eleventh Circuit. Faced with the issue we confront today, that is, whether a subordination provision permitted the payment of post-petition interest ahead of junior indebtedness, the Eleventh Circuit certified the following question to the New York Court of Appeals: "What, if any, language does New York law require in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest?" *Southeast Banking,* 156 F.3d at 1125. In so doing, the Eleventh Circuit invited the state court to fashion a bankruptcy-specific rule-and it did so without any evidence that New York had incorporated anything resembling the Rule of Explicitness into its general law of contracts.

Having received the invitation, the New York Court of Appeals responded in kind. The court recognized that it was being asked to determine if New York should adopt the Rule of Explicitness as a "guiding interpretive principle of State contract dispute resolution" in bankruptcy cases. *Chem. Bank,* 688 N.Y.S.2d 484, 710 N.E.2d at 1086. The court proceeded to embrace the rule as a rule of construction *applicable only in bankruptcy. See id.* at 1088 ("In accordance with the Rule of Explicitness, New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's post-petition interest demand."). The specificity of the court's holding is apparent from its use of the term "post-petition interest"-a term of art applicable only in bankruptcy. We recognize that the *Chemical Bank* court was constrained by the Eleventh Circuit's statement of the certified question. But this constraint does not alter the fact that, in its holding, *Chemical Bank* announced a bankruptcy-only principle. Nothing in that decision persuades us that the Rule of Explicitness is otherwise a part of the armamentarium of interpretive principles generally available to the courts under New York law.

[20][21] This illustrates our area of disagreement with the Eleventh Circuit. As framed, the question that it put to the New York court was beyond that court's competence to answer. While a federal court must defer when the highest court of a state interprets the state's general contract law, *see, e.g., Daigle v. Me. Med. Ctr., Inc.,* 14 F.3d 684, 689 (1st Cir.1994), no such deference is due to a state court's importation of a bankruptcy-specific rule into its own jurisprudence.[FN2]

> FN2. Although state courts do have the power to interpret federal law, that is not what the New York Court of Appeals was asked to do. The Eleventh Circuit requested the New York court to enunciate a bankruptcy-specific principle of state law. *See Southeast Banking,* 156 F.3d at 1125-26.

That ends this aspect of our inquiry. There is simply no reason to believe that the New York courts would apply the Rule of Explicitness outside the bankruptcy context. Accordingly, the Rule of Explicitness cannot hold sway. To find otherwise *366 would do violence to the language of section 510(a) and set state and federal law on a collision course.

[22] Let us be perfectly clear. If a state, as part of its general contract law, enunciates an interpretive principle that applies to subordination agreements generally (e.g., "construe all subordination provisions strictly and enforce them only if the intent to

364 F.3d 355                                                                                   Page 13
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
(Cite as: 364 F.3d 355)

subordinate is, on a particular set of facts, super-clear"), that principle would be enforceable under section 510(a).[FN3] In that event, rejecting the prioritization of post-petition interest in the absence of explicit language would be consistent with the general law of the state. Such a situation would not pose the same problem as does a state rule that applies only in bankruptcy.

> FN3. We recognize that the source of such an interpretive principle may be a state statute, a canon of construction enunciated by the state courts, or a rule of equity consistently applied. A bankruptcy court's adoption and enforcement of a state equitable principle is not the exercise of the bankruptcy court's own equitable powers, but, rather, an application of state law (and, thus, is a proper exercise of the authority conferred by section 510(a)).

We acknowledge that this conclusion compels us to part ways with the Eleventh Circuit. We are always reluctant to foment a circuit split, but we have no principled alternative here. The *Southeast Banking* court invited the New York Court of Appeals to craft a special bankruptcy-only canon of contract interpretation. *See* 156 F.3d at 1125. In our view, that course of action misapprehends the reach and breadth of section 510(a).

We now proceed to apply New York's general principles of contract enforcement to the facts at hand. This exercise will allow us to ascertain the effect of the provisions at issue upon the post-petition interest priority claimed by the appellants. Typically, the first step is to determine whether the challenged provisions are subordination agreements within the meaning of section 510(a). 4 Collier on Bankruptcy, *supra* ¶ 510.03[2], at 510-7. That step is a formality here: these are subordination clauses, pure and simple.

[23][24][25][26][27] We next must determine the meaning and effect of the subordination provisions. Initially, we ask whether the provisions are ambiguous with respect to the relative priority of the payment of post-petition interest on the Senior Debt. This is a question of New York law. *See W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990). The New

York Court of Appeals has provided us with clear, if conventional, guidelines:

> Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish. The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance, and a sensible meaning of words should be sought.

*William C. Atwater & Co. v. Panama R. Co.,* 246 N.Y. 519, 159 N.E. 418, 419 (1927) (citations and internal quotation marks omitted).

[28][29] We take it as a given that a contract is ambiguous when its provisions are susceptible of two or more reasonable interpretations. *See Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280, 1282 (1978); *367 Yanuck v. Simon Paston & Sons Agency, Inc.,* 209 A.D.2d 207, 618 N.Y.S.2d 295, 296 (N.Y.Sup.Ct.1994). That is the case here. Although each word, taken in isolation, may have a reasonably definite meaning, we must examine these words collectively. *See Atwater,* 159 N.E. at 419. When we do, ambiguity surfaces.

The pertinent language requires full payment of "interest due or to become due" upon the occurrence of a number of events (including bankruptcy, insolvency, receivership, conservatorship, or "other proceedings"). The meaning of "interest due or to become due" seems obvious in the context of, say, a municipal bond: upon the occurrence of a triggering event, interest that has been earned but is not yet due to be paid becomes entitled to a priority.[FN4] Thus, the application of this group of words in the context of most triggering events is fairly straightforward. But bankruptcy-an event specifically referenced in the subordination provisions-alters the equation. Bankruptcy provides a special system of legal rules that occupies the field upon the filing of a petition. One byproduct of this special set of rules is that all interest is considered due as of the filing date. *See* 11 U.S.C. §§ 101(5)(a), 502(b). Conversely, interest that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
(Cite as: 364 F.3d 355)

normally would accrue after that date is generally not recoverable at all (at least, not recoverable from the debtor). *See id.* § 502(b)(2).

> FN4. We provide an example. If interest accruing on a bond is paid every six months (e.g., February 1 and August 1) and a triggering event occurs on May 1, the contractual language provides that all interest earned from February 1 through May 1 is entitled to prioritization (even though that interest is not yet due).

These special rules cloud the meaning of the phrase "interest due or to become due." On the one hand, those words reasonably can be interpreted to apply only to triggering events outside of the bankruptcy context (where they have an unambiguous meaning). On the other hand, those words reasonably can be interpreted-as the appellants exhort-to apply to all triggering events, including bankruptcy. In that context, however, the words have no clear meaning and a court faces further ambiguity in trying to determine their contours. After all, in most cases the phrase "due or to become due" simply refers to unmatured interest. At the time of a bankruptcy filing, however, there is no unmatured interest, so the clause may be interpreted either to carry the same "nonbankruptcy" meaning throughout or to take on a bankruptcy-specific meaning (which would cover post-petition interest). Because each of these interpretations seems plausible, we believe that the subordination provisions-as they apply in bankruptcy-are ambiguous. *Cf. Southeast Banking,* 156 F.3d at 1124 (finding the phrase "paid in full" ambiguous *in the context of bankruptcy proceedings* ).

[30][31] In fine, we find the words "due or to become due" lacking in certitude as to whether they actually provide for the payment of post-petition interest on the Senior Debt prior to any payment referable to the Junior Debt. New York law requires that this amphiboly be resolved through a contextual examination of the parties' intent, taking full account of the surrounding facts and circumstances. *Ruttenberg v. Davidge Data Sys. Corp.,* 215 A.D.2d 191, 626 N.Y.S.2d 174, 178 (N.Y.Sup.Ct.1995); *Yanuck,* 618 N.Y.S.2d at 296; *Tobin v. Union News Co.,* 18 A.D.2d 243, 239 N.Y.S.2d 22, 25 (N.Y.Sup.Ct.1963). Discerning this intent ordinarily

requires the adjudication of factual questions. *See Ruttenberg,* 626 N.Y.S.2d at 175; *Yanuck,* 618 N.Y.S.2d at 296; *see also Time Warner Entm't Co. v. Brustowsky,* 221 A.D.2d 268, 634 N.Y.S.2d 82, 82 (N.Y.Sup.Ct.1995) (noting that factfinding *368 generally will be necessary if the contract term at issue is "susceptible to varying reasonable interpretations"). A trial can be avoided only if the parties' intent is made manifest within the four corners of the contract itself. *Ruttenberg,* 626 N.Y.S.2d at 175-76.

[32] In the case at bar, it is impossible to glean the parties' intent from the language and structure of the instruments alone. These documents evidence complex commercial transactions, and the matter is further complicated because the beneficiaries of the subordination provisions-the holders of the Senior Debt-are not parties to the agreements containing the subordination provisions (those agreements are directly appurtenant to the Junior Debt). Given these realities, we are persuaded that resolution of the intent question cannot be accomplished by the simple expedient of examining the relevant paperwork, but, rather, requires differential factfinding.[FN5] Because the bankruptcy court has not yet developed a record with this inquiry in mind, we remand for factfinding on the parties' intent vis-à-vis post-petition interest.

> FN5. To be sure, the backdrop of bankruptcy may inform the examination into the parties' intent. *See Dolman v. U.S. Trust Co.,* 2 N.Y.2d 110, 157 N.Y.S.2d 537, 541-42, 138 N.E.2d 784 (N.Y.Sup.Ct.1956) (noting the presumption "that the parties had [the law in force at the time of agreement] in contemplation when the contract was made," and that the contract generally will be "construed in light of such law"). Here, however, the effect of that tenet is uncertain absent further factfinding. *Cf. Time Warner Entm't,* 634 N.Y.S.2d at 83 (finding a regulatory definition of a term not determinative of its meaning in a contract where proof was adduced indicating that the parties intended an independent meaning).

### III. CONCLUSION

We need go no further. We hold that the Rule of Explicitness has no application in the context of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

364 F.3d 355                                                                          Page 15
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079
**(Cite as: 364 F.3d 355)**

bankruptcy where, as here, the state has not adopted the rule as one of general applicability. Consequently, we turn to generic principles of state law to interpret the contractual provisions at issue. Applying those principles, we find the subordination provisions ambiguous as to whether they provide for the priority payment of post-petition interest. This finding necessitates an examination into the intent of the parties-an inquiry which, in the circumstances of this case, entails questions of fact that must in the first instance be addressed by the bankruptcy court. We therefore vacate the decision of the district court and remand with instructions that the district court vacate the judgment of the bankruptcy court and remand the matter to that tribunal for further proceedings consistent with this opinion.

*Vacated and remanded. All parties shall bear their own costs.*

C.A.1 (Mass.),2004.
In re Bank of New England Corp.
364 F.3d 355, 51 Collier Bankr.Cas.2d 1634, 42 Bankr.Ct.Dec. 243, Bankr. L. Rep. P 80,079

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



◣ Mellon Bank, N.A. v. Aetna Business Credit, Inc.
C.A.Pa., 1980.

United States Court of Appeals,Third Circuit.
MELLON BANK, N.A.
v.
AETNA BUSINESS CREDIT, INC., Appellant.
No. 79-1092.

Argued Oct. 9, 1979.
Decided March 31, 1980.

Diversity action was brought by construction lender to recover from permanent or "take out" lender for alleged breach of agreement to purchase the construction loan. The United States District Court for the Western District of Pennsylvania, Joseph P. Willson, J., awarded damages to construction lender, and permanent lender appealed. The Court of Appeals, Cahn, District Judge, sitting by designation, held that: (1) plaintiff had burden to show that borrowers were solvent, as a condition precedent; (2) in contract interpretation it is the role of the judge to consider the contract language, alternative meanings suggested by counsel and nature of objective evidence to be offered in support of that meaning and if the reasonable alternative interpretation is proffered, even though alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered; (3) term "insolvency" was to be given its ordinary commercial meaning; and (4) it was not error to construe material adverse change clause, as incorporated by reference in purchase agreement, as a promise of the borrowers in consideration for permanent lender's promise and not as a condition precedent to the latter's obligation on the contract at issue.

Vacated and remanded for further proceedings.

West Headnotes



[1] Federal Courts 170B ⚷ 372

170B Federal Courts
  170BVI State Laws as Rules of Decision
    170BVI(A) In General
      170Bk372 k. Diversity of Citizenship Jurisdiction. Most Cited Cases



Federal Courts 170B ⚷ 409.1

170B Federal Courts
  170BVI State Laws as Rules of Decision
    170BVI(C) Application to Particular Matters
      170Bk409 Conflict of Laws
        170Bk409.1 k. In General. Most Cited Cases
  (Formerly 170Bk409)
In a diversity action the district court is bound by the forum law, including its conflict of law rules.



[2] Federal Courts 170B ⚷ 621

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
      170BVIII(D)2 Objections and Exceptions
        170Bk621 k. Necessity of Objections or Exceptions in General. Most Cited Cases
Where all parties in diversity action proceeded at trial and appellate level as if Pennsylvania law applied to interpretation of subject contract and no objection was raised below or on appeal, the Court of Appeals would consider the parties to have waived any objection to application of Pennsylvania law.



[3] Contracts 95 ⚷ 322(1)

95 Contracts
  95V Performance or Breach

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

95k322 Evidence
  95k322(1) k. Presumptions and Burden of Proof. Most Cited Cases

**Insurance 217**  **3575**

217 Insurance
  217XXXI Civil Practice and Procedure
    217k3572 Evidence
      217k3575 k. Burden of Proof. Most Cited Cases
  (Formerly 217k646)
Generally accepted rule is that burden of proof in regard to a condition precedent is on the party alleging the breach of the conditional promise; only general exception involves placing burden on insurance company where the company raises a "condition" in a policy as a defense.

**[4] Contracts 95**  **221(2)**

95 Contracts
  95II Construction and Operation
    95II(E) Conditions
      95k221 Conditions Precedent in General
        95k221(2) k. What Are Conditions Precedent in General. Most Cited Cases
Since permanent lender was not obligated to acquire construction loan in event of insolvency of a borrower, solvency was a condition precedent in that it had to exist or occur before duty of immediate performance would arise.

**[5] Contracts 95**  **322(1)**

95 Contracts
  95V Performance or Breach
    95k322 Evidence
      95k322(1) k. Presumptions and Burden of Proof. Most Cited Cases
Under Pennsylvania law, burden of proof to establish a condition precedent is on the party alleging breach.

**[6] Contracts 95**  **322(1)**

95 Contracts
  95V Performance or Breach
    95k322 Evidence
      95k322(1) k. Presumptions and Burden of Proof. Most Cited Cases
Under Pennsylvania law, construction lender, which brought action against permanent or "take out" lender for alleged breach of contract to purchase construction loan had burden of proving condition precedent, i. e., borrower's solvency, and it was error to place on permanent lender the burden of proving insolvency as a defense.

**[7] Constitutional Law 92**  **1119**

92 Constitutional Law
  92VII Constitutional Rights in General
    92VII(B) Particular Constitutional Rights
      92k1118 Freedom of Contract; Liberty of Contract
        92k1119 k. In General. Most Cited Cases
  (Formerly 92k89(1))
Commercial parties are free to contract as they desire.

**[8] Contracts 95**  **1**

95 Contracts
  95I Requisites and Validity
    95I(A) Nature and Essentials in General
      95k1 k. Nature and Grounds of Contractual Obligation. Most Cited Cases
Absent illegality, unconscionableness, fraud, duress or mistake the parties are bound by the terms of their contract.

**[9] Contracts 95**  **147(1)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k147 Intention of Parties
        95k147(1) k. In General. Most Cited Cases
In a contract construction case, the court sits with one purpose, that being to interpret through the use of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

619 F.2d 1001
619 F.2d 1001
(Cite as: 619 F.2d 1001)

objective indicia the intent of the contracting parties.

**[10] Contracts 95**  **147(1)**

95 Contracts
　95II Construction and Operation
　　95II(A) General Rules of Construction
　　　95k147 Intention of Parties
　　　　95k147(1) k. In General. Most Cited Cases
Courts neither claim nor possess psychic power and, therefore, to interpret contracts with some consistency and to provide contracting parties with a legal framework which provides a measure of predictability, courts must eschew the ideal of ascertaining the parties' subjective intent and instead bind parties by the objective manifestations of their intent.

**[11] Contracts 95**  **150**

95 Contracts
　95II Construction and Operation
　　95II(A) General Rules of Construction
　　　95k150 k. Written Contracts in General. Most Cited Cases
Strongest external sign of agreement between contracting parties is the words they use in their written contract.

**[12] Evidence 157**  **448**

157 Evidence
　157XI Parol or Extrinsic Evidence Affecting Writings
　　157XI(D) Construction or Application of Language of Written Instrument
　　　157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases
If the written contract is unambiguous, the parol evidence rule bars use of extrinsic evidence for interpretation, but if the written contract is ambiguous the rule does not prevent the use of extrinsic evidence to interpret the writing.

**[13] Evidence 157**  **397(2)**

157 Evidence
　157XI Parol or Extrinsic Evidence Affecting Writings
　　157XI(A) Contradicting, Varying, or Adding to Terms of Written Instrument
　　　157k397 Contracts in General
　　　　157k397(2) k. Completeness of Writing and Presumption in Relation Thereto; Integration. Most Cited Cases

**Evidence 157**  **448**

157 Evidence
　157XI Parol or Extrinsic Evidence Affecting Writings
　　157XI(D) Construction or Application of Language of Written Instrument
　　　157k448 k. Grounds for Admission of Extrinsic Evidence. Most Cited Cases
For purpose of the parol evidence rule, the issue of ambiguity must be carefully distinguished from the issue of "integration" which arises when evidence is introduced to vary or add to the unambiguous written terms of the contract on ground that the evidence is admissible because the written contract is not fully integrated, and the issue then becomes whether the proffered evidence is extrinsic to the integrated written contract and thus inadmissible or whether the proffered evidence is part and parcel of the entire contract of which the written document is but a part.

**[14] Contracts 95**  **143(2)**

95 Contracts
　95II Construction and Operation
　　95II(A) General Rules of Construction
　　　95k143 Application to Contracts in General
　　　　95k143(2) k. Existence of Ambiguity. Most Cited Cases
A strict "four corners" approach to integration issue is not required by Pennsylvania law in regard to the issue of ambiguity.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[15] Contracts 95**  **176(2)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k176 Questions for Jury
            95k176(2) k. Ambiguity in General.
Most Cited Cases
Under Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law.

**[16] Contracts 95**  **143(3)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k143 Application to Contracts in General
            95k143(3) k. Rewriting, Remaking, or
Revising Contract. Most Cited Cases
Although interpretation of a writing is part of the duties of the fact finder or trier of law, there is a point beyond which interpretation becomes alteration.

**[17] Contracts 95**  **143(2)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k143 Application to Contracts in General
            95k143(2) k. Existence of Ambiguity.
Most Cited Cases
Before contractual language may be found ambiguous a court must have a reference point to determine if words may reasonably admit of different meaning.

**[18] Contracts 95**  **143(2)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k143 Application to Contracts in General
            95k143(2) k. Existence of Ambiguity.

Most Cited Cases
Under a "four corners" approach to interpretation a judge sits in chambers and determines from his point of view whether the written words before him are ambiguous.

**[19] Contracts 95**  **143(2)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k143 Application to Contracts in General
            95k143(2) k. Existence of Ambiguity.
Most Cited Cases
An alternative to the "four corners" approach to contract interpretation is for the judge to hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings; such alternative approach is believed to be the correct approach.

**[20] Contracts 95**  **176(1)**

95 Contracts
   95II Construction and Operation
      95II(A) General Rules of Construction
         95k176 Questions for Jury
            95k176(1) k. In General. Most Cited
Cases
In contract interpretation it is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel and nature of the objective evidence to be offered in support of that meaning, with trial judge then to determine if a full evidentiary hearing is warranted.

**[21] Evidence 157**  **448**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting
Writings
      157XI(D) Construction or Application of
Language of Written Instrument
         157k448 k. Grounds for Admission of
Extrinsic Evidence. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

If a reasonable alternative interpretation of contract language is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder as it is only by such approach that courts can achieve consistency in contract interpretation.

**[22] Contracts 95**  **143(2)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k143 Application to Contracts in General
        95k143(2) k. Existence of Ambiguity.
Most Cited Cases
Pennsylvania courts hold contract language unambiguous only after an examination of circumstances and facts demonstrating that any variation of the words used would be an impermissible rewriting.

**[23] Contracts 95**  **143(2)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k143 Application to Contracts in General
        95k143(2) k. Existence of Ambiguity.
Most Cited Cases
Even under a contract interpretation approach involving consideration of linguistic reference point of the parties rather than solely that of the judge, there will be cases where a claim of ambiguity is virtually impossible, and a failure to proffer an argument for ambiguity in the answer to pleadings or motions might suffice to allow a judge to declare terms unambiguous, as there is no reason for a court to consider seriously a complaint or argument which seeks to mischaracterize an agreement although the court must entertain the argument before it can be rejected.

**[24] Contracts 95**  **152**

95 Contracts

95II Construction and Operation
  95II(A) General Rules of Construction
    95k151 Language of Instrument
      95k152 k. In General. Most Cited Cases
In interpreting contract language the judge should not abandon his legal expertise or knowledge of the English language, although his own semantic expertise does not necessarily stand sacrosanct against a reasonable alternative semantic reference presented by the parties.

**[25] Contracts 95**  **150**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k150 k. Written Contracts in General.
Most Cited Cases
If no "reasonable" alternative meanings to contractual language are put forth by the parties, then the writing is to be enforced as the judge reads it "on its face."

**[26] Contracts 95**  **152**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k151 Language of Instrument
        95k152 k. In General. Most Cited Cases
Contract interpretation approach whereby trial judge is to consider reasonable alternative semantic references advanced by the parties does not authorize a trial judge to demote the written word to a reduced status.

**[27] Contracts 95**  **147(2)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k147 Intention of Parties
        95k147(2) k. Language of Contract.
Most Cited Cases
Although extrinsic evidence may be considered under proper circumstances in contract interpretation, the

619 F.2d 1001
619 F.2d 1001
(Cite as: 619 F.2d 1001)

Page 6

parties remain bound by the appropriate objective definition of the words they use to express their intent.



**[28] Contracts 95**          152

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k151 Language of Instrument
       95k152 k. In General. Most Cited Cases

**Customs and Usages 113**          10

113 Customs and Usages
   113k9 Application and Operation
     113k10 k. Scope and Effect in General. Most Cited Cases
Generally, parties will be held to definitions given to words in specialized commercial and trade areas in which they deal and, similarly, certain words attain binding definition as legal terms of art.



**[29] Contracts 95**          143(3)

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k143 Application to Contracts in General
       95k143(3) k. Rewriting, Remaking, or Revising Contract. Most Cited Cases

**Evidence 157**          397(1)



157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
     157XI(A) Contradicting, Varying, or Adding to Terms of Written Instrument
      157k397 Contracts in General
       157k397(1) k. In General. Most Cited Cases

**Evidence 157**          455



157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
     157XI(D) Construction or Application of Language of Written Instrument
      157k454 Meaning of Words, Phrases, Signs, or Abbreviations
       157k455 k. In General. Most Cited Cases
In interpreting a contract, dates, numbers and the like generally cannot be varied, although, for example, extrinsic evidence may be used to show that, "Ten Dollars paid" meant ten Canadian dollars although it would not be allowed to show that the parties meant 20 dollars.



**[30] Contracts 95**          152

95 Contracts
   95II Construction and Operation
     95II(A) General Rules of Construction
      95k151 Language of Instrument
       95k152 k. In General. Most Cited Cases
Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent.

**[31] Contracts 95**          194

95 Contracts
   95II Construction and Operation
     95II(C) Subject-Matter
      95k194 k. Loans and Advances. Most Cited Cases
Term "insolvent" as used in agreement whereby permanent or "take out" lender would purchase construction loan from construction lender provided borrowers were not insolvent was given its normal meaning, and was not construed to exclude liabilities or assets of the borrowers accruing from the project financed; fact that "take out" lender, which insisted that solvency clause be retained, bore some risk of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

default if occupancy rate fell too low was not sufficient to vary normal commercial meaning of the word and such construction was not irrational. 12A P.S.Pa. § 1-201(23); Bankr.Code, 11 U.S.C.A. § 101(26).

**[32] Contracts 95**  194

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k194 k. Loans and Advances. Most Cited Cases
Since term "insolvent" as used in agreement whereby permanent or "take out" lender was to purchase construction loan provided the borrowers were not insolvent on closing of permanent financing was given its normal commercial meaning, the court, in determining insolvency of borrowers, was to include all assets and liabilities of the borrowers, with notion of insolvency to be measured both by a balance sheet showing all assets and liabilities and the test of whether one could meet current debts as persons engaged in a trade normally do. 12A P.S.Pa. § 1-201(23); Bankr.Code, 11 U.S.C.A. § 101(26).

**[33] Contracts 95**  227

95 Contracts
    95II Construction and Operation
        95II(E) Conditions
            95k227 k. Waiver. Most Cited Cases
Permanent lender's letter to construction lender, from which permanent lender had agreed to purchase construction loan if borrowers were not insolvent, did not waive rights under insolvency clause or constitute a separate contract as it merely reminded borrowers that their solvency was a condition precedent and asked for "sworn statements" to assure that such condition was fulfilled and letter never unequivocally stated that permanent lender would fund the loan on submission of such statements alone, especially since cover letter returned with such statements and signed by borrowers' attorney could be said to have derogated contents of the statements.

**[34] Contracts 95** 169

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k169 k. Extrinsic Circumstances. Most Cited Cases
In the context of complex commercial dealings courts must be careful not to take single acts or isolated correspondence out of the context of the entire situation and construe them as separate contracts or waivers of important contract rights unless such an intent is explicitly and clearly expressed.

**[35] Contracts 95** 22(1)

95 Contracts
    95I Requisites and Validity
        95I(B) Parties, Proposals, and Acceptance
            95k22 Acceptance of Offer and Communication Thereof
                95k22(1) k. In General. Most Cited Cases
An acceptance must be unequivocal to be valid.

**[36] Contracts 95** 221(2)

95 Contracts
    95II Construction and Operation
        95II(E) Conditions
            95k221 Conditions Precedent in General
                95k221(2) k. What Are Conditions Precedent in General. Most Cited Cases
Fact that requirement that there have been no material adverse change in borrowers' financial condition was not included in that paragraph of construction loan acquisition agreement containing extensive list of conditions precedent was not determinative of whether the change clause was a condition precedent as such clause was contained in loan application, which in turn became part of the commitment, but became part of a buy-sell agreement by incorporation, especially since insolvency clause, a condition precedent, also was not in subject paragraph but was incorporated from permanent loan commitment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

619 F.2d 1001
619 F.2d 1001
(Cite as: 619 F.2d 1001)

Page 8



[37] Contracts 95 ⚷ 221(1)

95 Contracts
    95II Construction and Operation
        95II(E) Conditions
            95k221 Conditions Precedent in General
                95k221(1) k. In General. Most Cited
Cases
Rule in Pennsylvania is that a condition precedent to
an obligation must be expressed by clear language or
it will be construed as a promise or covenant.



[38] Contracts 95 ⚷ 175(1)

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k175 Evidence to Aid Construction
                95k175(1) k. Presumptions. Most Cited
Cases
Language not clearly written as a condition precedent
is presumed not to be, unless the contrary appears to
be the intention of the parties.



[39] Contracts 95 ⚷ 221(2)

95 Contracts
    95II Construction and Operation
        95II(E) Conditions
            95k221 Conditions Precedent in General
                95k221(2) k. What Are Conditions
Precedent in General. Most Cited Cases



Contracts 95 ⚷ 278(2)

95 Contracts
    95V Performance or Breach
        95k278 Performance of Conditions
            95k278(2) k. Sufficiency of Performance.
Most Cited Cases
It was not error to construe requirement of permanent
loan commitment, which was incorporated in
agreement by permanent lender to purchase
construction loan, that borrowers would furnish
satisfactory evidence of no material adverse change

in financial condition as a promise of the borrowers
to permanent lender and not as a condition precedent
to latter's obligation to acquire construction loan and
it was not error to find clause fulfilled where
permanent lender required no more information than
was received and expressed no dissatisfaction
therewith.

*1004 Thomas McGanney (argued), White & Case,
New York City, William C. O'Neil, David G. Ries,
Thorp, Reed & Armstrong, Pittsburgh, Pa., for
appellant.
Thomas R. Johnson (argued), Kirkpatrick, Lockhart,
Johnson & Hutchison, Pittsburgh, Pa., for appellee.

Before ALDISERT and HUNTER, Circuit Judges
and CAHN,[FN*] District Judge.

    FN* Edward N. Cahn of the United States
    District Court for the Eastern District of
    Pennsylvania, sitting by designation.

*1005 OPINION OF THE COURT

CAHN, District Judge.
[1][2] This diversity case, tried under Pennsylvania
law,[FN1] involves a contractual dispute between
Mellon Bank, N.A., of Pittsburgh, Pennsylvania
(Mellon), and Aetna Business Credit, Inc., of East
Hartford, Connecticut (Aetna). Both parties are
commercial lending institutions. In the context of this
case, Mellon is the construction lender and Aetna is
the permanent or "take out" lender.[FN2]Mellon sued
Aetna averring that Aetna breached a written contract
by refusing to purchase the construction loan held by
Mellon. In a nonjury proceeding the district court
found Aetna in breach and awarded Mellon damages
in the amount of $1,165,731, representing Mellon's
loss following foreclosure on the construction loan.
Aetna has appealed to this court from the final
judgment entered below. The facts, in greater detail,
are as follows.

    FN1. In this diversity action we are bound
    by the law of Pennsylvania, including its
    conflict of law rules. Klaxon Co. v. Stentor
    Electric Manufacturing Co., Inc., 313 U.S.
    487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).
    The district court made no specific finding
    in regard to choice of law. However, the
    district court applied Pennsylvania law.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

All parties have proceeded at the trial and appellate level as if Pennsylvania law applied to the interpretation of this contract. No objection was raised below or on appeal. At this time we will consider the parties to have waived any objection to the application of Pennsylvania law. See Bilancia v. G.M.C., 538 F.2d 621 (4th Cir. 1976).

FN2. In First National State Bank of New Jersey v. Commonwealth Federal Savings and Loan Association of Norristown, 610 F.2d 164 (3d Cir. 1979), Judge Adams outlined the usual method of financing a real estate development as follows:

As with most real estate developments, the financing here was to take place in two stages: a short-term construction loan and a long-term permanent loan. The construction loan was to finance the actual construction of the project and the permanent loan, or mortgage loan, was designed to replace or 'take out' any short-term borrowings. A permanent loan is generally obtained from a savings institution or insurance company, while a construction lender usually is a commercial bank. A standby commitment obligates the permanent lender to refinance the construction loan if called upon to do so by the developer, but in addition generally provides the borrower with the option to search for an alternative lender with more advantageous terms. The premium paid for this option is a nonrefundable fee, and the commitment enables a developer to seek short term construction financing.

610 F.2d at 167 (footnote omitted).

I. FACTS

Messrs. Opp, Elgin and Wise (the borrowers) were joint venturers in the development and construction of an office complex in the suburbs of Atlanta, Georgia. The project, known as Kensington Square, was to consist of six two-story office buildings. The

estimated total cost of the project was $2,500,000.

In May of 1974 Aetna extended to the borrowers a permanent loan commitment in the amount of $2,500,000. The borrowers paid a $50,000 fee to Aetna to bind the commitment which was to remain in force until August 1, 1975. Under the terms of the commitment the borrowers could obtain a six month extension for an additional fee of $25,000.

In June of 1974 Mellon issued a construction loan commitment to the borrowers. In July of 1974 the borrowers, Mellon, and Aetna executed a tripartite Buy-Sell Agreement and related instruments. Upon completion of the project, the Buy-Sell Agreement obligated Aetna, subject to certain conditions, to purchase the construction loan from Mellon. By August 1, 1975, the borrowers' contractor had substantially completed the project and Mellon had advanced $2,241,489 under the construction loan. The work which remained unfinished involved the completion of individual suites to the specifications of prospective tenants. However, earlier in 1975 there had been a precipitous decline in the Atlanta real estate market and the project was only seven percent leased, which placed its economic feasibility in jeopardy.

On August 1, 1975, a Mellon representative met with Aetna's special counsel in Atlanta and delivered closing documents to him. In a letter to Mellon dated August 15, *1006 1975, Aetna stated that upon Aetna's receipt of sworn statements from the borrowers, representing that they are solvent, "we (Aetna) shall be in a position to fund this loan."On August 27, 1975, Aetna received the executed affidavits of solvency. Two days later Aetna gave notice to Mellon that it would not purchase the construction loan.

The borrowers defaulted on their obligation on September 1, 1975. On October 3, 1975, Mellon declared the construction loan in default. On November 3, 1975, Kensington Square was sold at a foreclosure sale for $1,150,000. Thereafter, Mellon obtained an order from the Superior Court, DeKalb County, Georgia, confirming that the property was sold for its true market value.

Mellon brought suit against Aetna on November 12, 1975, in the United States District Court for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

619 F.2d 1001
619 F.2d 1001
(Cite as: 619 F.2d 1001)

Western District of Pennsylvania. In its complaint Mellon alleged that Aetna had breached the Buy-Sell Agreement by refusing to purchase the construction loan. Mellon claimed damages measured by the difference between the $2,241,489 advanced to the borrowers under the construction loan and the confirmed foreclosure sale price of $1,150,000 plus prejudgment interest and costs.

Aetna's answer denied that all conditions precedent to its take-out commitment had occurred or been performed. Aetna alleged that as a condition precedent to its obligation to purchase the construction loan it was required that the borrowers be solvent. The Buy-Sell Agreement in Section 4 provided that:

(I)n the event of bankruptcy or insolvency of Borrower the provisions of paragraph 3 of the Permanent Commitment relating thereto shall be applicable.

Aetna drafted paragraph 3 of the Permanent Commitment, insisted that it be incorporated by reference in the Buy-Sell Agreement, and rejected Mellon's attempt to negotiate its deletion. Paragraph 3 stated:
We (Aetna) shall have no obligation to acquire the construction loan from the construction lender in the event of bankruptcy or insolvency of the Borrower.

Aetna contended that the borrowers were not solvent at the time it was to purchase the construction loan from Mellon. Also Aetna alleged that there had been material adverse change in the borrowers' condition which negated Aetna's duty to fund the loan. The Permanent Commitment stated:
(The borrowers) will furnish evidence satisfactory to you (Aetna) at the date of funding that there has been no material adverse change in our financial or other condition . . . from that presented to you (Aetna) for the purpose of considering the loan.[FN3]

> FN3. Section 8 of the Buy-Sell Agreement provided that "the Permanent Commitment shall remain in full force and effect."

Mellon maintained that the borrowers were not insolvent and that there was no material adverse change in the borrowers' financial condition. Further, Mellon urged that Aetna was not only in breach of

the Buy-Sell Agreement, but in breach of a promise contained in the letter of August 15, 1975. That letter stated:

(W)e agreed to purchase the captioned loan from you upon compliance with all terms and conditions of our commitment. One such condition states that we shall have no obligation to purchase in the event of bankruptcy or insolvency of the borrower. Our funding is, therefore, conditioned upon your submission of sworn statements (in form attached hereto) of each borrower, that each is presently in a solvent condition. Upon receipt of these statements, we shall be in a position to fund this loan.

Record at 336a. The letter was signed by John J. Gillies, an attorney for Aetna. The executed affidavits represented that the borrowers were "presently in a solvent financial condition. My liabilities do not exceed the fair market value of my assets and I am able to pay my debts as they mature."Record at 341a-344a. However, a cover letter from the borrowers' attorneys returned with the affidavits stated:
*1007 This will further confirm conversation held in your office on August 8, 1975, wherein Mr. Opp advised members of your organization that the current cash flow from his other endeavors would not carry the payments on the Kensington operation until the same is leased. He further advised that the other individuals in the joint venture do not have sufficient cash flow to carry the amount of the loan payments until tenants are acquired.

Record at 339a. The letter also noted that Mr. Opp faced certain contingent liabilities from litigation then pending against him.

The district court, after a bench trial, first found that:

Aetna's defense in reality boils down to a very thin thread, that is, the issue of whether on August 1, 1975, the borrowers were insolvent. That was an affirmative defense, which Aetna was required to prove by a fair preponderance and has failed to do so.

Record at 75a. Second, the district court concluded that in determining whether or not the borrowers were insolvent the assets and liabilities of the Kensington Square project should be disregarded. Record at 78a. Third, the district court decided that Aetna's failure to purchase the construction loan was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in breach of a promise set forth in its letter of August 15, 1975. Finally, the district court held that the act of the borrowers' furnishing evidence to Aetna of no material adverse financial change on their part was not a condition precedent to Aetna's obligation to purchase the construction loan, but merely a promise of the borrower, and that in any event the promise or condition had been fulfilled. The district court entered judgment for Mellon against Aetna in the sum of $1,165,731, which included prejudgment interest.

We determine that the district court incorrectly placed the burden of proof on Aetna to establish the insolvency of the borrowers. Also, the district court should have considered the assets and liabilities of the Kensington Square project in calculating whether or not the borrowers were insolvent. The district court erred in interpreting Aetna's August 15 letter and the return of the borrowers' affidavits either as a separate contractual obligation to purchase the construction loan or as a waiver of the condition that the borrowers not be insolvent. The district court correctly construed the clause in the Permanent Commitment requiring the borrowers to furnish evidence of "no material adverse change in our financial or other condition" to be a promise of the borrowers and not a condition precedent to Aetna's obligation. The case will be remanded for further proceedings in accordance with this opinion.

## II. BURDEN OF PROOF

[3][4][5] The generally accepted rule is that the burden of proof in regard to a condition precedent is on the party alleging the breach of the conditional promise.[FN4]Standard Alliance Industries v. Black Clawson Co., 587 F.2d 813, 823 (6th Cir. 1978), cert. denied, 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979); Ziman v. Employers Fire Insurance Co., 493 F.2d 196, 199 (2d Cir. 1974); Aetna Casualty and Surety Co. v. Harris, 218 Va. 571, 239 S.E.2d 84, 88 (1977); *1008Allis Chalmers Manufacturing Co. v. Malan Construction Corp., 30 N.Y.2d 225, 331 N.Y.S.2d 636, 282 N.E.2d 600, 602 n.5 (1972); Israel W. Berthiaume's Case, 328 Mass. 186, 102 N.E.2d 412, 414 (1951); 3A Corbin, Contracts ss 749-751; 5 Williston, Contracts s 674. The few Pennsylvania cases dealing with the burden of proving a condition precedent also suggest that the burden of proof to establish the condition is on the party alleging the

breach. Dauphin Deposit Trust Co. v. World Mutual Health and Accident Insurance Co., 206 Pa.Super. 406, 213 A.2d 116 (1965); [FN5]Jennison v. Aacher, 201 Pa.Super. 583, 193 A.2d 769, 772 (1963); Bossler v. Poroner, 29 Pa.Dist. 421, 12 Berks 39 (C.P. Berks County 1919).

FN4. The only general exception to this rule is reflected by the strained reasoning courts utilize to place the burden on an insurance company where the company raises a "condition" in a policy as a defense. See e. g., Fortress Re, Inc. v. Jefferson Insurance Co., 465 F.Supp. 333 (E.D.N.C.1978); Stortenbecker v. Pottawattamie Mutual Insurance Association, 191 N.W.2d 709 (S.Ct.Iowa 1971); Allen v. Ross, 38 Wis.2d 209, 156 N.W.2d 434 (1968).

All parties and the district court have characterized the insolvency condition as a condition precedent. See Mellon Bank v. Aetna, No. 75-1156 at 7 (W.D.Pa.1978); Brief of Appellee at 21; Brief for Appellant at 6. This is clearly a correct characterization solvency was a condition which had to exist or occur before a duty of immediate performance of Aetna's promise would arise. See Restatement of Contracts s 250; 3A Corbin, Contracts ss 739-747; 5 Williston, Contracts ss 666-668. We need not delve into the elusive distinctions between conditions precedent and subsequent. There has been no contention presented that the insolvency clause was or became a condition subsequent.

FN5. This opinion is reported in Atlantic Second under the name of Peters v. World Mutual Health and Accident Insurance Co. The difference in names between the official and the West's reporter is unexplained.

[6] Therefore, the district court was in error when it placed on Aetna the burden of proving the insolvency of the borrowers as a defense to the action.[FN6] Mellon had the burden of showing that the borrowers were solvent as a condition precedent to recovery for breach of Aetna's promise.[FN7]

FN6. It should be noted that the appellant Aetna was partly responsible for this misapplication of the burden. Mellon correctly pleaded the occurrence of all conditions precedent in its complaint. Record at 5a; see Fed.R.Civ.P. 9(c). Aetna properly made a specific denial of the solvency condition. Record at 63a; see Fed.R.Civ.P. 9(c). However, Aetna misled the court by incorrectly pleading the nonoccurrence of the condition precedent as an "Affirmative Defense." Record at 64a.

FN7. We do not accept Mellon's argument, made in a supplementary letter brief, that the condition precedent is really a proviso subject to proof by Aetna. See 5 Williston, Contracts s 667, pp. 182-183 (1961). Mellon cites no authority for this proposition other than Williston, whose own analysis would probably preclude the application of the proviso doctrine to this situation. See 5 Williston, Contracts s 667. There is no Pennsylvania case law in support of Mellon's analysis and all other case law which has been brought to our attention is contrary thereto. See Kadner v. Shields, 20 Cal.App.3d 251, 97 Cal.Rptr. 742 (1971).

## III. INTERPRETATION OF "INSOLVENCY"

Aetna took the position in their briefs and at oral argument that they are entitled to judgment on the record as a matter of law. The basis for Aetna's position is the wording of the insolvency clause which states that Aetna "shall have no obligation to acquire the construction loan . . . in the event . . . of insolvency of the Borrower."Aetna contends that the test of insolvency is well established in law and as a commercial standard a party is insolvent when their liabilities exceed their assets or they are unable to pay their debts as they come due. See e. g. Larrimer v. Feeney, 411 Pa. 604, 192 A.2d 351 (1963); 11 U.S.C. s 101(26) (1978); Uniform Commercial Code, 12APa.Con.Stat.Ann. s 1-201(23) (Purdons). Aetna contends that documentary evidence establishes the borrowers were insolvent under either of these tests, and therefore, Aetna had no obligation to purchase the construction loan.

Mellon takes the position that the insolvency test

must be applied without reference to the liabilities or assets of the borrowers which accrue from the Kensington Square project. Mellon alleges that only this construction of the insolvency clause properly reflects the intent of the parties and is required for a rational interpretation of the Buy-Sell Agreement. Aetna responds to Mellon's position by contending that Mellon's interpretation of the insolvency clause is an impermissible rewriting of the words of the contract.

The district court heard oral testimony, received documentary evidence and concluded that the term insolvency in the context of the Buy-Sell Agreement should be interpreted to exclude reference to assets or liabilities related to the Kensington Square project. The district court held this interpretation was "required by the clear allocation of lending risks between Mellon Bank and Aetna."No. 75-1156, slip. op. at 8. The basis for this holding was not the words of the contract, but evidence extrinsic to it. The district court found that Aetna's loan officer recognized Aetna's principal risk to *1009 be whether the office park could reach and maintain a ninety percent occupancy level. The district court found that Aetna in analyzing the security for its permanent loan did not consider the borrowers' cash flow, did not condition its obligation upon any occupancy level, and therefore concluded "Aetna recognized that the financial transaction in question was not a basis for finding insolvency."The district court cited no basis in the contract document or wording of the insolvency clause for its conclusion. Our task is to decide if the district court permissibly used extrinsic evidence to interpret the contract and, if so, whether it drew the proper legal conclusions therefrom.

[7][8][9] In this case we confront several familiar, but not necessarily consistent, precepts of contract interpretation. We start from the premise that commercial parties are free to contract as they desire. Brokers Title Co., Inc. v. St. Paul Fire and Marine Insurance Co., 610 F.2d 1174 (3d Cir. 1979). Absent illegality, unconscionableness, fraud, duress, or mistake the parties are bound by the terms of their contract.[FN8]Peter J. Mascaro Co. v. Milonas, 401 Pa. 632, 166 A.2d 15 (1960); National Cash Register Co. v. Modern Transfer Co., 224 Pa.Super. 138, 302 A.2d 486 (1973).

FN8. Illegality, unconscionableness, fraud,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

duress or mistake are not alleged here. It should be noted that both parties to the Buy-Sell Agreement are commercial entities of great experience and expertise and were represented by counsel in negotiations. Therefore, what we rule in this case is not based on overriding policy concerns that courts sometimes apply to restrict freedom of contract. In the future commercial parties creating loan commitments and buy-sell agreements will negotiate with knowledge of this opinion and will take greater care in expressing their intent. If in the instant case the parties had, with greater clarity, excluded or included the liabilities associated with the Kensington Square project, that would not present public policy difficulties. In this case the court sits with one purpose to interpret through the use of objective indicia the intent of the contracting parties.

Additionally, it should be noted that we are not dealing with a proceeding in equity. For example, in First National State Bank of New Jersey v. Commonwealth Federal Savings and Loan Association of Norristown, 610 F.2d 164 (3d Cir. 1979), we considered a situation where a breach of a take out loan commitment had occurred, and the construction lender sought specific performance of the take-out commitment. The consideration of factors such as the allocation of risk between the parties was important in deciding if the court should exercise its discretion to grant equitable remedies.

[10]"In construing a contract, a court's paramount consideration is the intent of the parties."O'Farrell v. Steel City Piping Co., 266 Pa.Super. 219, 403 A.2d 1319, 1324 (1979). It would be helpful if judges were psychics who could delve into the parties' minds to ascertain their original intent. However, courts neither claim nor possess psychic power. Therefore, in order to interpret contracts with some consistency, and in order to provide contracting parties with a legal framework which provides a measure of predictability, the courts must eschew the ideal of ascertaining the parties' subjective intent and instead

bind parties by the objective manifestations of their intent. As Justice Holmes observed:

(T)he making of a contract depends not on the agreement of two minds, in one intention, but on the agreement of two sets of external signs not on the parties' having meant the same thing but on their having said the same thing.

Holmes, The Path of the Law, in Collected Legal Papers 178, as quoted by Judge Friendly in Frigaliment Importing Co. v. B. N. S. International Sales Corp., 190 F.Supp. 116, 117 (S.D.N.Y.1960) (emphasis in original). See also Gilmore, The Death of Contract (1974).

[11][12][13][14] The strongest external sign of agreement between contracting parties is the words they use in their written contract. Thus, the sanctity of the written words of the contract is embedded in the law of contract interpretation. As it has been variously put:

(A) court will make no inference or give any construction to the terms of a written contract that may be in conflict with the clearly expressed language of the written agreement.

National Cash Register Co. v. Modern Transfer Co., Inc., 224 Pa.Super. 138, 142, 302 A.2d 486, 488 (1973).
*1010 A court is not authorized to construe a contract in such a way as to modify the plain meaning of its words, under the guise of interpretation.

Best v. Realty Management Corp., 174 Pa.Super. 326, 329-330, 101 A.2d 438, 440 (1953).
When a written contract is clear and unequivocal, its meaning must be determined by its contents alone.

East Crossroads Center, Inc. v. Mellon-Stuart Co., 416 Pa. 229, 230, 205 A.2d 865, 866 (1965).
The rule enunciated in Gianni v. Russell & Co., Inc., (281 Pa. 320, 126 A. 791) supra, is firmly embedded in the law of Pennsylvania and from that rule we will not permit a deviation for it is essential that the integrity of written contracts be maintained. . . . 'Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

only, evidence of their agreement: (citing cases). All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract * * * and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence: (citing cases).'

United Refining Co. v. Jenkins, 410 Pa. 126, 134, 189 A.2d 574, 578 (1963) (emphasis and citations omitted).[FN9]

FN9. Though the concept of the Parole Evidence Rule is relevant here, the issue in this case really concerns an exception to that rule. In the instant case one party introduced extrinsic evidence to "interpret" the contract. The other party argues that this extrinsic evidence seeks to vary or add to the contract and is therefore not admissible. If the written contract is unambiguous, the Parol Evidence Rule and the doctrines cited above bar the use of extrinsic evidence for interpretation. If the written contract is ambiguous the Parole Evidence Rule does not prevent the use of extrinsic evidence to interpret the writing.

This issue of ambiguity must be carefully distinguished from the issue of "integration" which arises when evidence is introduced to vary or add to the unambiguous written terms of a contract on the ground that the evidence is admissible because the written contract is not fully integrated. The issue becomes whether the proffered evidence is extrinsic to the integrated written contract, and thus inadmissible, or whether the proffered evidence is part and parcel of the entire contract of which the written document is only a part.

Though it may be asserted that Pennsylvania courts employ a strict "four corners" approach to issues of integration, we do not believe this approach is required by Pennsylvania decisions in regard to the issue of ambiguity. See Universal Film Exchange, Inc. v. Viking

Theatre Corp., 400 Pa. 27, 161 A.2d 610 (1960); cf. In Re Estate of Breyer, 475 Pa. 108, 379 A.2d 1305 (1977); United Refining Co. v Jenkins, 410 Pa. 126, 138, 189 A.2d 574 (1963). In the case at bar there is no contention that the contract is not fully integrated.

In a world where semantics is a science instead of an art we might be able to read a contract and understand it without question. However, English is often a difficult and elusive language, and certainly not uniform among all who use it. External indicia of the parties' intent other than written words are useful, and probably indispensable, in interpreting contract terms. If each judge simply applied his own linguistic background and experience to the words of a contract, contracting parties would live in a most uncertain environment. Therefore, under Pennsylvania law we are instructed that:

A court must be careful not to 'retire into that lawyers Paradise where all words have a fixed, precisely ascertained meaning; where men may express their purposes, not only with accuracy, but with fullness; and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair inspect the text, and answer all questions without raising his eyes.

In Re Estate of Breyer, 475 Pa. 108, 379 A.2d 1305, 1309 n.5 (1977) (citations omitted), quoting Thayer, Preliminary Treatise on Evidence 428, as quoted in 3 Corbin, Contracts s 535 n.16 (1960);
In the construction of any contract, certain principles must guide us: (a) if there is any doubt as to the meaning of a *1011 term of a contract, such term should 'receive a reasonable construction and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the (contract) was made'; (b) in construing a contract we seek to ascertain what the parties intended and, in so doing, we consider the circumstances, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract; (c) 'However broad may be the apparent terms of the agreement, it extends only to those things concerning which the parties intended to contract, and the subject-matter of their negotiations may affect the meaning of the words they employ, especially if, in connection with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that subject-matter, the conventional interpretation would give an unreasonable or absurd result.'

<u>United Refining Co. v. Jenkins, 410 Pa. 126, 137-38, 189 A.2d 574, 580 (1963)</u> (citations omitted) (emphasis deleted).

[15][16] Courts are left with the difficult issue of determining as a matter of law which category written contract terms fall into clear or ambiguous. United Refining <u>Co. v. Jenkins, supra;</u> O'Farrell v. Steel City Piping Co., 266 Pa.Super. 219, 403 A.2d 1319 (1979).[FN10] There is a point at which interpretation becomes alteration of the written contract. We must determine if the trial judge went beyond that point.[FN11]

> FN10. Under Pennsylvania law, ambiguous writings are interpreted by the fact finder and unambiguous writings are interpreted by the court as a question of law. <u>Broker Title Insurance Co., Inc., v. St. Paul Fire and Marine Insurance Co., 610 F.2d 1174 (1979).</u> In the instant case the judge sitting without a jury made findings of fact and reached conclusions of law.

> FN11. We could declare our holding in this case, quote the appropriate doctrine, and not explain the approach we feel a court should take on the issue of ambiguity. However, we believe that guidance and standards are necessary in this most difficult area.

### A.

Ambiguity is defined as:

Intellectual uncertainty; . . . the condition of admitting of two or more meanings, of being understood in more than one way, or referring to two or more things at the same time . . .

Webster's Third New International Dictionary (unabr.1971).

[17][18][19] A court must have a reference point to determine if words may reasonably admit of different meanings. Under a "four corners" approach a judge sits in chambers and determines from his point of

view whether the written words before him are ambiguous. An alternative approach is for the judge to hear the proffer of the parties and determine if there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of differing meanings. We believe the latter to be the correct approach.

[20][21] It is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The trial judge must then determine if a full evidentiary hearing is warranted. If a reasonable alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder.[FN12]See Corbin, Contracts s 542.

> FN12. It is only by this approach that courts can achieve consistency in contract interpretation.

> The strict "four-corners" doctrine allows a court to sit in an isolated position and decide if words are "clear" or "ambiguous." Judges today come from a variety of backgrounds private law practice, government service, business, academia and their fields of experience represent an even wider variance. The parties who appear before the court in these times of complex commercial transactions come from a variety of specialized worlds of trade. It is the parties' linguistic reference that is relevant, not the judges'. The judge is in his or her linguistic field of expertise only when viewing words which lawyers have developed as terms of legal art. Even when the judge faces the need to interpret legal terms of art, extrinsic evidence and legal briefing are useful.

> For example, a contract might provide for a party to pay "$10,000 for 100 ounces of platinum."A judge might state that the quoted words are so clear and unambiguous that parol evidence is not admissible to vary their meaning. That

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

619 F.2d 1001
619 F.2d 1001
(Cite as: 619 F.2d 1001)

Page 16

judge might never learn that the parties have a consistent past practice of dealing only in Canadian dollars and follow a standard trade practice of measuring platinum in troy ounces (12 to the pound instead of 16). This is because that judge's linguistic frame of reference includes the dollars and the ounces he or she encounters in daily life. That is not the linguistic frame of reference of the commercial parties.

There are many other examples which demonstrate the necessity of the approach we outline. A "pound" of caviar is always 14 ounces. One can readily see the difficulty counsel might have convincing a judge who never has eaten caviar that a "pound" can be 14 ounces. The case could also come before a judge who was a lifelong gourmet and consumer of caviar. To the gourmet judge it might be "clear and unambiguous" that a pound of caviar is 14 ounces. Similarly, in the lumber business a "two by four" is never really two inches by four inches, but somewhat smaller. The background of some judges might make them aware of this, the background of others might not. Following the approach we outline in this opinion a consistent result could be reached in each case the parties would be bound to the same meaning of the external signs of their intent. When the judge who knows only common usage is told that a specialized usage can be shown which is common to both parties, he will realize an ambiguity can exist and will admit evidence to determine the meaning by which the parties should be bound. Under a "four-corners" approach to the question of ambiguity, the result would depend on which judge heard the case.

*1012[22][23][24][25] An analysis of Pennsylvania cases demonstrates that this approach is in accord with practice in the Pennsylvania courts.[FN13]Accordingly we conclude that it *1013 was proper for the court here to consider extrinsic evidence.

FN13. Confusion is often caused by the use of the term "ambiguous on its face." See Merriam v. Cedarbrook Realty, Inc., 266 Pa.Super. 252, 404 A.2d 398, 401 (1978). A requirement of "facial ambiguity" might mean that a court should look exclusively at the "face" of a contract to determine if words are ambiguous. However, we are not aware of any cases where Pennsylvania courts have construed a writing, declared it unambiguous, and ruled that any consideration of an argument for ambiguity must be disregarded. Much to the contrary, many cases which hold words unambiguous do so only after an examination of circumstances and facts demonstrate that any variation of the words would be an impermissible rewriting of the contract. See e. g. United Refining Co. v. Jenkins, supra;Merriam v. Cedarbrook Realty, Inc., 266 Pa.Super. 252, 404 A.2d 398, 401-402 (1978); Best v. Realty Management Corp., 174 Pa.Super. 326, 101 A.2d 438 (1953). Even given this approach, there will be cases where a claim of ambiguity is virtually impossible, and a failure to proffer an argument for ambiguity in the answer to pleadings or motions might be sufficient to allow a judge to declare terms unambiguous. There is no reason for a court to consider seriously a complaint or argument which seeks to mischaracterize an agreement. See e. g. East Crossroads Center, Inc. v. Mellon-Stuart Company, 416 Pa. 229, 205 A.2d 865 (1965). However, the court must entertain the argument before it can be rejected. The judge should not abandon his legal expertise or knowledge of the English language. We only assert that the judge's own semantic expertise does not stand sacrosanct against a reasonable alternative semantic reference presented by the parties. If no "reasonable" alternative meanings are put forth, then the writing will be enforced as the judge reads it on its "face." See International Systems, Inc. v. Personnel Data Systems, slip. op. (Pa.Supreme Ct. Jan. 18, 1980).

An illuminating example of the approach of the Pennsylvania courts is the case of United Refining Co. v. Jenkins, 410 Pa. 126, 189 A.2d 574 (1963). This case was

619 F.2d 1001
619 F.2d 1001
(Cite as: 619 F.2d 1001)

divided into two parts, a suit on a note (United v. Jenkins ) and a counterclaim on an oil sale contract (Jenkins v. United ). The basis of the claim in United v. Jenkins was a note which provided:

December 31, 1957 after date I promise to pay the order of United Refining Company Ten Thousand Dollars . . . with interest at 5 per cent per annum.

The trial court had admitted extrinsic evidence on behalf of Jenkins to show that the sole source of payment of the note was to be proceeds from property involved in another agreement between United and Jenkins. Jenkins contended that the note was part and parcel of the oil sale agreement between United and Jenkins and that therefore the proffered interpretation was a permissible interpretation of the note. The Pennsylvania Supreme Court ruled that this note was clear and unequivocal and could not be varied by parol evidence. "The contract is absolute and complete on its face and sufficiently comprehensive to embody the aim and object of the parties."410 Pa. at 134, 189 A.2d at 578, quoting Speier v. Michelson, 303 Pa. 66, 70-71 (1931). Judgment was entered for United.

The basis of the counterclaim was the same oil purchase agreement which Jenkins had claimed was integrated with the note in United v. Jenkins, under this purchase agreement United agreed to purchase and Jenkins agreed to sell all the crude oil produced by Jenkins. The agreement provided that it was to continue in force "so long as there remains unpaid any indebtedness and interest thereon of (Jenkins) to (United)." Jenkins argued that the clause meant what it said that as long as a debt was outstanding, the agreement was in force. United argued that it would be irrational to construe the words in such a way that the obligation remained in effect even if the debts Jenkins owed United were in default. The Pennsylvania

Supreme Court agreed with United and the counterclaim was dismissed. This cause was held to be ambiguous and was interpreted rationally in accord with all the circumstances and negotiations of the parties.

It is beyond argument that the clause in issue in the counterclaim by Jenkins was not ambiguous on its face. The words "so long as" have a clear meaning. The words "there remains unpaid" have no facial ambiguity. The meaning of the words "any indebtedness and interest thereon" were not in dispute. They referred to the note Jenkins owed United. It was this very note which the court ruled in United v. Jenkins was not "part and parcel" of the oil purchase plan, but a separate integrated contract. There were no facially inconsistent words in the contract. Why then did the court allow United to add the condition that made the clause which was written "so long as there remains unpaid any indebtedness and interest thereon of (Jenkins) to (United)" read "so long as there remains unpaid any indebtedness and interest thereon of (Jenkins) to (United) which is not in default "? The reasons are clear from an examination of external signs and objective indicia this was the only rational interpretation of the parties intent. The court had made detailed examination of the evidence offered on the claim and the counterclaim. The evidence on the counterclaim was so compelling that the inference was permissible. However, there was no similar evidence of a compelling nature presented by Jenkins in the action on the note. Interpretation of the note as written was not irrational.

B.

[26][27][28][29][30] But our approach does not authorize a trial judge to demote the written word to a reduced status in contract interpretation. Although extrinsic evidence may be considered under proper circumstances, the parties remain bound by the appropriate objective definition of the words they use

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to express their intent. Generally parties will be held to definitions given to words in specialized commercial and trade areas in which they deal. Similarly, certain words attain binding definition as legal terms of art. See e. g. Brockett v. Carnes, slip. op. (Pa.Super.Ct.Dec. 19, 1979). Dates, numbers and the like generally cannot be varied. See e. g. O'Farrell v. Steel Piping Co., supra.[FN14] For example, extrinsic evidence may be used to show that "Ten Dollars paid on January 5, 1980," meant ten Canadian dollars, but it would not be allowed to show the parties meant twenty dollars. Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent.[FN15]

FN14. But see the "two by four" example given at note 12, supra.

FN15. There could still be proof of fraud, duress, mistake or subsequent oral modification to vary the term used. See F. D. I. C. v. Barness, No. 78-100, slip op. at 20-21 (Pa.Super.Ct.Jan. 31, 1980). See note 9, supra.

[31] We have concluded that the district court here exceeded the permissible boundary of interpretation. We believe its interpretation of insolvency was improperly restrictive. Commercial parties entered a Buy-Sell Agreement using a well defined commercial term and legal term of art "insolvent." The court rejected the test which we believe an attorney or commercial creditor would use to determine if the borrowers were insolvent in any other context, and instead substituted a test for insolvency which excluded certain liabilities of the borrowers. This variation of the written words used in the contract was not justified by the evidence received. When the district judge received Mellon's evidence it should have rejected it as insufficient to vary the meaning of a commercial term as well established as "insolvent." In this case the district court added a term which made the condition a nullity. It ruled that, although the solvency of the borrowers was a condition*1014 in the written contract, the fact that the borrowers' solvency was not significantly considered by Aetna in evaluating the take-out loan minimized or nullified

this clause of the contract.

The condition that the borrowers not be insolvent was added by Aetna and retained in the contract over Mellon's protests. The fact that the insolvency of the borrowers was not significantly considered by Aetna in evaluating the take-out loan is immaterial given the expression of that concern in the written words of the contract. The fact that Aetna thought it bore some risk of default if the occupancy rate of the project fell too low was not sufficient to vary the normal commercial meaning of the word "insolvent." Of course Aetna bore some risk of default Aetna's funding obligation extended over a ten year period. There was no substantial evidence for Mellon's interpretation of the contract other than evidence tending to show that Aetna was not significantly concerned with the borrowers' solvency until they desired an "out" to excuse their obligation to purchase a loan which had become unsound. Fortunately for Aetna it retained that "out" in the Buy-Sell Agreement despite specific objections from Mellon. See Testimony of DeLuca, Record at 515a-518a. At best, Mellon's officers admitted that they knew the insolvency clause was adverse to Mellon's interests, but they didn't "really" know what it meant. Testimony of DeLuca, Record at 518a. Mellon's evidence was simply insufficient to vary the clear meaning of the commercial term "insolvent."

C.

Our holding the parties to a generally accepted commercial interpretation of the word "insolvency" in no way produces an irrational result. Aetna was to undertake the risk of a decline in the real estate market for ten years after it purchased the construction loan. Mellon was at risk of construction not being completed on time and within cost. The issue is who bore the risk that the borrowers' financial reserves could not carry the project from the date of the Buy-Sell Agreement to the closing on the permanent financing i. e. who bore the risk of a decline in the Atlanta real estate market from July of 1974 to August of 1975. It is not irrational to place that risk on Mellon, nor is it irrational to place it on Aetna.[FN16]Aetna inserted the insolvency clause in the commitment. Mellon demanded that the clause be excluded from the Buy-Sell Agreement. Aetna refused. When Mellon signed the agreement notwithstanding the inclusion of the clause, it became

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

619 F.2d 1001                                                                                                    Page 19
619 F.2d 1001
**(Cite as: 619 F.2d 1001)**

bound by the usual meaning of insolvency. This result is not irrational and therefore does not compel the alternative meaning of insolvency suggested by Mellon. Mellon cannot now insert an exception to the solvency condition. "Where one of two innocent persons must sustain a loss, the law will place that burden on the party that has agreed to sustain it." F. J. Busse, Inc. v. Department of General Services, 47 Pa.Cmwlth. 539, --, 408 A.2d 578, 580 (1979). See International Systems, Inc. v. Personnel Data Systems, slip. op. (Pa. Superior Ct., Jan. 18, 1980).

> FN16. Mellon cannot deny that such a decline in real estate value was a risk it at least partially bore Mellon took a mortgage on the Kensington property as security for its construction loan.

[32] Accordingly, we conclude that in determining the insolvency of the borrowers the district court must include all the assets and liabilities of the borrowers in applying both generally accepted commercial tests for insolvency. The notion of insolvency is measured both by a balance sheet showing all assets and liabilities and the test of whether one can meet current debts as persons engaged in a trade normally do.[FN17]

> FN17. The issue is if the borrowers were solvent on the day the duty to fund would otherwise arise August 1, 1975. A determination of solvency requires a factual review of the borrowers' financial condition and the application of complex and sometimes conflicting accounting practices and valuation theories. Although the definition of solvency on the surface appears simple, the factual finding of its existence may present difficulties which should be resolved by the trial court.

**\*1015 IV. THE LETTER OF AUGUST 15, 1975**

[33][34] We find it necessary to respond to Mellon's alternative argument that notwithstanding the presence of the insolvency clause in the contract, Aetna waived any defense based on this clause by its letter of August 15, 1975. We believe that the letter of August 15, 1975, and the borrowers' affidavits of solvency submitted in response to that letter do not establish a separate contract obligating Aetna to

purchase the construction loan nor do they constitute a waiver of the condition that the borrowers not be insolvent at the time Aetna would otherwise become obligated to purchase the loan. We are unable to perceive how this letter could be construed as an offer by Aetna to waive any of Aetna's contractual rights under the insolvency clause. This very letter reasserted Aetna's rights under that clause, reminded the borrowers that their solvency was a required condition precedent to funding the permanent loan, and asked for "sworn statements" to assure Aetna that the condition was fulfilled. The letter never unequivocally stated that Aetna would fund the loan upon submission of the statements, but only that Aetna would "be in a position" to fund the loan. In the context of complex commercial dealings courts must be careful not to take single acts or isolated correspondence out of the context of the entire situation and construe them as separate contracts or waivers of important contract rights unless such an intent is explicitly and clearly expressed.

When Aetna requested affidavits they were asking for sworn truthful statements of the borrowers' solvency.[FN18]If the borrowers were insolvent when they signed affidavits swearing that they were solvent, then the return of those affidavits did not consummate a contract since the act of acceptance was not in conformity with the offer. If the affidavits were signed truthfully, then the letter and affidavits merely evidence that the condition of solvency was satisfied.[FN19]In reality, the letter of August 15 was an attempt by Aetna to determine if the insolvency condition was fulfilled.

> FN18. As a matter of judicial integrity and public policy the court would not enforce a contract requiring submission of perjured affidavits. In any event, it could not be argued here that Aetna, when requesting "sworn" affidavits, wanted anything less than truthful statements.

> FN19. We need not determine what the effect might be if the borrowers signed the affidavits truthfully but were unaware of their own insolvency. The cover letter returned with the letters makes clear that all parties were aware that the major borrower, Mr. Opp, could not meet his obligations in connection with the Kensington Square

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

619 F.2d 1001
619 F.2d 1001
(Cite as: 619 F.2d 1001)

project.

[35] In addition, the cover letter which was returned with the affidavits and signed by the borrowers' attorney can be said to have derogated the contents of the affidavits. An acceptance must be unequivocal to be valid.In Re ABC-Federal Oil and Burner Co., 182 F.Supp. 928 (E.D.Pa.1960), aff'd290 F.2d 886 (3d Cir. 1961); Hedden v. Lupinsky, 405 Pa. 609, 176 A.2d 406 (1962).

## V. MATERIAL ADVERSE CHANGE

[36] The district court determined that the material adverse change clause was not a condition precedent to Aetna's obligation to buy the construction loan. First, the district court noted that paragraph four of the Buy-Sell Agreement contained an extensive list of conditions precedent to Aetna's obligations. The material adverse change clause was not in that paragraph. Normally this might be probative evidence that the material adverse change clause was not a condition precedent. However, the material adverse change clause was in a totally different document, which preceded the Buy-Sell Agreement. The material adverse change clause was contained in the Loan Application, which in turn became part of the Permanent Commitment, which as previously noted, became part of the Buy-Sell Agreement by incorporation. Therefore, the fact that such a clause was not in paragraph four of the Buy-Sell Agreement does not by itself support the district court's conclusion that the material adverse change clause was not a condition precedent to Aetna's obligation. The insolvency*1016 condition also was not in paragraph four, but in the Permanent Loan Commitment.

The district court also held that the insolvency clause was not a condition precedent to Aetna's obligation based on the language of the clause. The clause stated:

If the application is approved, we (the borrowers) agree to the following: . . . we (the borrowers) will furnish evidence satisfactory to you (Aetna) at the date of funding that there has been no material adverse change in our financial or other condition. . .
.

Record at 29a.

[37][38][39] The rule in Pennsylvania is that a condition precedent to an obligation must be expressed by clear language or it will be construed as a promise or covenant. Language not clearly written as a condition precedent is presumed not to be, unless the contrary clearly appears to be the intention of the parties. Britex Waste Co. v. Nathan Schwab and Sons, 139 Pa.Super. 474, 12 A.2d 473 (1940); Potts Mfg. Co. v. Loffredo, 96 Dauph. 413 (Ct. of Common Pleas), aff'd, 235 Pa.Super. 294, 340 A.2d 468 (1974); Sharp v. McKelvey, 57 Lanc.Rev. 377, exceptions dismissed, 57 Lanc.Rev. 391,aff'd196 Pa.Super. 138, 172 A.2d 580 (1961). We hold that it was not error for the district court to construe the material adverse change clause as a promise of the borrowers, and as consideration for Aetna's promise and not a condition precedent to Aetna's obligation. It was also not error for the district judge to hold that this clause was fulfilled. Aetna required no more information than they received, and expressed no dissatisfaction with this information. Aetna added the insolvency/bankruptcy condition in the acceptance of the application which already contained the material adverse change clause. It is a rational interpretation to view the insolvency clause as addressing Aetna's concerns about the borrowers' financial condition because it viewed the material adverse change clause as insufficient to cover the same potential problems. The material adverse change clause was the procedural way Aetna was to receive information about the financial status of the borrowers. Unless the borrowers and Mellon were in substantial noncompliance with their obligations under the Buy-Sell Agreement/Permanent Loan Commitment, Aetna was limited to the insolvency condition as a ground for refusing to purchase the construction loan.

## VI. CONCLUSION

On remand the district court should place the burden of proof on Mellon to establish the condition precedent that the borrowers were not insolvent as of August 1, 1975. The district court should include the liabilities of the Kensington Square project in deciding whether or not the borrowers were then insolvent. Aetna's letter of August 15, 1975, and the response thereto do not constitute a valid waiver of the condition precedent nor do they create a separate contract obliging Aetna to purchase the construction loan.[FN20]

619 F.2d 1001
619 F.2d 1001
**(Cite as: 619 F.2d 1001)**

FN20. We need not reach the issue of Mellon's entitlement to prejudgment interest.

The judgment of the district court will be vacated and the cause remanded for proceedings consistent with the foregoing.

C.A.Pa., 1980.
Mellon Bank, N.A. v. Aetna Business Credit, Inc.
619 F.2d 1001

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



246 B.R. 325                                                                                        Page 1
246 B.R. 325, 43 Collier Bankr.Cas.2d 1463, 35 Bankr.Ct.Dec. 219
**(Cite as: 246 B.R. 325)**

**H**
In re 203 North LaSalle Street Partnership
Bkrtcy.N.D.Ill.,2000.

United States Bankruptcy Court,N.D.
Illinois,Eastern Division.
In re 203 NORTH LaSALLE STREET PARTNER-
SHIP, Debtor.
Bank of America, National Ass'n, Plaintiff,
v.
North LaSalle Street Limited Partnership, Defend-
ant.
**Bankruptcy No. 95-B-04998.**
**Adversary No. 99-A-01168.**

March 10, 2000.

Mortgage lender sued for declaratory judgment as
to effect of prepetition subordination agreement.
The Bankruptcy Court, Eugene R. Wedoff, J., held
that: (1) language of subordination agreement, un-
der which one mortgage lender agreed to subordin-
ate all of its rights under its own note and mortgage
to those of other nonrecourse lender, required sub-
ordination of first mortgage lender's rights to entire
claim of preferred lender, both its secured and un-
secured deficiency claims, but (2) agreement would
not be enforced to effect transfer of subordinated
creditor's voting rights.

So ordered.

West Headnotes

**[1] Mortgages 266 ⟋159**

266 Mortgages
    266III Construction and Operation
        266III(D) Lien and Priority
            266k159 k. Priority as Affected by Provi-
sions of Mortgage or by Agreement. Most Cited
Cases
Illinois law provides that, in absence of ambiguity,
terms of subordination agreements are to be con-
strued according to their plain language; only if am-

biguity exists should court consider evidence out-
side agreement.

**[2] Bankruptcy 51 ⟋2970**

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2967 Subordination
                51k2970 k. Subordination Agreements.
Most Cited Cases
Language of subordination agreement, under which
one mortgage lender agreed to subordinate all of its
rights under its own note and mortgage to those of
other nonrecourse lender, required subordination of
first mortgage lender's rights to entire claim of pre-
ferred lender, both its secured and unsecured defi-
ciency claims, notwithstanding that, but for debtor's
bankruptcy filing, this other lender would have had
no unsecured deficiency claim due to nonrecourse
nature of its loan. Bankr.Code, 11 U.S.C.A. §§
510(a), 1111(b).

**[3] Bankruptcy 51 ⟋2970**

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2967 Subordination
                51k2970 k. Subordination Agreements.
Most Cited Cases
No special degree of explicitness was required in
order for subordination agreement to be interpreted,
by bankruptcy court, as according senior status to
entire claim of preferred mortgage lender, both its
secured and unsecured deficiency claims.
Bankr.Code, 11 U.S.C.A. §§ 510(a), 1111(b).

**[4] Bankruptcy 51 ⟋2970**

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2967 Subordination
                51k2970 k. Subordination Agreements.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

246 B.R. 325, 43 Collier Bankr.Cas.2d 1463, 35 Bankr.Ct.Dec. 219
**(Cite as: 246 B.R. 325)**

Most Cited Cases
Subordination provision that violates no principle of bankruptcy law must be enforced in bankruptcy just as it would be enforced under applicable non-bankruptcy law. Bankr.Code, 11 U.S.C.A. § 510(a).

**[5] Bankruptcy 51 ⊂⇒3544**

51 Bankruptcy
    51XIV Reorganization
       51XIV(B) The Plan
          51k3541 Acceptance
              51k3544 k. Eligibility to Vote; Impairment. Most Cited Cases
Language in pre-bankruptcy subordination agreement, which provided that, in event of mortgagor's insolvency, preferred creditor would have right to vote subordinated creditor's claim, would not be enforced to effect transfer of subordinated creditor's voting rights in Chapter 11 case. Bankr.Code, 11 U.S.C.A. § 510(a).

**[6] Bankruptcy 51 ⊂⇒3101**

51 Bankruptcy
    51IX Administration
       51IX(C) Debtor's Contracts and Leases
          51k3101 k. In General. Most Cited Cases
It is generally understood that prebankruptcy agreements do not override contrary provisions of the Bankruptcy Code.

**[7] Bankruptcy 51 ⊂⇒2967.1**

51 Bankruptcy
    51VII Claims
       51VII(F) Priorities
          51k2967 Subordination
              51k2967.1 k. In General. Most Cited Cases
"Subordination" is the act or process by which one person's rights or claims are ranked below those of others; it has to do with order of priority of payment of claims. Bankr.Code, 11 U.S.C.A. § 510(a).

**[8] Bankruptcy 51 ⊂⇒2967.1**

51 Bankruptcy
    51VII Claims
       51VII(F) Priorities
          51k2967 Subordination
              51k2967.1 k. In General. Most Cited Cases
Subordination affects only priority of payment, not right to payment. Bankr.Code, 11 U.S.C.A. § 510(a).

**\*326** Thomas S. Kiriakos, Beverly J. Klein, Mayer, Brown & Platt, Chicago, IL, for Bank of America, N.A.
Kenneth N. Klee, Martin R. Barash, Klee Tuchin & Bogdanoff LLP, Los Angeles, CA, for North LaSalle Street Limited Partnership.

## MEMORANDUM OF OPINION

EUGENE R. WEDOFF, Bankruptcy Judge.
This adversary proceeding seeks a declaratory judgment as to the effect of subordination agreements on plan confirmation proceedings in a Chapter 11 case. The adversary is before the court on a motion for summary judgment, and there are two issues in dispute: (1) whether senior status under the subordination agreements should be accorded to an artificial deficiency claim created by § 1111(b) of the Bankruptcy Code (Title 11, U.S.C.), and (2) whether the senior creditor is entitled**\*327** to vote subordinated claims. For the reasons set out below, the court will enter judgment declaring that the subordination agreements are effective as to a deficiency claim arising under § 1111(b), but that the senior creditor is not entitled to vote the subordinated claims in Chapter 11 proceedings, despite a provision to that effect in the subordination agreements.

## Jurisdiction

Pursuant to 28 U.S.C. § 1334(a), federal district courts have exclusive jurisdiction over bankruptcy cases. However, pursuant to 28 U.S.C. § 157(a), the district courts may refer bankruptcy cases to the bankruptcy judges for their district, and, by Internal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

246 B.R. 325
246 B.R. 325, 43 Collier Bankr.Cas.2d 1463, 35 Bankr.Ct.Dec. 219
(Cite as: 246 B.R. 325)

Page 3

Operating Procedure 15(a), the District Court for the Northern District of Illinois has made such reference of the pending case. When presiding over such a referred case, a bankruptcy judge has jurisdiction, pursuant to 28 U.S.C. § 157(b)(1), to enter appropriate orders and judgments as to core proceedings within the case. The matter before the court is a core proceeding since it concerns the administration of the estate (§ 157(b)(2)(A)), will determine the extent of a claim (§ 157(b)(2)(K)), and deals with the confirmation of a plan (§ 157(b)(2)(L)). Therefore, this court has jurisdiction to enter an order deciding the present motion and entering judgment in the adversary proceeding.

### Findings of Fact

The facts relevant to this case are undisputed. The debtor in this Chapter 11 case, 203 North LaSalle Street Partnership, owns fifteen floors of a commercial office building located in downtown Chicago. The debtor has two major secured creditors. One is the debtor's general partner, which has a similar name, but without the initial numerals-North LaSalle Street Limited Partnership ("North LaSalle"). The other is Bank of America, National Association, formerly Continental Bank ("the Bank").

In early 1987, the debtor obtained a loan from the Bank secured by a duly recorded first mortgage on the property. The loan was nonrecourse in nature, generally enforceable only against the Bank's collateral. The nonrecourse nature of the loan was emphasized by an agreement that the maker of the loan would be an Illinois land trustee, on behalf of the trust through which the debtor owned the property.

In September, 1988, the debtor obtained a second nonrecourse mortgage loan from North LaSalle. The terms of North LaSalle's mortgage explicitly provided that this mortgage was junior and subordinate to the mortgage of the Bank. At the time it entered into the loan agreement with the debtor, North LaSalle also entered into an Inter-Creditor Agreement with the Bank. The Inter-Creditor

Agreement again provided that North LaSalle's loan was subordinate to the Bank's loan. Specifically, the Inter-Creditor Agreement provided:

North LaSalle covenants and agrees that the North LaSalle Loan and the North LaSalle Loan Documents, as they may be, at any time from time to time, amended, modified, supplemented, substituted, replaced or restated, are and shall at all times be and remain junior and subordinate to the [Bank] Transactions....

In October 1992, North LaSalle also entered into a "Consent and Subordination Agreement" in consideration for the Bank's waiving certain rights under its original loan documents. This agreement contained a broad subordination provision, including an agreement that the Bank could vote North LaSalle's claim in any bankruptcy reorganization:

[North LaSalle] further agrees that in the event of any dissolution, winding up, liquidation, readjustment, reorganization or other similar proceeding relating to ... the [debtor] or to its creditors, ... whether in bankruptcy, insolvency or receivership ..., the liabilities of the Trust or the [debtor] under the Bank's Loan Papers (the "Senior Liabilities") ... shall first be paid in full before [North *328 LaSalle] shall be entitled to receive and to retain any payment or distribution in respect of the liabilities of the Trust or [the debtor] under the Second Mortgage Loan Papers the ("Junior Liabilities"), and, in order to implement the foregoing, (a) all payments and distributions of any kind or character in respect of the Junior Liabilities to which [North LaSalle] would be entitled if the Junior Liabilities were not subordinated ... shall be made directly to the Bank ... and (c) [North LaSalle] hereby irrevocably agrees that the Bank may, at its sole discretion, in the name of [North LaSalle] or otherwise, demand, sue for, collect, receive and receipt for any and all such payments or distributions and file, prove, and vote or consent in any such proceedings with respect to, any and all claims of [North LaSalle] relating to the Junior Liabilities.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Bank's loan to the debtor matured on January 3, 1995. The debtor was unable to pay the Bank's loan at that time and subsequently, on March 13, 1995, the debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. At that time, the debtor owed the Bank over $93 million in outstanding principal and accrued interest under the Bank's loan documents. The principal balance on North LaSalle's Second Mortgage at the petition date was $11.3 million.

In December of 1995, the court confirmed a Chapter 11 plan proposed by the debtor, over the Bank's objection. The Bank then appealed the confirmation order, eventually to the Supreme Court of the United States. The Supreme Court reversed the order and the case was remanded to this court for further proceedings. *Bank of America Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). Following the remand of the debtor's case, this court issued an order on September 15, 1999 designed, insofar as possible, to place the parties in the positions that they occupied prior to confirmation. The order also terminated the debtor's exclusive right to propose a plan. Thereafter, the Bank and the debtor indicated an intent to present competing plans.

The present dispute involves the rights of the Bank and North LaSalle under the Bankruptcy Code and the parties' subordination agreements. The Bank has filed an adversary complaint seeking a declaration both (1) that its entire claim-including any portion of the claim in excess of the value of its interest in the debtor's property-is entitled to payment before any payment from the debtor to North LaSalle, and (2) that the Bank is entitled to vote the claim of North LaSalle in the anticipated confirmation proceedings. In response, North LaSalle has acknowledged that the Bank holds a superior claim as to any amounts received from the proceeds of the Debtor's property. However, North LaSalle asserts that any deficiency claim of the Bank should be paid pro rata with North LaSalle's claim, and North

LaSalle contends that it has the right to vote its own claim in the confirmation proceedings.

The Bank has moved for summary judgment, and the court took the matter under advisement to consider the arguments of the parties.

**Conclusions of Law**

The declaratory judgment sought in this pending adversary proceeding is an appropriate method for determining the rights of the parties, and is specifically authorized by Fed.R.Bankr.P. 7001(9). Given the undisputed facts set forth above, the declaration of rights that is sought in the complaint can be issued summarily, pursuant to Fed.R.Bankr.P. 7056 (incorporating the standards for summary judgment set out in Fed.R.Civ.P. 56). *See In re Sonicraft, Inc.,* 238 B.R. 409, 412-13 (Bankr.N.D.Ill.1999) (discussing summary judgment standards).

With the admission by North LaSalle that its mortgage is subordinate to the secured claim of the Bank, there are two *329 issues for the court to determine: (1) whether any unsecured deficiency claim held by the Bank is entitled to senior status, and (2) whether the Bank is entitled to vote North LaSalle's subordinated claim in the anticipated confirmation proceedings.

[1] *The deficiency claim.* Section 510(a) of the Bankruptcy Code provides that a subordination agreement is enforceable in bankruptcy "to the same extent that such agreement is enforceable under applicable nonbankruptcy law." In this case, as the parties acknowledge, the applicable nonbankruptcy law is the law of Illinois, and the subordination agreements between North LaSalle and the Bank must be enforced as they would be under Illinois law. As with other contracts, Illinois law provides that, in the absence of ambiguity, the terms of subordination agreements are to be construed according to their plain language. *Marriott Family Restaurants, Inc. v. Lunan Family Restaur-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

246 B.R. 325
246 B.R. 325, 43 Collier Bankr.Cas.2d 1463, 35 Bankr.Ct.Dec. 219
**(Cite as: 246 B.R. 325)**

*ants (In re Lunan),* 194 B.R. 429, 445 (Bankr.N.D.Ill.1996). Only if an ambiguity exists should the court consider evidence outside of the agreement. *Greenfield Direct Response, Inc. v. ADCO List Management (In re Greenfield Direct Response, Inc.),* 171 B.R. 848, 855-56 (Bankr.N.D.Ill.1994).

[2] The language of the agreements in this case is not ambiguous. North LaSalle's Promissory Note, the Inter-Creditor Agreement, and the Consent and Subordination Agreement each seek, in broad language, to subordinate all rights of North LaSalle under its note and mortgage to the rights of the Bank under its prior note and mortgage. The Consent and Subordination Agreement is particularly clear in this regard, stating that "the liabilities of the Trust or [the debtor] under the Bank's Loan Papers ... shall first be paid in full before [North LaSalle] shall be entitled to receive and to retain any payment or distribution."

North LaSalle argues first that the liabilities under the Bank's loan do not include payment of a deficiency claim, because the loan is nonrecourse, and only gives rise to a claim in bankruptcy because of the operation of § 1111(b) of the Code. This argument is mistaken. The "liabilities" under the loan agreement with the Bank include the full amount of principal and interest under the promissory note, made by the land trustee on behalf of the debtor's trust. The fact that the Bank's loan is nonrecourse does not change the reality that the land trust, at least, had a liability under the promissory note to repay the entire principal and interest specified by the note. The nonrecourse features of the loan simply impose a limitation on collection actions-with the Bank generally agreeing, in the absence of fraud, to restrict its recovery on the liability of the debtor and its land trust to the property that secures the loan. This restriction on enforcement would likely have resulted in the Bank being unable, outside of bankruptcy, to obtain any recovery beyond the value of its collateral. However, even if the liability of the trust and the debtor for the Bank's

loan was not able to serve as the basis for recovery, it still existed-there was liability under the note for the full amount of the principal and interest, and the full amount of that liability was given senior status by the subordination agreements that North LaSalle executed.

North LaSalle makes an additional argument-that even if the subordination agreements grant senior status to a deficiency claim, the agreements should not be enforced in this regard, because the application of the agreements to a deficiency claim is not explicit. In this connection, North LaSalle cites authority for the proposition that a "Rule of Explicitness" should be applied to subordination agreements in bankruptcy. *See, e.g., In re Ionosphere Clubs, Inc.,* 134 B.R. 528, 533-34 (Bankr.S.D.N.Y.1991).

[3] The subordination agreements involved in this case in fact contain no explicit provision according senior status to a claim arising from an insufficiency of the *330 Bank's collateral-such a deficiency claim is simply part of the general class of "liabilities" arising under the Bank's loan as to which senior status is accorded. Thus, the subordination of North LaSalle's loan claims to a deficiency claim of the Bank is provided for expressly (in general language), but not explicitly. However, there is no requirement under the Bankruptcy Code that any special degree of explicitness is required to accord senior status to a deficiency claim.

The Rule of Explicitness to which North LaSalle refers was developed to deal with a particular problem arising from subordination agreements in bankruptcy-the question of whether a subordination agreement could require interest on an unsecured senior claim, accruing after the filing of a bankruptcy case, to be paid before payment of the subordinated debt. This problem is described in *Chemical Bank v. First Trust of New York (In re Southeast Banking Corp.),* 156 F.3d 1114, 1118-20 (1998), and can be summarized as follows:

• Under the Bankruptcy Act of 1898, there was no

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

246 B.R. 325
246 B.R. 325, 43 Collier Bankr.Cas.2d 1463, 35 Bankr.Ct.Dec. 219
**(Cite as: 246 B.R. 325)**

statutory treatment of subordination agreements, and the courts enforced these agreements according to equitable principles.

• One of the general principles of bankruptcy law is that interest on unsecured claims stops at the time of the filing of a bankruptcy case.

• A senior creditor under a subordination agreement could argue that its claim was entitled to postpetition interest, despite the general prohibition, with the payment of interest coming not from the estate, but from the dividend that would otherwise be paid to the subordinated claim. The idea was that the senior claim was to be paid "in full" before the subordinated claim was paid, and that full payment required postpetition interest.

• The Third Circuit, faced with such an assertion by a senior creditor, ruled that in order for the parties to a subordination agreement to change the general bankruptcy rule ("that interest stops on the date of the filing of the petition"), their agreement would have to "clearly show that the general rule ... is to be suspended, at least vis-a-vis these parties." *In re Time Sales Fin. Corp.,* 491 F.2d 841, 844 (3d Cir.1974). This requirement, operant only in the context of postpetition interest, became known as the Rule of Explicitness.

[4] With this understanding, it is plain that the Rule of Explicitness has no application in the present case. Allowing payment of postpetition interest violated a general bankruptcy principle, and the courts held that in order to have this anomalous effect, a subordination agreement would have to be explicit in deviating from the usual rule. Payment of an unsecured deficiency claim, on the other hand, violates no policy of bankruptcy law, and hence there is no reason why an explicit provision should be required to obtain its enforcement in a subordination agreement. Indeed, as noted above, § 510(a) now indicates that subordination agreements must be enforced in bankruptcy just as they would be under applicable nonbankruptcy law, and hence it is doubtful whether the Rule of Explicitness continues to be viable even as to postpetition interest. (The *Southeast Banking* case, 156 F.3d at 1120-24, held that § 510 obviates any bankruptcy-based requirement of explicitness, and that any remaining need for special explicitness depends on applicable state law.) Pursuant to § 510(c), it is certain that a subordination provision that violates no principle of bankruptcy law-such as the present one-must be enforced as it would be under nonbankruptcy law. Since the subordination agreement here would accord senior status to the unsecured deficiency claim of the Bank under Illinois law, it enjoys the same status in this bankruptcy case.

[5] *The right to vote a subordinated claim.* While the language of the subordination agreements governs the outcome of the Bank's right to repayment of any deficiency claim, the language of the Bankruptcy*331 Code governs the determination of voting rights in this case. Section 1126(a) of the Code provides that "[t]he holder of a claim" may vote to accept or reject a plan under Chapter 11, and the parties acknowledge that North LaSalle is the holder of the claim arising under its loan. Unless there is some basis for deviating from the plain language of § 1126(a), North LaSalle should therefore be allowed to vote its claim in the confirmation process. *See United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 ("The plain meaning of legislation should be conclusive, except in 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' ") (citation omitted). None of the arguments given by the Bank justifies any deviation from the plain language of § 1126(a).

[6] First, the fact that North LaSalle agreed that the Bank could vote its claim as part of a subordination agreement does not provide a basis for disregarding § 1126(a). It is generally understood that prebankruptcy agreements do not override contrary provisions of the Bankruptcy Code. Thus, in *Klingman v. Levinson,* 831 F.2d 1292, 1296 n. 3 (7th Cir.1987), the court noted that the Bankruptcy Code generally

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provides for the discharge of an individual's debts, and that it would be contrary to public policy to allow a debtor "to contract away the right to a discharge." *See also Hayhoe v. Cole (In re Cole),* 226 B.R. 647, 652 n. 7 (9th Cir. BAP 1998) (collecting decisions refusing to enforce prepetition waivers of "bankruptcy benefits" other than discharge). Indeed, since bankruptcy is designed to produce a system of reorganization and distribution different from what would obtain under nonbankruptcy law, it would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply.

[7] Second, § 510(a), in directing enforcement of subordination agreements, does not allow for waiver of voting rights under § 1126(a). "Subordination," though not defined by the Code, has a common understanding in the law, reflected in Black's Law Dictionary, which defines subordination as: "The act or process by which a person's rights or claims are ranked below those of others." Joseph R. Nolan and Jacqueline M. Nolan-Haley, *Black's Law Dictionary* 1426 (6th ed.1990). Subordination thus affects the order of priority of payment of claims in bankruptcy, but not the transfer of voting rights. One of the decisions cited by North LaSalle, *Beatrice Foods Co. v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.),* 5 B.R. 734, 736 (Bankr.D.Minn.1980), made this point emphatically in the course of deciding that a subordinated creditor was entitled to adequate protection of its claim:

The intent of § 510(a) ... is to allow the consensual and contractual priority of payment to be maintained between creditors among themselves in a bankruptcy proceedings. There is no indication that Congress intended to allow creditors to alter, by a subordination agreement, the bankruptcy laws unrelated to distribution of assets.

*Hart Ski* went on to address the very issue involved here, stating in dicta that the Code "guarantees each secured creditor certain rights, regardless of subordination ... includ[ing] the right ... to participate in the voting for confirmation or rejection of any plan

of reorganization."

Third, Fed.R.Bankr.P. 3018(c) does not allow the voting of a subordinated creditor's claim by the senior creditor. The rule provides that an acceptance or rejection of a Chapter 11 plan must be signed by "the creditor or equity security holder or an authorized agent." Of course, a bankruptcy rule may not be enforced so as to contradict provisions of the Code. *U.S. v. Cardinal Mine Supply, Inc.,* 916 F.2d 1087, 1089 (6th Cir.1990). However, there is no conflict here. An "agent" is commonly understood to act at the direction of a principal. Indeed, in **\*332**Brunswick Leasing Corp. v. Wisconsin Central Ltd., 136 F.3d 521, 526 (7th Cir.1998), the court stated that "[t]he test of agency is the existence of the right to control the method or manner of accomplishing a task by the alleged agent" (quoting *Wargel v. First Nat'l Bank of Harrisburg,* 121 Ill.App.3d 730, 736, 77 Ill.Dec. 275, 460 N.E.2d 331, 334 (1984)). The Bank in this case would not be acting at the direction of North LaSalle in voting its claim; it would be acting in its own interests, quite possibly contrary to those of North LaSalle. Accordingly, the Bank cannot be seen as the agent of North LaSalle under Rule 3018.

[8] Finally, far from producing any results at odds with the intent of Congress, the plain language of § 1126(a) is completely consistent with reasonable bankruptcy policy. Although a creditor's claim is subordinated, it may very well have a substantial interest in the manner in which its claim is treated. Subordination affects only the priority of payment, not the right to payment. If the assets in a given estate are sufficient, a subordinated claim certainly has the potential for receiving a distribution, and Congress may well have determined to protect that potential by allowing the subordinated claim to be voted. This result assures that the holder of a subordinated claim has a potential role in the negotiation and confirmation of a plan, a role that would be eliminated by enforcing contractual transfers of Chapter 11 voting rights.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

246 B.R. 325                                                                Page 8
246 B.R. 325, 43 Collier Bankr.Cas.2d 1463, 35 Bankr.Ct.Dec. 219
**(Cite as: 246 B.R. 325)**

### Conclusion

For the reasons discussed above, the court will
enter judgment, in a separate order, declaring (1)
that North LaSalle's claim in this case is subordin-
ate to the Bank's entire claim, including any defi-
ciency claim, and (2) that North LaSalle, as holder
of the claim arising under its loan to the debtor, is
entitled to vote that claim in this Chapter 11 case.

Bkrtcy.N.D.Ill.,2000.
In re 203 North LaSalle Street Partnership
246 B.R. 325, 43 Collier Bankr.Cas.2d 1463, 35
Bankr.Ct.Dec. 219

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



365 B.R. 578
365 B.R. 578, 48 Bankr.Ct.Dec. 64
**(Cite as: 365 B.R. 578)**

Page 1

▷
In re Buzzeo
Bkrtcy.W.D.Pa.,2007.

United States Bankruptcy Court,W.D. Pennsylvania.
In re Eugene C. BUZZEO and Janet N. Buzzeo,
Debtors.
Geoffrey Todd Hodges, as Trustee of the Frank
Musolino, Jr. Irrevocable Trust and Geoffrey Todd
Hodges, as Trustee of the Ashley Marie Musolino
Irrevocable Trust, Movants
v.
Eugene C. Buzzeo and Janet N. Buzzeo, Respond-
ents.
**Bankruptcy No. 05-90056.**
**Adversary No. 06-1088.**

May 15, 2007.

**Background:** Investors who had previously sued
Chapter 11 debtor-husband for his alleged fraud in
connection with sale of securities and entered into
settlement with debtor-husband and his debtor-wife
for payments that debtors had failed to make
brought adversary proceeding to except resulting
debt from discharge. Investors moved for summary
judgment.

**Holdings:** The Bankruptcy Court, Warren W.
Bentz, J., held that:
(1) prepetition settlement agreement resolving in-
vestors' common law and securities fraud claims
against Chapter 11 debtor-husband did not result in
novation of debtor-husband's nondischargeable se-
curities fraud debt and transform this debt into con-
tractual obligation that debtor-husband could dis-
charge in bankruptcy; but
(2) judgment entered against debtor-wife, for fail-
ing to make payments that she and debtor-husband
had agreed to make in settlement of common law
and securities fraud claims asserted solely against
debtor-husband, did not conclusively establish that
debtor-wife's obligation was nondischargeable as

debt for her violation of securities laws or common
law fraud in connection with sale of security.

Motion granted as to debtor-husband; motion re-
fused as to debtor-wife.

West Headnotes

**[1] Bankruptcy 51 ⟨key⟩3343.1**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)1 In General
                51k3343 Particular Debts or Liabilities
                    51k3343.1 k. In General. Most
Cited Cases
Prepetition settlement agreement resolving in-
vestors' common law and securities fraud claims
against Chapter 11 debtor-husband did not result in
novation of debtor-husband's nondischargeable se-
curities fraud debt and transform this debt into con-
tractual obligation that debtor-husband could dis-
charge in bankruptcy; rather, bankruptcy court
could look behind settlement agreement to determ-
ine that debt which debtor-husband assumed was
nondischargeable, as debt for debtor-husband's vi-
olation of securities laws or common law fraud in
connection with sale of security, which had resulted
in judgment, order, consent order or decree entered
in any federal or state judicial or administrative
proceeding. 11 U.S.C.A. § 523(a)(19).

**[2] Bankruptcy 51 ⟨key⟩3372.1**

51 Bankruptcy
    51X Discharge
        51X(C) Debts and Liabilities Discharged
            51X(C)4 Fraud
                51k3372.1 k. In General. Most Cited
Cases
In deciding whether debt for debtor's breach of pre-
petition settlement agreement is nondischargeable
in bankruptcy, court must behind settlement agree-
ment to determine whether debt was originally the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

365 B.R. 578
365 B.R. 578, 48 Bankr.Ct.Dec. 64
**(Cite as: 365 B.R. 578)**

Page 2

product of fraud.

**[3] Judgment 228 ☞735**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k734 Matters Not in Issue
                228k735 k. In General. Most Cited Cases
Judgment entered against Chapter 11 debtor-wife, for failing to make payments that she and debtor-husband had agreed to make in settlement of common law and securities fraud claims asserted solely against debtor-husband, did not conclusively establish that debtor-wife's obligation on this prepetition judgment was nondischargeable as debt for her violation of securities laws or common law fraud in connection with sale of security, where debtor-wife was not party to underlying fraud action, but was named as defendant only in second action brought to recover for her breach of contract in failing to make payments that she had agreed to make in settlement agreement. 11 U.S.C.A. § 523(a)(19).

**\*579** Donald R. Calaiaro, Esq., Pittsburgh, PA, Attorney for Debtors.
Geoffrey Todd Hodges, Esq., Lutz, FL, Attorney for Plaintiffs.

*OPINION*

WARREN W. BENTZ, Bankruptcy Judge.

*I. Introduction.*

Eugene C. Buzzeo ("Eugene" or "Buzzeo") and Janet N. Buzzeo ("Janet") or (Eugene and Janet collectively, the "Debtors") filed a voluntary Petition under Chapter 11 of the Bankruptcy Code on December 5, 2005 (the "Filing Date").

Before the Court is a Motion for Summary Judgment on Count I of a Complaint filed by Geoffrey Todd Hodges, as Trustee of the Frank Musolino, Jr. Irrevocable Trust and Geoffrey Todd Hodges, as Trustee of the Ashley Marie Musolino Irrevocable

Trust (collectively, the "Trusts" or the "Plaintiffs"). In Count I, the Plaintiffs seek a determination that the debts owed to them by the Debtors are nondischargeable pursuant to 11 U.S.C. § 523(a)(19) [FN1].

    FN1. All references to Code sections are to Title 11 of the United States Code unless otherwise indicated.

**\*580** *II. Summary Judgment Standard.*

Fed.R.Civ.P. 56(c) made applicable to these proceedings pursuant to Fed.R.Bankr.P. 7056, provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.7D' *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 482 n. 1 (3d Cir.2001) citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

*III. Factual Background.*

At all times material to the allegations of the Complaint, Buzzeo was a director and officer of Buzzeo, Inc., an Arizona corporation (the "Corporation"). The Corporation was engaged in the business of software development.

On May 5, 2000, Buzzeo sold stock of the Corporation to the Plaintiffs. On or about February 23, 2001, Plaintiffs filed a lawsuit against Buzzeo in the Florida State Court for fraud in the inducement (Count I), violation of the Florida Securities and Investor Protection Act (Count II), and breach of warranty (Count III). Janet was not named as a Defendant in the Complaint. Buzzeo removed the case to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

365 B.R. 578
365 B.R. 578, 48 Bankr.Ct.Dec. 64
**(Cite as: 365 B.R. 578)**

the United States District Court for the Middle District of Florida, Tampa Division (the "District Court"). On June 5, 2002, the Plaintiffs, Buzzeo and Janet entered into a Settlement Agreement. The Settlement Agreement provides in part:

1. RESOLUTION OF THE LAWSUIT.

(a) Within three (3) business days of the execution of this SETTLEMENT AGREEMENT, the TRUSTS and BUZZEO shall file with the COURT a Stipulation voluntarily dismissing with prejudice Count II (Violation of Florida Securities Act) and Count III (Breach of Contractual Representations and Warranties) of the TRUSTS' Complaint, voluntarily dismissing with prejudice BUZZEO's Counterclaims asserted in the LAWSUIT, and stipulating to the entry of judgment in the amount of $1,500,000.00 (one million five hundred thousand dollars) on Count I of the Complaint filed by the TRUSTS in the LAWSUIT (the "JUDGMENT"), in the form attached hereto as Exhibit A.

(b) The TRUSTS and BUZZEO intend for the JUDGMENT to be a final adjudication of claims asserted by the TRUSTS in Count I of the Complaint. BUZZEO does not admit the allegations of Count I; however, he agrees not to contest those allegations so that the JUDGMENT may be entered without the necessity of introducing evidence or the conduct of a trial. BUZZEO agrees and intends that the JUDGMENT debt will be a non-dischargeable debt, pursuant to 11 U.S.C. § 523(a)(2) in the event of a bankruptcy, or in any similar proceeding. BUZZEO further agrees and intends that in any subsequent proceeding to which the TRUSTS and BUZZEO are parties, all of their allegations as set forth in Count I may be taken as true and correct without further proof by the TRUSTS. As such, BUZZEO agrees and intends that the stipulated JUDGMENT will collaterally estop him from *581 re-litigating with the TRUSTS, in any forum, the issues asserted in Count I of the Complaint.

Pursuant to the Settlement Agreement, District Court entered a judgment for $1,500,000 against

Buzzeo only. The Settlement Agreement required Debtors to make payment of $1,500,000, plus interest, not later than December, 2002. Debtors failed to make payment.

On March 5, 2004, the parties amended the Settlement Agreement by letter which provides, in relevant part:

This will confirm a final monetary settlement between [Plaintiffs] and Eugene and Janet Buzzeo, pursuant to which Mr. and Mrs. Buzzeo will pay [the Plaintiffs] the sum of $1,650,000 on or before June 8, 2004....

Debtors again failed to make payment and on August 25, 2004 the parties entered into a Supplement to Settlement Agreement to provide Buzzeo and Janet an additional forbearance period in exchange for an agreed payment of $2,025,000 by October 15, 2004, or $2,000,000 if paid by September 8, 2004. Buzzeo and Janet further agreed that in the event of further default, the Trusts were entitled to the immediate entry of an agreed form of Supplemental Judgment.

On October 21, 2004, a new Complaint for Breach of Contract, with both Buzzeo and Janet named as defendants, was initiated in the District Court. The District Court entered the Supplemental Judgment in the new case. The Supplemental Judgment provides, in part:

That the Plaintiffs, Geoffrey Todd Hodges, as Trustee of the Frank Musolino, Jr. Irrevocable Trust u/t/d/ 10/6/97, and as Trustee of the Ashley Marie Musolino Irrevocable Trust u/t/d 10/6/97, recover of the Defendants, Eugene C. Buzzeo and Janet N. Buzzeo, jointly and severally, the sum of five hundred twenty-five thousand dollars ($525,000) and shall recover from Janet N. Buzzeo the sum of one million five hundred thousand dollars ($1,500,000), with interest thereon at the rate of 7% as provided by law.

IV. *Count I of the Objection to Discharge.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

365 B.R. 578
365 B.R. 578, 48 Bankr.Ct.Dec. 64
**(Cite as: 365 B.R. 578)**

Page 4

Plaintiffs assert that the obligations of Buzzeo and Janet are nondischargeable pursuant to § 523(a)(19) because the debts owed Plaintiff "are for common law fraud in connection with the sale of a security and result from judgments entered in federal court proceedings and settlement agreements entered into by the debtors."

Debtors deny that the Bankruptcy Code has a § 523(a)(19) exception to discharge. Debtors further assert:

The [Debtors] did not commit common law fraud nor did they misrepresent any material fact to the Plaintiffs. Janet Buzzeo had no contact with the Plaintiffs prior to the sale of the stock. Only Eugene Buzzeo owned the stock sold to the Plaintiffs. Any reliance by the Plaintiffs was not reasonable nor was [sic] they justified. The Plaintiffs received full value for their investment when they converted their stock or when they enforced their lien rights.

### V. Section 523(a)(19).

Section 523(a)(19) was added to the Bankruptcy Code by § 803 of the Corporate and Criminal Fraud Accountability Act of 2002 (Pub.L. No. 107-204) FN2 (the "Accountability Act"). According to legislative*582 history, the purpose of § 523(a)(19) was to protect investors:

> FN2. The Corporate and Criminal Fraud Accountability Act of 2002 is Title VIII of the Sarbanes-Oxley Act of 2002.

Current bankruptcy law may permit such wrongdoers to discharge their obligations under court judgments or settlements based on securities fraud and other securities violations.

This loophole in the law should be closed to help defrauded investors recoup their losses and to hold accountable those who violate securities laws after a government unit or private suit results in a judgment or settlement against the wrongdoer.

*In re Gibbons,* 289 B.R. 588, 592 (Bankr.S.D.N.Y.2003), *aff'd.,*311 B.R. 402 (S.D.N.Y.2004), *aff'd.,*155 Fed.Appx. 534 (2d Cir.2005)*quoting*S.Rep. No. 107-146 (2002). Section 523(a)(19) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 to indicate that it applies to such debts that result: "before, on, or after the date on which the petition was filed."

As amended, § 523(a)(19) provides that an individual is not discharged of any debt:

(19) that-

(A) is for-

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from-

(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii) any settlement agreement entered into by the debtor; or....

11 U.S.C. § 523(a)(19).
Section 523(a)(19) makes a debt non-dischargeable if two conditions are met: (1) the debt is for the violation of certain federal securities laws, state securities laws or regulations under the federal or state securities laws or is for common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and (2) the debt results from a judgment, order, consent order or decree in a federal or state judicial or administrative pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

365 B.R. 578
365 B.R. 578, 48 Bankr.Ct.Dec. 64
(Cite as: 365 B.R. 578)

Page 5

ceeding or any settlement agreement entered by the debtor or any court or administrative order for the payment of damages, a fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost or other payment owed by the debtor.

*In re Whitcomb,* 303 B.R. 806, 810 (Bankr.N.D.Ill. 2004)

## VI. *Discussion.*

### (a) *Eugene Buzzeo.*

[1] On February 23, 2001, Plaintiffs sued Buzzeo in the Florida State Court. Buzzeo removed the case to the District Court (the "Litigation"). The Plaintiffs' allegations in the Litigation included common law fraud claims and violations of securities laws. Buzzeo actively participated in the litigation and on June 5, 2002, executed a Settlement Agreement in resolution of the Litigation. Buzzeo stipulated to the entry of judgment in the amount of $1,500,000 on Count I of the Complaint, which alleged fraud in the Inducement. Pursuant to the Settlement Agreement, the District Court entered judgment against Buzzeo.

When Buzzeo failed to make payment when due, the Settlement was amended on two occasions to increase the amounts due *583 and to allow Buzzeo more time to satisfy the judgment.

Debtors assert that the Settlement Agreement constitutes a novation of the Plaintiffs' original common law fraud claims and transfers the original, potentially nondischargeable claim based on common law fraud in connection with the sale of securities into a dischargeable contractual claim.

The United States Supreme Court in *Archer v. Warner,* 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003) held that a settlement or stipulated judgment reducing a previous claim for fraud into a monetary obligation without a specific finding of fraud can continue to be barred from discharge un-

der 11 U.S.C. § 523. In *Archer,* the debtors sold a company to the creditors, and the creditors sued the debtors for fraud in connection with the sale. The parties settled the lawsuit. However, when the debtors failed to make payments under the settlement agreement and filed for bankruptcy, the creditors asserted that the debt was nondischargeable under § 523(a)(2)(A). The issue was whether the settlement agreement was a novation of the original debt for money obtained by fraud, with the novation negating the fraud claim. The Supreme Court held that the entire settlement debt was nondischargeable under § 523(a)(2)(A), even though the parties had executed a settlement agreement. As long as the creditor is able to prove that the debtor fraudulently took something of value, such as money, property, or services from the creditor, then any damages resulting from that fraud are nondischargeable under Section 523(a)(2)(A).

[2] The Bankruptcy Code requires that courts look behind a settlement agreement to determine if the debt was originally the product of fraud. *Archer,* 538 U.S. at 320-21, 123 S.Ct. 1462.

The Settlement Agreement does not preclude our examination into the underlying facts to determine whether Plaintiffs' claims are nondischargeable under § 523(a)(19). The underlying facts reflect that the obligation arises from common law fraud in connection with the sale of a security and the debt results from a settlement agreement entered by Buzzeo and a judgment order in the District Court.

Buzzeo has not demonstrated that any genuine issue for trial exists. For the reasons stated above, § 523(a)(19) is applicable and Buzzeo's debt to the Plaintiffs is nondischargeable.

### (b) *Janet Buzzeo.*

[3] Janet was not a party to the litigation in the District Court. She was not named as a defendant. She did however, join as a party to the Settlement Agreement.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

365 B.R. 578
365 B.R. 578, 48 Bankr.Ct.Dec. 64
(Cite as: 365 B.R. 578)

In the AFFIDAVIT OF GEOFFREY TODD HODGES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT I OF COMPLAINT, Hodges states, in part:

14. I learned that during 1999 and 2000, a company called "Pazona Technologies" had sold hundreds of thousands of shares of Buzzeo, Inc. stock to dozens of investors in the Tampa Bay area, in other parts of the country, and overseas. Pazona had received millions of dollars from those stock sales. I then learned that Pazona Technologies had paid nothing for its Buzzeo, Inc. stock. I investigated further. I learned that Pazona Technologies was represented by two residents of Tampa, who were acting as the purported sellers of the stock. They had told the purchasers and the employees of Buzzeo, Inc. that one of them was involved in a divorce and was trying to liquidate his stock as part of that process.*584 In May 2002, I learned that Pazona Technologies was actually a corporation affiliated with Eugene and Janet Buzzeo. They were secretly selling their personal stock through Pazona and through third parties for millions of dollars. They had taken extraordinary steps to hide their identity and involvement in those sales from unsuspecting investors, including me, and from the employees of Buzzeo, Inc.

15. In early June 2002, before the start of a scheduled deposition in Tampa in the First Lawsuit, I confronted Mr. Buzzeo and his counsel with the foregoing facts and numerous other indicia of the fraud at Buzzeo, Inc. I explained that the Trusts' counsel was preparing to add several counts to the First Lawsuit, to add Mrs. Buzzeo as a party based on her activities and involvement with Pazona Technologies, and to add several million dollars of claims to recoup the Trusts' and their affiliates' direct investments into Buzzeo, Inc.

16. Settlement discussions immediately commenced. Those culminated in the execution of a Settlement Agreement, dated June 5, 2002 (the "Settlement Agreement")....

Nothing in the Settlement Agreement indicates that Janet committed any wrongdoing. She, along with Buzzeo, did agree to make payment to the Plaintiffs. Pursuant to the Settlement Agreement, the District Court entered judgment against Buzzeo in the amount of $1,500,000. Janet was not a party to the Litigation and judgment was not entered against her.

The Settlement Agreement was amended by letter and by Supplement to increase the amounts owed and to extend the time for Buzzeo and Janet to make payment. Although Janet agreed to liability for the obligation, neither document reflected any indication or admission of wrongdoing by Janet.

Buzzeo and Janet did not comply with the Settlement Agreement and Supplement. On October 19, 2004, a new lawsuit was initiated in the District Court at Case No. 8:04-CV-02297-RAL-MAP, for the filing of a COMPLAINT FOR BREACH OF CONTRACT with both Buzzeo and Janet named as defendants (the "Second Lawsuit"). The Plaintiffs alleged damages from the breach of the Settlement Agreement and Supplement. Buzzeo and Janet admitted the allegations of the Complaint and the parties filed a Stipulation and Joint Motion for Entry of Judgment.

The Stipulation in the Breach of Contract action provides:

HODGES, BUZZEO and JANET stipulate to entry of judgment in favor of HODGES on the complaint against BUZZEO and JANET in the amount of five hundred twenty-five thousand dollars ($525,000) against BUZZEO AND JANET, jointly and severally, and in the amount of one million five hundred thousand dollars ($1,500,000) against JANET.

The District Court entered judgment in the Second Lawsuit on October 21, 2004. The Judgment Order carries the case number of the Second Lawsuit, but is erroneously captioned with Buzzeo only named as Defendant. The Judgment Order provides, in part:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

That the Plaintiffs, Geoffrey Todd Hodges, as Trustee of the Frank Musolino, Jr. Irrevocable Trust u/t/d 10/6/97, and as Trustee of the Ashley Marie Musolino Irrevocable Trust u/t/d 10/6/97, recover of the Defendants, Eugene C. Buzzeo and Janet N. Buzzeo, jointly and severally, the sum of five hundred twenty-five thousand dollars ($525,000) and shall recover from Janet N. Buzzeo the sum of one million five hundred thousand dollars*585 ($1,500,000), with interest thereon at the rate of 7% as provided by law.

We find that Plaintiffs are not entitled to Summary Judgment against Janet. Janet was not a party to the original District Court lawsuit which alleged common law fraud against Buzzeo and resulted in the Settlement Agreement and the Second Lawsuit that followed. Even accepting the allegation of Hodges' affidavit as true and unrebutted, we find that there is an insufficient factual record to enable the Court to conclude that Janet's obligation to the Plaintiffs is a debt for violation of securities law or for common law fraud, deceit, or manipulation in connection with the sale of securities. The Second Lawsuit was a breach of contract action and not an action sounding in fraud.

Summary Judgment will be refused as to Plaintiffs' claims against Janet.

An appropriate Order will be entered.

### ORDER

This 15th day of May, 2007, in accordance with the accompanying Opinion, it shall be, and hereby is ORDERED as follows:

1. The Motion for Summary Judgment as to Count I of the Complaint filed by Geoffrey Todd Hodges, as Trustee of the Frank Musolino, Jr. Irrevocable Trust and Geoffrey Todd Hodges, as Trustee of the Ashley Marie Musolino Irrevocable Trust is GRANTED as to Defendant Eugene C. Buzzeo and the obligations of Eugene C. Buzzeo to the Plaintiffs shall not be discharged in this bankruptcy

case.

2. The Motion for Summary Judgment as to Count I of the Complaint filed by Geoffrey Todd Hodges, as Trustee of the Frank Musolino, Jr. Irrevocable Trust and Geoffrey Todd Hodges, as Trustee of the Ashley Marie Musolino Irrevocable Trust is REFUSED as to Defendant Janet N. Buzzeo.

3. Discovery is open as to the claims against Janet N. Buzzeo.

4. A status conference is fixed for June 11, 2007 at 3:00 p.m., in the U.S. Courthouse, Bankruptcy Courtroom, 17 South Park Row, Erie, PA. Only 10 minutes have been reserved on the Court's calendar. All parties may participate by telephone pursuant to instructions on the Court's website.

5. An evidentiary hearing is fixed for July 11, 2007 beginning at 10:00 a.m. and July 12, 2007 beginning at 9:00 a.m., in the U.S. Courthouse, Bankruptcy Courtroom, 17 South Park Row, Erie, PA. Parties shall provide, for the Court's use, two copies of any exhibits presented at the evidentiary hearing or trial, one each for the Court and the law clerk.

Bkrtcy.W.D.Pa.,2007.
In re Buzzeo
365 B.R. 578, 48 Bankr.Ct.Dec. 64

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Westlaw.

123 S.Ct. 1462                                                                                    Page 1
538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec.
12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed.
S 196
**(Cite as: 538 U.S. 314, 123 S.Ct. 1462)**

▷

Archer v. Warner
U.S.,2003.

Supreme Court of the United States
A. Elliott ARCHER, et ux., Petitioners,
v.
Arlene L. WARNER.
No. 01-1418.

Argued Jan. 13, 2003.
Decided March 31, 2003.

Buyers of business brought suit in state court
against the sellers for fraud connected with the sale.
Pursuant to settlement, sellers executed a $100,000
promissory note, and when they defaulted on their
first payment, buyers brought another suit in state
court for payment of the note. Sellers then filed for
bankruptcy. Buyers filed adversary complaint after
liquidation under Chapter 7 was ordered, seeking
judgment for amount due under the note and de-
termination that the debt was nondischargeable.
The United States Bankruptcy Court for the Middle
District of North Carolina found the note dis-
chargeable, and creditors appealed. The District
Court, Frank W. Bullock, Jr., J., affirmed, and cred-
itors again appealed. The United States Court of
Appeals for the Fourth Circuit, 283 F.3d 230, af-
firmed. Certiorari was granted. The United States
Supreme Court, Justice Breyer, held that debt for
money promised in settlement agreement, which
settled and released creditors' prior state-law claim
against Chapter 7 debtors for fraud in sale of busi-
ness, could amount to debt for money obtained by
fraud, within meaning of Bankruptcy Code's dis-
charge exception for debt for money obtained by
false pretenses, false representation, or actual fraud.

Reversed and remanded.

Justice Thomas filed dissenting opinion in which
Justice Stevens joined.

West Headnotes

Bankruptcy 51 ⬤⟞3372.1

51 Bankruptcy
  51X Discharge
    51X(C) Debts and Liabilities Discharged
      51X(C)4 Fraud
        51k3372.1 k. In General. Most Cited
Cases
    (Formerly 51k3353(1))
Debt for money promised in settlement agreement,
which settled and released creditors' prior state-law
claim against Chapter 7 debtors for fraud in sale of
business, could amount to debt for money obtained
by fraud, within meaning of Bankruptcy Code's dis-
charge exception for debt for money obtained by
false pretenses, false representation, or actual fraud.
Bankr.Code, 11 U.S.C.A. § 523(a)(2)(A).

**\*\*1463 Syllabus** [FN*]

    FN* The syllabus constitutes no part of the
    opinion of the Court but has been prepared
    by the Reporter of Decisions for the con-
    venience of the reader. See *United States v.*
    *Detroit Timber & Lumber Co.,* 200 U.S.
    321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

A debt is not dischargeable in bankruptcy "to the
extent" it is "for money ... obtained by ... fraud." 11
U.S.C. § 523(a)(2)(A). Petitioners, the Archers,
sued respondent Warner and her former husband in
state court for (among other things) fraud connected
with the sale of the Warners' company to the Arch-
ers. In settling the lawsuit, the Archers executed re-
leases discharging the Warners from all present and
future claims, except for obligations under a
$100,000 promissory note and related instruments.
The Archers then voluntarily dismissed the lawsuit
with prejudice. After the Warners failed to make
the first payment on the promissory note, the Arch-
ers sued in state court. The Warners filed for bank-
ruptcy, and the Bankruptcy Court ordered liquida-
tion under Chapter 7. The Archers brought the
present claim, asking the Bankruptcy Court to find

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 1462                                                                                    Page 2
538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec.
12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed.
S 196
(Cite as: 538 U.S. 314, 123 S.Ct. 1462)

the $100,000 debt nondischargeable, and to order the Warners to pay the sum. Respondent Warner contested nondischargeability. The Bankruptcy Court denied the Archers' claim. The District Court and the Fourth Circuit affirmed. The latter court held that the settlement agreement, releases, and promissory note worked a kind of "novation" that replaced (1) an original potential debt to the Archers for money obtained by fraud with (2) a new debt for money promised in a settlement contract that was dischargeable in bankruptcy.

*Held:* A debt for money promised in a settlement agreement accompanied by the release of underlying tort claims can amount to a debt for *money obtained by fraud,* within the nondischargeability statute's terms. Pp. 1466-1468.

(a) The outcome here is governed by *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767, in which (1) Brown filed a state-court suit seeking money that he said Felsen had obtained through fraud; **1464 (2) the court entered a consent decree based on a stipulation providing that Felsen would pay Brown a certain amount; (3) neither the decree nor the stipulation indicated the payment was for fraud; (4) Felsen did not pay; (5) Felsen entered bankruptcy; and (6) Brown asked the Bankruptcy Court to look behind the decree and stipulation and hold that the debt was nondischargeable because it was a debt for money obtained by fraud. *Id.,* at 128-129, 99 S.Ct. 2205. This Court found that, although claim preclusion would bar Brown from making any claim " 'based on the same cause of action' " that he had brought *315 in state court, *id.,* at 131, 99 S.Ct. 2205, it did not prevent the Bankruptcy Court from looking beyond the state-court record and the documents terminating the state-court proceeding to decide whether the debt was a debt for money obtained by fraud, *id.,* at 138-139, 99 S.Ct. 2205. As a matter of logic, *Brown's* holding means that the Fourth Circuit's novation theory cannot be right. If reducing a fraud claim to settlement definitively changed the nature of the debt for dischargeability purposes, the nature

of the debt in *Brown* would have changed similarly, thereby rendering that debt dischargeable. This Court's instruction that the Bankruptcy Court could "weigh all the evidence," *id.,* at 138, 99 S.Ct. 2205, would have been pointless, as there would have been nothing for the court to examine. Moreover, the Court's statement in *Brown* that "the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt,"*ibid.,* strongly favors the Archers' position. Finally, *Brown's* basic reasoning applies here. The Court noted that a change in the Bankruptcy Code's nondischargeability provision indicated that "Congress intended the fullest possible inquiry" to ensure that "all debts arising out of" fraud are "excepted from discharge," no matter their form. *Ibid.* Congress also intended to allow the determination whether a debt arises out of fraud to take place in bankruptcy court, not to force it to occur earlier in state court when nondischargeability concerns "are not directly in issue and neither party has a full incentive to litigate them." *Id.,* at 134, 99 S.Ct. 2205. The only difference between *Brown* and this case-that the relevant debt here is embodied in a settlement, not in a stipulation and consent judgment-is not determinative, since the dischargeability provision applies to all debts that "aris[e] out of" fraud. *Id.,* at 138, 99 S.Ct. 2205. Pp. 1466-1468.

(b) The Fourth Circuit remains free, on remand, to determine whether Warner's additional arguments were properly raised or preserved, and, if so, to decide them. Pp. 1468.

283 F.3d 230, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. THOMAS, J., filed a dissenting opinion, in which STEVENS, J., joined, *post,* p. 1468.

Harry G. Gordon, Gordon Law Offices, Greensboro, NC, Seth P. Waxman, Counsel of Record, Philip D. Anker, Craig Goldblatt, Andrew R. Var-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 1462                                                                                        Page 3

538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec.
12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed.
S 196

(Cite as: 538 U.S. 314, 123 S.Ct. 1462)

coe, Kate Hutchins, Wilmer, Cutler & Pickering,
Washington, D.C., for Petitioners.

Lisa S. Blatt, for United States as amicus curiae,
Washington, DC, by special leave of the Court sup-
porting the petitioners.

*316 Donald B. Ayer, Counsel of Record, Jack W.
Campbell, IV, Jones, Day, Reavis & Pogue, Wash-
ington, D.C., Rayford K. Adams, III, Hunter, Hig-
gins, Miles, Elam, & Benjamin, PLLC, Greensboro,
NC, for Respondent.For U.S. Supreme Court briefs,
see:2002    WL    1885046    (Pet.Brief)2002    WL
31295420   (Resp.Brief)2002    WL    31507010
(Reply.Brief)

**1465 Justice BREYER delivered the opinion of
the Court.

The Bankruptcy Code provides that a debt shall not
be dischargeable in bankruptcy "to the extent" it is
"for money ... obtained by ... false pretenses, a false
representation, or actual fraud." 11 U.S.C. §
523(a)(2)(A). Can this language cover a debt em-
bodied in a settlement agreement that settled a cred-
itor's earlier claim "for money ... obtained by ...
fraud"? In our view, the statute can cover such a
debt, and we reverse a lower court judgment to the
contrary.

I

This case arises out of circumstances that we out-
line as follows: (1) A sues B seeking money that (A
says) B obtained *317 through fraud; (2) the parties
settle the lawsuit and release related claims; (3) the
settlement agreement does not resolve the issue of
fraud, but provides that B will pay A a fixed sum;
(4) B does not pay the fixed sum; (5) B enters bank-
ruptcy; and (6) A claims that B's obligation to pay
the fixed settlement sum is nondischargeable be-
cause, like the original debt, it is for "money ... ob-
tained by ... fraud."

This outline summarizes the following circum-
stances: In late 1991, Leonard and Arlene Warner
bought the Warner Manufacturing Company for
$250,000. About six months later they sold the
company to Elliott and Carol Archer for $610,000.

A few months after that the Archers sued the
Warners in North Carolina state court for (among
other things) fraud connected with the sale.

In May 1995, the parties settled the lawsuit. The
settlement agreement specified that the Warners
would pay the Archers "$300,000.00 less legal and
accounting expenses""as compensation for emo-
tional distress/personal injury type damages." App.
61. It added that the Archers would "execute re-
leases to any and all claims ... arising out of this lit-
igation, except as to amounts set forth in [the] Set-
tlement Agreement." Id., at 63. The Warners paid
the Archers $200,000 and executed a promissory
note for the remaining $100,000. The Archers ex-
ecuted releases "discharg[ing]" the Warners "from
any and every right, claim, or demand" that the
Archers "now have or might otherwise hereafter
have against" them, "excepting only obligations un-
der" the promissory note and related instruments.
Id., at 67; see also id., at 70. The releases, signed by
all parties, added that the parties did not "admi[t]
any liability or wrongdoing," that the settlement
was "the compromise of disputed claims, and that
payment [was] not to be construed as an admission
of liability." Id., at 67-68, 71. A few days later the
Archers voluntarily dismissed the state-court law-
suit with prejudice.

In November 1995, the Warners failed to make the
first payment on the $100,000 promissory note. The
Archers *318 sued for the payment in state court.
The Warners filed for bankruptcy. The Bankruptcy
Court ordered liquidation under Chapter 7 of the
Bankruptcy Code. And the Archers brought the
present claim, asking the Bankruptcy Court to find
the $100,000 debt nondischargeable, and to order
the Warners to pay the $100,000. Leonard Warner
agreed to a consent order holding his debt nondis-
chargeable. Arlene Warner contested nondis-
chargeability. The Archers argued that Arlene
Warner's promissory note debt was nondis-
chargeable because it was for "money ... obtained
by ... fraud."

The Bankruptcy Court, finding the promissory note

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec. 12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed. S 196

(Cite as: 538 U.S. 314, 123 S.Ct. 1462)

debt dischargeable, denied the Archers' claim. The District Court affirmed the Bankruptcy Court. And the Court of Appeals for the Fourth Circuit, dividing two to one, affirmed the District Court. 283 F.3d 230 (C.A.4 2002). The majority reasoned that the settlement agreement, releases, and promissory note had worked a kind of "novation." This novation replaced (1) an original potential debt to the Archers for money obtained by fraud with (2) a new debt. The new debt **1466 was not for money obtained by fraud. It was for money promised in a settlement contract. And it was consequently dischargeable in bankruptcy.

We granted the Archers' petition for certiorari, 536 U.S. 938, 122 S.Ct. 2618, 153 L.Ed.2d 802 (2002), because different Circuits have come to different conclusions about this matter, compare *In re West,* 22 F.3d 775, 778 (C.A.7 1994) (supporting the novation theory), with *United States v. Spicer,* 57 F.3d 1152, 1155 (C.A.D.C.1995) ("The weight of recent authority rejects" the novation theory), cert. denied, 516 U.S. 1043, 116 S.Ct. 701, 133 L.Ed.2d 658 (1996).

## II

We agree with the Court of Appeals and the dissent, *post,* at 1468-1469 (opinion of THOMAS, J.), that "[t]he settlement agreement and promissory note here, coupled with the broad language of the release, completely addressed and released *319 each and every underlying state law claim." 283 F.3d, at 237. That agreement left only one relevant debt: a debt for money promised in the settlement agreement itself. To recognize that fact, however, does not end our inquiry. We must decide whether that same debt can *also* amount to a debt for *money obtained by fraud,* within the terms of the nondischargeability statute. Given this Court's precedent, we believe that it can.

*Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), governs the outcome here. The circumstances there were the following: (1) Brown sued Felsen in state court seeking money that (Brown said) Felsen had obtained through fraud; (2) the state court entered a consent decree embodying a stipulation providing that Felsen would pay Brown a certain amount; (3) neither the decree nor the stipulation indicated the payment was for fraud; (4) Felsen did not pay; (5) Felsen entered bankruptcy; and (6) Brown asked the Bankruptcy Court to look behind the decree and stipulation and to hold that the debt was nondischargeable because it was a debt for money obtained by fraud. *Id.,* at 128-129, 99 S.Ct. 2205.

The lower courts had held against Brown. They pointed out that the relevant debt was for money owed pursuant to a consent judgment; they noted that the relevant judgment-related documents did not refer to fraud; they added that the doctrine of res judicata prevented the Bankruptcy Court from looking behind those documents to uncover the nature of the claim that had led to their creation; and they consequently concluded that the relevant debt could not be characterized as one for money obtained by fraud. *Id.,* at 130-131, 99 S.Ct. 2205.

This Court unanimously rejected the lower court's reasoning. The Court conceded that the state law of claim preclusion would bar Brown from making any claim " 'based on the same cause of action' " that Brown had brought in state court. *Id.,* at 131, 99 S.Ct. 2205 (quoting *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Indeed, this aspect of res judicata would prevent Brown from litigating "all grounds for ... *320 recovery" previously available to Brown, whether or not Brown had previously "asserted" those grounds in the prior state-court "proceeding." 442 U.S., at 131, 99 S.Ct. 2205. But all this, the Court held, was beside the point. Claim preclusion did not prevent the Bankruptcy Court from looking beyond the record of the state-court proceeding and the documents that terminated that proceeding (the stipulation and consent judgment) in order to decide whether the debt at issue (namely, the debt embodied in the consent decree and stipulation) was a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 1462                                                                                    Page 5

538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec.
12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed.
S 196

**(Cite as: 538 U.S. 314, 123 S.Ct. 1462)**

debt for money obtained by fraud. *Id.,* at 138-139,
99 S.Ct. 2205.

As a matter of logic, *Brown's* holding means that
the Fourth Circuit's novation theory cannot be right.
The reduction of Brown's state-court fraud claim to
a stipulation (embodied in a consent decree)
**1467 worked the same kind of novation as the
"novation" at issue here. (Despite the dissent's sug-
gestions to the contrary, *post,* at 1470-1471, it did
so by an agreement of the parties that would seem
to have "sever[ed] the causal relationship," *post,* at
1470, between liquidated debt and underlying fraud
no more and no less than did the settlement and re-
leases at issue here.) Yet, in *Brown,* this Court held
that the Bankruptcy Court should look behind that
stipulation to determine whether it reflected settle-
ment of a valid claim for fraud. If the Fourth Cir-
cuit's view were correct-if reducing a fraud claim to
settlement definitively changed the nature of the
debt for dischargeability purposes-the nature of the
debt in *Brown* would have changed similarly,
thereby rendering the debt dischargeable. This
Court's instruction that the Bankruptcy Court could
"weigh all the evidence," 442 U.S., at 138, 99 S.Ct.
2205, would have been pointless. There would have
been nothing for the Bankruptcy Court to examine.

Moreover, the Court's language in *Brown* strongly
favors the Archers' position here. The Court said
that "the mere fact that a conscientious creditor has
previously reduced his claim to judgment should
not bar further inquiry into the *321 true nature of
the debt." *Ibid.;* accord, *Grogan v. Garner,* 498
U.S. 279, 290, 111 S.Ct. 654, 112 L.Ed.2d 755
(1991) (assuming that the Bankruptcy Code seeks
to "permit exception from discharge of all fraud
claims creditors have successfully reduced to judg-
ment"). If we substitute the word "settlement" for
the word "judgment," the Court's statement de-
scribes this case.

Finally, the Court's basic reasoning in *Brown* ap-
plies here. The Court pointed out that the Bank-
ruptcy Code's nondischargeability provision had
originally covered "only 'judgments' sounding in

fraud." 442 U.S., at 138, 99 S.Ct. 2205. Congress
later changed the language so that it covered all
such " 'liabilities.' " *Ibid.* This change indicated
that "Congress intended the fullest possible in-
quiry" to ensure that "all debts arising out of" fraud
are "excepted from discharge," no matter what their
form. *Ibid.;* see also 11 U.S.C. § 523(a) (current
"any debt" language). Congress also intended to al-
low the relevant determination (whether a debt
arises out of fraud) to take place in bankruptcy
court, not to force it to occur earlier in state court at
a time when nondischargeability concerns "are not
directly in issue and neither party has a full incent-
ive to litigate them." *Brown,* 442 U.S., at 134, 99
S.Ct. 2205.

The only difference we can find between *Brown*
and the present case consists of the fact that the rel-
evant debt here is embodied in a settlement, not in a
stipulation and consent judgment. But we do not
see how that difference could prove determinative.
The dischargeability provision applies to all debts
that "aris[e] out of" fraud. *Id.,* at 138, 99 S.Ct.
2205; see also *Cohen v. de la Cruz,* 523 U.S. 213,
215, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). A
debt embodied in the settlement of a fraud case
"arises" no less "out of" the underlying fraud than a
debt embodied in a stipulation and consent decree.
Policies that favor the settlement of disputes, like
those that favor "repose," are neither any more nor
any less at issue here than in *Brown.* See 442 U.S.,
at 133-135, 99 S.Ct. 2205. In *Brown,* the doctrine
of res judicata itself ensured "a blanket release" of
the underlying claim of fraud, just as the contractu-
al releases did here, *post,* at 1469. *322 See *supra,*
at 1465-1466. Despite the dissent's protests to the
contrary, *post,* at 1468-1471, what has *not* been es-
tablished here, as in *Brown,* is that the parties
meant to resolve the *issue* of fraud or, more nar-
rowly, to resolve that issue for purposes of a later
claim of nondischargeability in bankruptcy. In a
word, we can find no significant difference between
*Brown* and the case now before us.

Arlene Warner argues that we should affirm the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 1462                                                                                              Page 6
538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec.
12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed.
S 196
(Cite as: 538 U.S. 314, 123 S.Ct. 1462)

Court of Appeals' decision on alternative grounds. She says that the **1468 settlement agreement and releases not only worked a novation by converting potential tort liabilities into a contract debt, but also included a promise that the Archers would not make the present claim of nondischargeability for fraud. She adds that, in any event, because the Archers dismissed the original fraud action with prejudice, North Carolina law treats the fraud issue as having been litigated and determined in her favor, thereby barring the Archers from making their present claim on grounds of collateral estoppel. But cf. *Arizona v. California,* 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) ("[S]ettlements ordinarily occasion no *issue preclusion*... unless it is clear ... that the parties intend their agreement to have such an effect").

Without suggesting that these additional arguments are meritorious, we note that the Court of Appeals did not determine the merits of either argument, both of which are, in any event, outside the scope of the question presented and insufficiently addressed below. See *Roberts v. Galen of Va., Inc.,* 525 U.S. 249, 253-254, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999)*(per curiam).* We choose to leave initial evaluation of these arguments to "[t]he federal judges who deal regularly with questions of state law in their respective districts and circuits," and who "are in a better position than we,"*Butner v. United States,* 440 U.S. 48, 58, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), to determine, for example, whether the parties intended their agreement and dismissal to have issue-preclusive, as well as claim-preclusive, effect, and to what extent such preclusion applies to enforcement of a debt specifically*323 excepted from the releases, *supra,* at 1465; *post,* at 1469. The Court of Appeals remains free, on remand, to determine whether such questions were properly raised or preserved, and, if so, to decide them.

We conclude that the Archers' settlement agreement and releases may have worked a kind of novation, but that fact does not bar the Archers from showing that the settlement debt arose out of "false pretenses, a false representation, or actual fraud," and consequently is nondischargeable, 11 U.S.C. § 523(a)(2)(A). We reverse the Court of Appeals' judgment to the contrary. And we remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, with whom Justice STEVENS joins, dissenting.
Section 523(a)(2) of the Bankruptcy Code excepts from discharge "any debt ... for money, property, [or] services, ... to the extent *obtained by*... false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A) (emphasis added). The Court holds that a debt owed under a settlement agreement was "obtained by" fraud even though the debt resulted from a contractual arrangement pursuant to which the parties agreed, using the broadest language possible, to release one another from "any and every right, claim, or demand ... arising out of" a fraud action filed by petitioners in North Carolina state court. App. 67. Because the Court's conclusion is supported neither by the text of the Bankruptcy Code nor by any of the agreements executed by the parties, I respectfully dissent.

The Court begins its description of this case with the observation that "the settlement agreement does not *resolve* the issue of fraud, but provides that *B* will pay *A* a fixed sum." *Ante,* at 1465 (emphasis added). Based on that erroneous premise, the Court goes on to find that there is "no significant difference between *324Brown [v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 1979),] and [this case]." *Ante,* at 1467.The only distinction, the Court explains, is that "the relevant debt here is embodied in a settlement, not in a stipulation and consent judgment" as in *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). *Ibid.*

**1469 Remarkably, however, the Court fails to address the critical difference between this case and *Brown:* The parties here executed a blanket release, rather than entered into a consent judgment. And, in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 1462                                                                    Page 7
538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec.
12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed.
S 196
(Cite as: 538 U.S. 314, 123 S.Ct. 1462)

my view, "if it is shown that [a] note was given and received as payment or waiver of the original debt and the parties agreed that the note was to substitute a new obligation for the old, the note fully discharges the original debt, and the nondischargeability of the original debt does not affect the dischargeability of the obligation under the note." *In re West*, 22 F.3d 775, 778 (C.A.7 1994). That is the case before us, and, accordingly, *Brown* does not control our disposition of this matter.

In *Brown*, Brown sued Felsen in state court, alleging that Felsen had fraudulently induced him to act as guarantor on a bank loan. 442 U.S., at 128, 99 S.Ct. 2205. The suit was settled by stipulation, which was incorporated by the court into a consent judgment, but "[n]either the stipulation nor the resulting judgment indicated the cause of action on which respondent's liability to petitioner was based." *Ibid.* The Court held that principles of res judicata did not bar the Bankruptcy Court from looking behind the consent judgment and stipulation to determine the extent to which the debt was "obtained by" fraud. The Court concluded that it would upset the policy of the Bankruptcy Code for "state courts to decide [questions of nondischargeability] at a stage when they are not directly in issue and neither party has a full incentive to litigate them." *Id.*, at 134, 99 S.Ct. 2205. *Brown* did not, however, address the question presented in this case-whether a creditor may, *without the participation of the state court*, completely release a debtor from "any and every right, claim, or demand ... relating to" a state-court fraud action. App. 67.

*325 Based on the sweeping language of the general release, it is inaccurate for the Court to say that the parties did not "resolve the issue of fraud." *Ante*, at 1465.To be sure, as in *Brown*, there is no legally controlling document stating that respondent did (or did not) commit fraud. But, unlike in *Brown*, where it was not clear which claims were being resolved by the consent judgment, the release in this case clearly demonstrates that the parties intended to resolve conclusively not only the issue of

fraud, but also any other "right[s], claim[s], or demand[s]" related to the state-court litigation, "excepting only obligations under [the] Note and deeds of trust." [FN1] App. 67. See *McNair v. Goodwin*, 262 N.C. 1, 7, 136 S.E.2d 218, 223 (1964) (" '[A] compromise agreement is conclusive between the parties as to the matters compromised' " (quoting *Penn Dixie Lines v. Grannick*, 238 N.C. 552, 556, 78 S.E.2d 410, 414 (1953))).

> FN1. There are no allegations that petitioners were fraudulently induced to execute the settlement agreement or the general release.

The fact that the parties intended, by the language of the general release, to replace an "old" fraud debt with a "new" contract debt is an important distinction from *Brown*, for the text of the Bankruptcy Code prohibits discharge of any debt "to the extent *obtained by*" fraud. 11 U.S.C. § 523(a)(2) (emphasis added). In interpreting this provision, the Court has recognized that, in order for a creditor to establish that a debt is not dischargeable, he must demonstrate that there is a causal nexus between the fraud and the debt. See *Cohen v. de la Cruz*, 523 U.S. 213, 218, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (describing § 523(a)(2)(A) as barring discharge of debts " 'resulting from' " or " 'traceable to' " fraud (quoting *Field v. Mans*, 516 U.S. 59, 61, 64, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995))). Indeed, petitioners conceded at oral argument that the "obtained by" language of § 523(a)(2) requires a creditor to prove that a debtor's fraud is the proximate cause of the debt. Tr. of Oral Arg. 10, 12; see also **14701 Am.Jur.2d, Actions § 57, p. 760 (1994) ("What is essential is that the wrongful act charged be the proximate cause of the *326 damage; the loss must be *the direct result of, or proximately traceable to,* the breach of an obligation owing to the plaintiff" (emphasis added)).

This Court has been less than clear with respect to the requirements for establishing proximate cause. In the past, the Court has applied the term " 'proximate cause' to label generically the judicial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 1462                                                                                                                        Page 8
538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec.
12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed.
S 196
**(Cite as: 538 U.S. 314, 123 S.Ct. 1462)**

tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Securities Investor Protection Corporation,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The Court has explained that, "[a]t bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.' " *Ibid.* (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed.1984) (hereinafter Keeton)); see also *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 352, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting) ("What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point"). While the concept of proximate cause is somewhat amorphous, see Keeton 279, the common law is clear that certain intervening events-otherwise called "superseding causes"-are sufficient to sever the causal nexus and cut off all liability. See *Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 837, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996) (" 'The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable' " (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d ed.1994))); 57A Am.Jur.2d, Negligence § 790, p. 701 (1989) ("The intervention, between the negligence of the defendant and the occurrence of an injury to the plaintiff, of a new, independent, and efficient cause, or of a superseding cause, of the injury renders the negligence of the defendant a remote cause of *327 the injury, and he cannot be held liable, notwithstanding the existence of some connection between his negligence and the injury").

In this case, we are faced with the novel situation where the parties have, by agreement, attempted to sever the causal relationship between the debtor's fraudulent conduct and the debt.[FN2] In my view,

the "intervening" settlement and release create the equivalent of a superseding cause, no different from the intervening negligent acts of a third party in a negligence action. In this case, the parties have made clear their intent to replace the old "fraud" debt with a new "contract" debt. Accordingly, the only debt that remains intact for bankruptcy purposes is the one "obtained by" voluntary agreement of the parties, not by fraud.

> FN2. Petitioners argue that *any* prepetition waiver of nondischargeability protections should be deemed unenforceable because it is inconsistent with the Bankruptcy Code and impairs the rights of third-party creditors. Brief for Petitioners 24. As respondent points out, however, a creditor forfeits the right to contest dischargeability if it fails to affirmatively request a hearing within 60 days after the first date set for the meeting of the creditors. See 11 U.S.C. § 523(c)(1); Fed. Rule Bkrtcy. Proc. 4007(c). Thus, presumably, creditors may choose, for any or no reason at all, to forgo an assertion of nondischargeability under § 523(a)(2). Indeed, petitioners have failed to point to *any* provision of the Bankruptcy Code that specifically bars a creditor from entering into an agreement that impairs its right to contest dischargeability.

Petitioners' own actions in the course of this litigation support this conclusion. Throughout the proceedings below and continuing in this Court, petitioners have sought to recover only the amount of the debt set forth in the settlement agreement, which is lower than the total damages they allegedly suffered as a result of respondent's **1471 alleged fraud. See Brief for Petitioners 21 ("[T]he nondischargeability action was brought solely in order to enforce the agreement to pay [the amount in the settlement agreement]"). This crucial fact demonstrates that petitioners seek to recover a debt based only in contract, not in fraud.

*328 The Court concludes otherwise. The Court,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 1462                                                          Page 9
538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71 USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41 Bankr.Ct.Dec.
12, Bankr. L. Rep. P 78,821, 03 Cal. Daily Op. Serv. 2754, 2003 Daily Journal D.A.R. 3512, 16 Fla. L. Weekly Fed.
S 196
**(Cite as: 538 U.S. 314, 123 S.Ct. 1462)**

however, does not explain why it permits petition-
ers to look at the settlement agreement for the
amount of the debt they seek to recover but not for
the character of that debt. Neither this Court's pre-
cedents nor the text of the Bankruptcy Code per-
mits such a selective implementation of a valid
agreement between the parties.


                    * * *


The Court today ignores the plain intent of the
parties, as evidenced by a properly executed settle-
ment agreement and general release, holding that a
debt owed by respondent under a contract was
"obtained by" fraud. Because I find no support for
the Court's conclusion in the text of the Bankruptcy
Code, or in the agreements of the parties, I respect-
fully dissent.

U.S.,2003.
Archer v. Warner
538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454, 71
USLW 4249, 49 Collier Bankr.Cas.2d 1019, 41
Bankr.Ct.Dec. 12, Bankr. L. Rep. P 78,821, 03 Cal.
Daily Op. Serv. 2754, 2003 Daily Journal D.A.R.
3512, 16 Fla. L. Weekly Fed. S 196

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**H**
In re DeTrano
C.A.2 (N.Y.),2003.

United States Court of Appeals,Second Circuit.
In re: Roger M. DETRANO, Debtor.
Joseph O. Giaimo, Executor of the Estate of Elizabeth M. Chase Deceased, Plaintiff-Appellee,
v.
Roger M. Detrano, Defendant-Appellant.
**Docket No. 01-5053.**

Argued: Nov. 15, 2002.
Decided: April 15, 2003.

Judgment creditor filed adversary complaint against Chapter 7 debtor, seeking declaration that judgment debt, as established by parties' settlement agreement, was excepted from discharge as an obligation for fraud while acting in a fiduciary capacity. The United States Bankruptcy Court for the Eastern District of New York, 222 B.R. 685,Stan Bernstein, J., granted summary judgment in favor of debtor, finding debt dischargeable. Judgment creditor appealed. The District Court, Amon, J., 266 B.R. 282, vacated the order and remanded. Debtor appealed. The Court of Appeals, Sotomayor, Circuit Judge, held that in light of the Supreme Court's decision in *Archer v. Warner*, the district court correctly held that courts are to look beyond the contractual nature of a settlement agreement to determine whether an underlying debt was a nondischargeable debt "for fraud or defalcation while acting in a fiduciary capacity."

Affirmed and remanded.

West Headnotes

**[1] Bankruptcy 51 🔑 3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo

Review. Most Cited Cases
Review of an order of a district court issued in its capacity as an appellate court is plenary.

**[2] Bankruptcy 51 🔑 3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases

**Bankruptcy 51 🔑 3785.1**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3785.1 k. In General. Most Cited
Cases
Factual determinations and legal conclusions of a bankruptcy court are to be reviewed independently by the Court of Appeals.

**[3] Bankruptcy 51 🔑 3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases

**Bankruptcy 51 🔑 3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear Error. Most Cited
Cases
Bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed de novo.

**[4] Bankruptcy 51 🔑 2363.1**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

326 F.3d 319
326 F.3d 319, 50 Collier Bankr.Cas.2d 502, 41 Bankr.Ct.Dec. 49, Bankr. L. Rep. P 78,831
(Cite as: 326 F.3d 319)

Page 2

51 Bankruptcy
  51IV  Effect of Bankruptcy Relief; Injunction
and Stay
    51IV(A) In General
      51k2363  Protection Against Discrimina-
tion or Collection Efforts in General; "Fresh Start."
        51k2363.1 k.  In General. Most Cited
Cases
Bankruptcy allows "honest but unfortunate" debtors
an opportunity to reorder their financial affairs and
get a fresh start.

[5] Bankruptcy 51 ☞2363.1

51 Bankruptcy
  51IV  Effect of Bankruptcy Relief; Injunction
and Stay
    51IV(A) In General
      51k2363  Protection Against Discrimina-
tion or Collection Efforts in General; "Fresh Start."
        51k2363.1 k.  In General. Most Cited
Cases

Bankruptcy 51 ☞3251

51 Bankruptcy
  51X  Discharge
    51X(A) In General
      51k3251 k.  In General. Most Cited Cases

Bankruptcy 51 ☞3341

51 Bankruptcy
  51X  Discharge
    51X(C) Debts and Liabilities Discharged
      51X(C)1 In General
        51k3341 k.  In General. Most Cited Cases
Debtor's "fresh start" is accomplished through the
statutory discharge of preexisting debts, with ex-
ceptions provided for certain categories of nondis-
chargeable debts that Congress has deemed should
survive bankruptcy. Bankr.Code, 11 U.S.C.A. §
523(a).

[6] Judgment 228 ☞627

228 Judgment
  228XIII  Merger and Bar of Causes of Action
and Defenses
    228XIII(C) Persons Who May Take Advant-
age of the Bar
      228k627 k.  Parties of Record and Privies
in General. Most Cited Cases
Where the debt in question is a judgment entered
after a claim of fraud has been adjudicated, either
party to a subsequent adversary proceeding on
nondischargeability can invoke collateral estoppel
to establish that the debt is or is not dischargeable
under the relevant nondischargeability provision.
Bankr.Code, 11 U.S.C.A. § 523(a)(2)(A), (a)(4).

[7] Judgment 228 ☞954

228 Judgment
  228XXIII  Evidence of Judgment as Estoppel or
Defense
    228k954 k.  Evidence as to Identity of Cause
of Action. Most Cited Cases
Where a prepetition judgment does not indicate the
cause of action on which liability is based, res ju-
dicata does not apply and a creditor is allowed to
prove in a subsequent nondischargeability proceed-
ing that the underlying debt is based in fraud.
Bankr.Code, 11 U.S.C.A. § 523(a)(2)(A), (a)(4).

[8] Bankruptcy 51 ☞3372.1

51 Bankruptcy
  51X  Discharge
    51X(C) Debts and Liabilities Discharged
      51X(C)4 Fraud
        51k3372.1 k.  In General. Most Cited
Cases
  (Formerly 51k3353(1))
Congress through the Bankruptcy Code intended
the fullest possible inquiry to ensure that all debts
arising out of fraud are excepted from discharge, no
matter their form. Bankr.Code, 11 U.S.C.A. §
523(a)(2)(A), (a)(4).

[9] Judgment 228 ☞828.21(2)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

326 F.3d 319
Page 3

326 F.3d 319, 50 Collier Bankr.Cas.2d 502, 41 Bankr.Ct.Dec. 49, Bankr. L. Rep. P 78,831
**(Cite as: 326 F.3d 319)**

228 Judgment
   228XVII Foreign Judgments
     228k828 Effect of Judgments of State Courts in United States Courts
       228k828.21 Particular Federal Proceedings
         228k828.21(2)  k.  Bankruptcy.  Most Cited Cases

Congress intended to allow the determination whether a debt arises out of fraud to take place in bankruptcy court, not to force it to occur earlier, in state court, when nondischargeability concerns are not directly in issue and neither party has a full incentive to litigate them. Bankr.Code, 11 U.S.C.A. §§ 523(a)(2)(A), (a)(4).

**[10] Bankruptcy 51 ☞3376(5)**

51 Bankruptcy
   51X Discharge
     51X(C) Debts and Liabilities Discharged
       51X(C)5 Torts and Crimes
         51k3376 Fraud or Defalcation in Fiduciary Capacity
            51k3376(5)  k.  Defalcation.  Most Cited Cases
   (Formerly 51k3357(4))

**Bankruptcy 51 ☞3376(6)**

51 Bankruptcy
   51X Discharge
     51X(C) Debts and Liabilities Discharged
       51X(C)5 Torts and Crimes
         51k3376 Fraud or Defalcation in Fiduciary Capacity
            51k3376(6)  k.  Fraud.  Most Cited Cases
   (Formerly 51k3357(5))

If prepetition tort claims asserted against Chapter 7 debtor would have created a nondischargeable debt under the discharge exception for fiduciary fraud or defalcation, had those claims been litigated to judgment in creditor's favor, then it was no defense for debtor to state that he had replaced that possible liability with a dischargeable contractual obligation

through the parties' settlement agreement. Bankr.Code, 11 U.S.C.A. § 523(a)(4).

**\*320** Roy J. Lester, Lester & Fontanetta, P.C., Garden City, NY, for Defendant-Appellant.
Michael T. Sucher, Brooklyn, NY, for Plaintiff-Appellee.

Before: KEARSE, McLAUGHLIN, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.
Defendant Roger M. DeTrano appeals from a judgment of the United States District Court for the Eastern District of New York (Amon, J.) holding that a debt incurred pursuant to a settlement agreement is nondischargeable in bankruptcy if the agreement settled claims that would have created a nondischargeable debt under 11 U.S.C. § 523(a)(4), and remanding to the bankruptcy court to determine whether the obligations embodied in the settlement agreement are nondischargeable. We hold that in light of the Supreme Court's decision in *Archer v. Warner,* 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003), the district court correctly held that courts are to look beyond the contractual nature of a settlement agreement to determine whether an underlying debt was a debt "for fraud or defalcation while acting in a fiduciary capacity" as defined by § 523(a)(4). We affirm.

**BACKGROUND**

Plaintiff Joseph O. Giaimo brought this action seeking a declaration that the obligations owed him by defendant Roger M. DeTrano were nondischargeable under 11 U.S.C. § 523(a)(4). In 1979, Elizabeth Chase appointed DeTrano to manage her financial affairs under an Inter Vivos Trust Agreement. Chase died in 1988, and Giaimo was named executor of her estate (the "Chase Estate"). Between 1989 and 1993, Giaimo commenced three separate actions in the State Supreme Court against DeTrano to recover funds Giaimo alleged DeTrano had fraudulently converted while serving as Trust-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

326 F.3d 319
326 F.3d 319, 50 Collier Bankr.Cas.2d 502, 41 Bankr.Ct.Dec. 49, Bankr. L. Rep. P 78,831
(Cite as: 326 F.3d 319)

Page 4

ee. In 1993, DeTrano filed a petition and accounting in Surrogate's Court, seeking judicial settlement of his account as Trustee, to which Giaimo filed objections. The three State Supreme Court actions were subsequently transferred to and consolidated in Surrogate's Court.

The parties reached a settlement agreement in 1995, resolving the consolidated *321 actions. The Surrogate's Court approved the settlement, under which DeTrano agreed to pay Giaimo $480,000 plus interest in periodic payments, and to provide a mortgage on his residence and a term life insurance policy as security for the payment of the debt. The agreement provided that it was in full settlement of all claims of the Chase Estate, and that all parties would execute and exchange general releases with respect to all matters involved in the consolidated actions (except DeTrano's obligations under the settlement agreement).

DeTrano made one payment of $25,000 toward his obligations under the settlement agreement and then defaulted. Giaimo brought suit in the State Supreme Court to enforce the agreement, and in 1996 judgment was entered against DeTrano for approximately $459,000.

In 1997, DeTrano filed for Chapter 7 bankruptcy. Giaimo filed a complaint seeking a declaration that the obligations owed him pursuant to the state court judgment enforcing the settlement agreement were nondischargeable under § 523(a)(4), which provides that a discharge under the bankruptcy code does not release an individual debtor from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Both parties moved for summary judgment.

The bankruptcy court granted DeTrano's motion for summary judgment, finding that "the debt that arises under the settlement agreement is a simple dischargeable contract debt in the ensuing bankruptcy case." *In re Detrano,* 222 B.R. 685, 688 (Bankr.E.D.N.Y.1998). The court held that "[i]t is irrelevant that the settlement was of claims, which

if litigated to judgment on the merits in favor of [Giaimo], could have been excepted from the scope of the debtor's discharge." *Id.* Noting that "Giaimo released Detrano from [the] tortious claims," the court concluded that "Giaimo must be held to his state-court approved bargain." *Id.* at 689.

Giaimo appealed to the district court, which vacated the bankruptcy court's decision. The district court held that "in bankruptcy, a court should look beyond a settlement agreement to determine whether or not the debt is in fact based on fraud." *In re Detrano,* 266 B.R. 282, 286 (E.D.N.Y.2001). Noting that "a discharge proceeding in bankruptcy court is fundamentally different from a tort action seeking damages," the court held that the settlement agreement "does not prevent an inquiry into whether Detrano in fact committed fraud or breached his fiduciary duties as alleged for the purpose[] of determining the dischargeability of his debt." *Id.* at 288. The court based its decision principally on the purposes and goals of the Bankruptcy Code, noting that Congress's decision to include a fraud exception in the general grant of discharge reflected a strong policy preference for protecting the rights of defrauded creditors. *See id.* The district court remanded to the bankruptcy court for a determination on the merits of Giaimo's claim that the obligations embodied in the settlement agreement were nondischargeable pursuant to § 523(a)(4). DeTrano appealed to this Court.

### DISCUSSION

[1][2][3] Review of an order of a district court issued in its capacity as an appellate court is plenary. *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir.1990). The factual determinations and legal conclusions of the bankruptcy court are thus to be reviewed independently by this Court. *Id.* The bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo. Id.*

*322 [4][5] Bankruptcy allows "honest but unfortu-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

326 F.3d 319                                                                                    Page 5
326 F.3d 319, 50 Collier Bankr.Cas.2d 502, 41 Bankr.Ct.Dec. 49, Bankr. L. Rep. P 78,831
(Cite as: 326 F.3d 319)

nate" debtors an opportunity to reorder their financial affairs and get a fresh start. *Cohen v. de la Cruz,* 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998). This is accomplished through the statutory discharge of preexisting debts, with exceptions provided for certain categories of nondischargeable debts that Congress has deemed should survive bankruptcy. *See* 11 U.S.C. § 523(a). Among these exceptions to discharge are two provisions pertaining to fraudulent conduct: § 523(a)(2)(A), excepting from discharge any debt for "money, property, [or] services ... to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition"; and § 523(a)(4), excepting from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

[6][7] Where the debt in question is a judgment entered after a claim of fraud has been adjudicated, either party to a subsequent adversary proceeding on nondischargeability can invoke collateral estoppel to establish that the debt is or is not dischargeable under the relevant nondischargeability provision. *See Grogan v. Garner,* 498 U.S. 279, 285-91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (holding that where a judgment entailed proof of fraud, the debtor was estopped in subsequent nondischargeability proceeding from denying that the underlying debt was obtained by fraud). Where, however, the judgment does not indicate the cause of action on which liability is based, res judicata does not apply and a creditor is allowed to prove in a subsequent nondischargeability proceeding that the underlying debt is based in fraud. In *Brown v. Felsen,* 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), the Supreme Court held that a consent judgment that resolved state court claims, without indicating the cause of action on which liability was based, did not preclude the creditor from later raising fraud charges in a bankruptcy discharge proceeding. *See id.* at 133-35, 99 S.Ct. 2205. The Court noted that the creditor was not attacking the validity of the prior judgment but rather was

"attempting to meet ... the new defense of bankruptcy which [the debtor] has interposed between [the creditor] and the sum determined to be due to him." *Id.* at 133, 99 S.Ct. 2205.

The central question on this appeal is whether the principle that informs *Brown* applies in a case in which litigation ended in settlement as opposed to judgment-that is, whether a debt incurred pursuant to a settlement agreement is nondischargeable in bankruptcy if the agreement settled claims that, if proven, would have created a nondischargeable debt. In *Archer v. Warner,* 538 U.S. 314, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003), the Supreme Court answered this question in the affirmative, holding that reducing a fraud claim to settlement did not change the nature of the debt for dischargeability purposes.

[8][9][10] The instant case involves a claim of nondischargeability under § 523(a)(4), whereas *Archer* involved a claim of nondischargeability pursuant to § 523(a)(2)(A). The reasoning of *Archer* nonetheless controls the outcome here. As the Supreme Court explained in *Archer:*

"Congress [through the Bankruptcy Code] intended the fullest possible inquiry" to ensure that "all debts arising out of" fraud are "excepted from discharge," no matter their form. Congress also intended to allow the determination whether a debt arises out of fraud to take place in bankruptcy court, not to force it to occur earlier in state court *323 when nondischargeability concerns "are not directly in issue and neither party has a full incentive to litigate them."

*Archer,* 538 U.S. at ---- (quoting *Brown,* 442 U.S. at 134, 138, 99 S.Ct. 2205) (internal citations omitted). Both the § 523(a)(2)(A) and § 523(a)(4) exceptions to discharge deal with fraudulent conduct. Accordingly, if the tort claims against DeTrano would have created a nondischargeable debt under § 523(a)(4), had those claims been litigated to judgment in Giaimo's favor, then it is no defense for DeTrano to state that he has replaced that possible

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

326 F.3d 319
326 F.3d 319, 50 Collier Bankr.Cas.2d 502, 41 Bankr.Ct.Dec. 49, Bankr. L. Rep. P 78,831
(Cite as: 326 F.3d 319)

liability with a dischargeable contractual obligation through the settlement agreement. If the bankruptcy court determines that the debt DeTrano owes pursuant to the settlement agreement "arises out of" fraud, that debt must be excepted from discharge.

## CONCLUSION

We affirm the judgment of the district court and remand to the bankruptcy court for a determination whether the obligations embodied in the settlement are nondischargeable pursuant to § 523(a)(4).

C.A.2 (N.Y.),2003.
In re DeTrano
326 F.3d 319, 50 Collier Bankr.Cas.2d 502, 41 Bankr.Ct.Dec. 49, Bankr. L. Rep. P 78,831

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



263 B.R. 510
263 B.R. 510
**(Cite as: 263 B.R. 510)**

<span>▷</span>
In re Permian Producers Drilling, Inc.
W.D.Tex.,2000.

United States District Court, W.D. Texas, Midland-
Odessa Division.
In re PERMIAN PRODUCERS DRILLING, INC.,
Debtor.
**No. MO-00-CA-133.**

Nov. 13, 2000.

Creditor moved for stay pending appeal from order
of bankruptcy court substantively consolidating two
bankruptcy estates and confirming Chapter 11 plan.
The District Court, Furgeson, J., held that: (1) ap-
peal did not raise any serious legal question, as re-
quired to permit stay in absence of showing that ap-
peal was likely to succeed; and (2) creditor was not
entitled to stay.

Motion denied.

West Headnotes

**[1] Bankruptcy 51 ☞3784**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3784 k. Discretion. Most Cited Cases
Decision of bankruptcy court to deny stay pending
appeal is reviewed for abuse of discretion.

**[2] Bankruptcy 51 ☞3776.5(2)**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3776 Effect of Transfer
                51k3776.5 Supersedeas or Stay
                    51k3776.5(2) k. Right; Grant or
Denial; Discretion. Most Cited Cases
Bankruptcy court abuses its discretion in denying a
stay pending appeal if it seriously errs in its deter-

mination of whether moving party has established a
case meriting injunctive relief.

**[3] Bankruptcy 51 ☞3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases

**Bankruptcy 51 ☞3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear Error. Most Cited
Cases
Bankruptcy court's findings of fact are reviewed for
clear error and its conclusions of law are reviewed
de novo. Fed.Rules Bankr.Proc.Rule 8013, 11
U.S.C.A.

**[4] Bankruptcy 51 ☞3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases
On appeal from bankruptcy court's denial of stay
pending appeal from its prior decision substantively
consolidating two bankruptcy estates, district court
would consider propriety of stay de novo, in order
to avoid the needlessly complex and somewhat ab-
surd situation of having to review for abuse of dis-
cretion bankruptcy judge's determination that ap-
pellant had failed to show a likelihood of success in
proving that bankruptcy judge abused his discretion
in substantively consolidating estates.

**[5] Bankruptcy 51 ☞3776.5(2)**

51 Bankruptcy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 1

263 B.R. 510
263 B.R. 510
(Cite as: 263 B.R. 510)

Page 2

51XIX Review
  51XIX(B) Review of Bankruptcy Court
    51k3776 Effect of Transfer
      51k3776.5 Supersedeas or Stay
        51k3776.5(2) k. Right; Grant or
Denial; Discretion. Most Cited Cases
Factors that district court considers, in deciding
whether to grant stay pending appeal from bank-
ruptcy court's decision, are as follows: (1) whether
movant has demonstrated likelihood of success on
merits; (2) whether movant has made showing of ir-
reparable injury if stay is not granted; (3) whether
granting stay would substantially harm the other
parties; and (4) whether granting stay would serve
public interest; while the absence of any one factor
is not fatal, greater weight is given to the first
factor, i.e., to movant's likelihood of success.

**[6] Bankruptcy 51 ⟷3776.5(2)**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3776 Effect of Transfer
        51k3776.5 Supersedeas or Stay
          51k3776.5(2) k. Right; Grant or
Denial; Discretion. Most Cited Cases
Creditor was not entitled to stay pending appeal
from order of bankruptcy court substantively con-
solidating two bankruptcy estates and confirming
Chapter 11 plan, notwithstanding that creditor
might suffer irreparable injury if estate assets were
distributed while appeal was pending, given com-
plete lack of evidence that creditor had any likeli-
hood of succeeding on merits and harm to creditors
if distribution was delayed.

**[7] Bankruptcy 51 ⟷3776.5(2)**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3776 Effect of Transfer
        51k3776.5 Supersedeas or Stay
          51k3776.5(2) k. Right; Grant or
Denial; Discretion. Most Cited Cases

Although, in most cases, appellant must demon-
strate likelihood of success in order to obtain stay
pending appeal, if appeal involves serious legal
question, then stay may be appropriate on lesser
showing that case is one with patent substantial
merit, and that balance of equities tips heavily in
appellant's favor.

**[8] Bankruptcy 51 ⟷3776.5(2)**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3776 Effect of Transfer
        51k3776.5 Supersedeas or Stay
          51k3776.5(2) k. Right; Grant or
Denial; Discretion. Most Cited Cases
Split among circuit courts may indicate that appeal
raises a serious legal question, as required to permit
stay pending appeal in absence of showing that ap-
peal is likely to succeed.

**[9] Bankruptcy 51 ⟷3776.5(2)**

51 Bankruptcy
  51XIX Review
    51XIX(B) Review of Bankruptcy Court
      51k3776 Effect of Transfer
        51k3776.5 Supersedeas or Stay
          51k3776.5(2) k. Right; Grant or
Denial; Discretion. Most Cited Cases
Creditor's appeal from bankruptcy court's decision
to substantively consolidate debtors' estates failed
to raise any serious question as to bankruptcy
court's authority to order substantive consolidation,
upon which there was no split among the circuit
courts; mere fact that Fifth Circuit had not yet ad-
opted standard as to when substantive consolidation
was warranted did not permit creditor to obtain stay
pending appeal upon showing of anything less than
likelihood of success on merits.

**[10] Bankruptcy 51 ⟷2125**

51 Bankruptcy
  51II Courts; Proceedings in General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51II(A) In General
 51k2124 Power and Authority
  51k2125 k. Equitable Powers and Prin-
ciples. Most Cited Cases
While bankruptcy courts cannot use their equitable
power to enter "necessary or appropriate orders" in
order to fashion substantive rights and remedies not
contained in the Bankruptcy Code or Rules, or to
negate substantive rights or remedies that are avail-
able, this does not mean that bankruptcy court's
equitable power is limited solely to issuing orders
already expressly allowed for by other provisions of
Bankruptcy Code. Bankr.Code, 11 U.S.C.A. §
105(a).

**[11] Bankruptcy 51 ☞2084.1**

51 Bankruptcy
 51I In General
  51I(D) Venue; Personal Jurisdiction
   51k2084 Transfer and Consolidation of
Cases
    51k2084.1 k. In General. Most Cited
Cases

**Bankruptcy 51 ☞2125**

51 Bankruptcy
 51II Courts; Proceedings in General
  51II(A) In General
   51k2124 Power and Authority
    51k2125 k. Equitable Powers and Prin-
ciples. Most Cited Cases
Whatever the limits on bankruptcy court's equity
power, that power includes authority to order sub-
stantive consolidation of debtors' estates.
Bankr.Code, 11 U.S.C.A. § 105(a).

**[12] Bankruptcy 51 ☞3784**

51 Bankruptcy
 51XIX Review
  51XIX(B) Review of Bankruptcy Court
   51k3784 k. Discretion. Most Cited Cases
Bankruptcy court order for substantive consolida-
tion is reviewed for abuse of discretion.

Bankr.Code, 11 U.S.C.A. § 105(a).

**[13] Bankruptcy 51 ☞2084.1**

51 Bankruptcy
 51I In General
  51I(D) Venue; Personal Jurisdiction
   51k2084 Transfer and Consolidation of
Cases
    51k2084.1 k. In General. Most Cited
Cases
Whether the circumstances warrant substantive
consolidation of bankruptcy estates is highly fact
specific question, that must be answered upon case-
by-case basis. Bankr.Code, 11 U.S.C.A. § 105(a).

**[14] Bankruptcy 51 ☞2084.10**

51 Bankruptcy
 51I In General
  51I(D) Venue; Personal Jurisdiction
   51k2084 Transfer and Consolidation of
Cases
    51k2084.10 k. Particular Cases. Most
Cited Cases
Bankruptcy court's decision to order substantive
consolidation of corporate Chapter 11 debtors'
bankruptcy estates was not abuse of discretion,
where debtors shared a substantial relationship,
based upon their extensive commingling of assets,
undocumented transfers of funds, occupation of
same physical premises, and control by same of-
ficers and directors, and where consolidation was
necessary to prevent equity holders from benefit-
ting at unsecured creditors' expense. Bankr.Code,
11 U.S.C.A. § 105(a).

**[15] Bankruptcy 51 ☞3782**

51 Bankruptcy
 51XIX Review
  51XIX(B) Review of Bankruptcy Court
   51k3782 k. Conclusions of Law; De Novo
Review. Most Cited Cases
Whether prior order of bankruptcy court denying
unsecured creditors committee's objection to credit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

263 B.R. 510
263 B.R. 510
**(Cite as: 263 B.R. 510)**

or's proof of claim was res judicata on court's ability to subordinate claim was question of law, which would be reviewed de novo. Bankr.Code, 11 U.S.C.A. § 510(b).

**[16] Bankruptcy 51 €══2969**

51 Bankruptcy
   51VII Claims
     51VII(F) Priorities
      51k2967 Subordination
        51k2969 k. Security Purchase Rescission Claims. Most Cited Cases
Section of the Bankruptcy Code providing for subordination of damages claims arising from purchase or sale of security is remedial statute, that must be construed broadly in order to effectuate intent of Congress. Bankr.Code, 11 U.S.C.A. § 510(b).

**[17] Bankruptcy 51 €══2969**

51 Bankruptcy
   51VII Claims
     51VII(F) Priorities
      51k2967 Subordination
        51k2969 k. Security Purchase Rescission Claims. Most Cited Cases
Fact that proof of claim was predicated on settlement agreement did not alter fact that settlement related to damages claim arising from purchase of security, within meaning of subordination provision of the Bankruptcy Code. Bankr.Code, 11 U.S.C.A. § 510(b).

**[18] Bankruptcy 51 €══2951**

51 Bankruptcy
   51VII Claims
     51VII(F) Priorities
      51k2951 k. In General. Most Cited Cases

**Courts 106 €══99(6)**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision

      106k99 Previous Decisions in Same Case as Law of the Case
        106k99(6) k. Other Particular Matters, Rulings Relating To. Most Cited Cases

**Judgment 228 €══542**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
     228XIII(A) Judgments Operative as Bar
      228k541 Courts or Other Tribunals Rendering Judgment
        228k542 k. In General. Most Cited Cases
Decision to allow claim was prerequisite to eventual prioritization of claim in hierarchy of allowed claims, and did not preclude bankruptcy court, under doctrines of res judicata or law of the case, from later subordinating claim to claims of other unsecured creditors. Bankr.Code, 11 U.S.C.A. § 510(b).

**[19] Bankruptcy 51 €══2084.10**

51 Bankruptcy
   51I In General
     51I(D) Venue; Personal Jurisdiction
      51k2084 Transfer and Consolidation of Cases
        51k2084.10 k. Particular Cases. Most Cited Cases
Substantive consolidation of Chapter 11 estates of debtor-corporations did not seek to hold shareholders personally liable for debts of corporate entities, but was tool for properly defining the relevant group of assets and liabilities.

**[20] Bankruptcy 51 €══2894**

51 Bankruptcy
   51VII Claims
     51VII(D) Proof; Filing
      51k2892 Necessity of Filing; Effect of Failure
        51k2894 k. Secured Claims. Most

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

263 B.R. 510
263 B.R. 510
**(Cite as: 263 B.R. 510)**

Cited Cases
Secured creditor's lien survived, despite creditor's failure to properly file proof of claim in Chapter 11 proceedings.

**[21] Action 13 ⬡⟿68**

13 Action
    13IV Commencement, Prosecution, and Termination
        13k67 Stay of Proceedings
            13k68 k. In General. Most Cited Cases
Generally, injunctive relief, such as stay, is not appropriate to secure post-judgment legal relief in form of money damages, since purely monetary harm does not rise to level of "irreparable injury."

**[22] Bankruptcy 51 ⬡⟿3776.5(2)**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3776 Effect of Transfer
                51k3776.5 Supersedeas or Stay
                    51k3776.5(2) k. Right; Grant or Denial; Discretion. Most Cited Cases
Monetary injury which results from a distribution of assets pursuant to confirmed Chapter 11 plan can constitute "irreparable injury," of kind needed to support stay pending appeal from plan confirmation order.

*513 Wiley France James, III,James, Goldman & Haugland, P.C., El Paso, TX, for debtor.
Michael G. Kelly, McMahon, Tidwell, et al., Odessa, TX, for creditor.

**Order Denying Glynn Andrews's Motion for Stay Pending Appeal of the Order for Substantive Consolidation and Order Confirming the Reorganization Plan**

FURGESON, District Judge.
Before this Court is Glynn Andrews's Motion for Stay Pending Appeal of the Bankruptcy Court's Order for Substantive Consolidation and Order Confirming the Reorganization Plan. To allow proper

consideration of the Andrews's motions, the Court issued a temporary stay through and until November 10, 2000. After full consideration of the arguments presented and of the relevant authorities, the Court is of the opinion that Andrews's Motions for Stay should be DENIED.

### Facts and Procedural History

This case involves bankruptcy proceedings of two entities, Permian Producers, Inc. ("PPI") and Permian Producers Drilling, Inc. ("PPDI"). The shareholders of PPI were Tommy G. Carmen and Charles R. Close. The shareholders of PPDI were Glynn Andrews (50%), Carmen (40%), Close (5%) and Carmen's son Gerald (5%). PPI and PPDI also had common officers and directors. Carmen was president and Close was secretary for both corporations. In addition, Carmen and Close served as the directors of both PPI and PPDI.

Andrews has nearly 40 years of experience in the oil and gas industry. Andrews first met Close in 1992, when Close was employed as the accountant for Andrews's company, MoVac Service Company. MoVac is involved in oilfield transportation. It was Close who proposed the PPDI joint venture. In addition to being a 50% shareholder in PPDI, Andrews served as a director and he was extensively involved in its management and operation.

At some point in the relationship, Andrews sued both the entities as well as the individuals. On September 1, 1999, prior to the commencement of bankruptcy proceedings against PPI and PPDI, Andrews entered into a compromise and settlement agreement with PPI, PPDI, Tommy Carmen, Charles Close and Gerald Carmen, which provided for the payment to Andrews*514 of$2,840,000. This amount represented Andrews's equity investment into PPDI. Payment was to be funded by the auction of substantially all the assets of PPI and PPDI. PPI received approximately $2,700,000 from the auction. However, it owed approximately $5,200,000 in debt: $3,000,000 to Bank United and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$2,200,000 to various unsecured creditors. PPDI received $2,100,000 from the auction. It owed $500,000 to various unsecured creditors. Under the terms of the compromise and settlement agreement, Andrews could collect the $2,840,000 owed to him from both PPI and PPI as well as Carmen and Close, after payment to the secured and other unsecured creditors. For obvious reasons, after bankruptcy was filed, Andrews went to Bankruptcy Court for payment of his claim.

An involuntary petition for Chapter 11 bankruptcy was filed against PPDI on September 24, 1999. PPI filed a voluntary petition for Chapter 11 bankruptcy on September 29, 1999. After extensive hearings, the Bankruptcy Court, with Bankruptcy Judge Ronald King, presiding, entered its Order for Substantive Consolidation of the two estates on October 19, 2000. The Bankruptcy Court also confirmed the Chapter 11 Plan of Reorganization for the consolidated estate. On October 23, 2000, Glynn Andrews, a creditor of both PPDI and PPI, timely filed Notices of Appeals and moved in the Bankruptcy Court for a stay of all the orders pending appeal. The Bankruptcy Court heard arguments and denied each of Andrews's stay requests, but granted stays through and until November 3, 2000, in order to allow Andrews to seek stays from this District Court. This Court granted Andrews's Motion for Emergency Hearing on Motions for Stay Pending Appeal of Order Confirming Plan Filed by Official Unsecured Creditors Committee and Motion for Emergency Hearing on Motions for Stay Pending Appeal of Order for Substantive Consolidation.

### Standard of Review

[1][2][3] The decision of a bankruptcy court to deny a stay pending appeal will be reviewed for abuse of discretion. *In re Barrier,* 776 F.2d 1298, 1299-1300 (5th Cir.1985). A bankruptcy court abuses its discretion if it seriously errs in its determination of whether the moving party has established a case meriting injunctive relief. *Id.* at 1300. The "clearly erroneous" standard of review applies to a

bankruptcy court's findings of fact. FED. R. BANKR. P. 8013; *In re First South Savings Ass'n,* 820 F.2d 700, 711 (5th Cir.1987). A finding is "clearly erroneous" if "although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed." *First South,* 820 F.2d at 711 (citation omitted). The bankruptcy court's conclusions of law are reviewed de novo. *Richmond Leasing Co. v. Capital Bank,* 762 F.2d 1303, 1307 (5th Cit.1985).

[4] In this case, however, this Court considers Andrews's motions entirely de novo rather than review them as an appeal of the Bankruptcy Court's denial of the motions for stay. This avoids the needlessly complex and somewhat absurd situation where this Court would review for abuse of discretion Judge King's determination that Andrews failed to show a likelihood of success in proving that Judge King abused his discretion in ordering substantive consolidation or in confirming the reorganization plan. The Court acknowledges that, in order to prevail on his motion for stay at the Bankruptcy Court, Andrews would have had to convince Judge King that he erred in his original rulings. 6 NORTON BANKR.L. & PRACT. 2d § 148:60 (2000) ("As a practical matter, this showing [of a likelihood of success] is *515 always a difficult one, because it is to be made in the first instance to the court who has by definition ruled against the applicant."). In addition, the absence of findings of fact and conclusions of law other than the rulings themselves makes a review of the Bankruptcy Court's rulings for abuse of discretion problematic. *First South,* 820 F.2d at 708.

### Discussion

[5][6] In determining whether a stay pending appeal should be granted, the district court considers four factors: (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether granting the stay would substantially harm the other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

parties; and (4) whether the granting of the stay would serve the public interest. *First South,* 820 F.2d at 709. While the absence of any one factor is not fatal to a successful motion for stay, greater weight is given to the first factor-the movant's likelihood of success. *Id.* at 709 n. 10 (holding that in the absence of the movant's showing of a likelihood of success on the merits, a stay is warranted only if the balance of the remaining equities is heavily titled in the movant's favor).

### A. Likelihood of Success on the Merits

[7] In most cases, a showing of a likelihood of success is a prerequisite in order for the movant to obtain a stay. *Id.* (citation omitted) ("Likelihood of success remains a prerequisite in the usual case even if it is not an invariable requirement."). If the appeal involves a "serious legal question," then a stay may be appropriate upon the lesser showing that the case is one with "patent substantial merit" and that the "balance of equities (i.e. consideration of the other three factors) is ... heavily titled in movant's favor." *Id.* (citation omitted).

Andrews appeals both the order granting substantive consolidation and the order confirming the reorganization plan. As to the order granting substantive consolidation, Andrews presents two arguments for appeal. First, Andrews argues that the Bankruptcy Court lacks the statutory authority to order the substantive consolidation of the debtors PPI and PPDI. Next, Andrews asserts that even if substantive consolidation is permitted by the Bankruptcy Code, the Bankruptcy Court erred in finding that substantive consolidation was warranted in this case. Andrews also seeks appeal of the order confirming the reorganization plan. First, he asserts that the Bankruptcy Court erred in allowing Bank United's claim since it failed to timely file a proof of claim. Second, he asserts that the Bankruptcy Court erred in subordinating Andrews's claim to the claims of the other unsecured creditors. These issues do not raise any "serious legal questions" warranting a lesser showing than a likelihood of suc-

cess.

### 1. Does the Bankruptcy Court have the authority to order substantive consolidation?

11 U.S.C. § 105(a), states, in relevant part, that: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Andrews asserts that whether a bankruptcy court has the authority to order substantive consolidation under Rule 105(a) poses a serious legal question warranting a lesser showing than the usual likelihood of success. In support, Andrews notes the absence of any Fifth Circuit case law directly determining this issue. Next, he points to the Fifth Circuit's opinion in *In re Smith,* 21 F.3d 660, 665 (5th Cir.1994), which seems to demarcate a boundary*516 of the bankruptcy court's equity power under Bankr. Rule 105(a). The Court finds these arguments unconvincing.

[8][9] A split among the circuit courts may indicate a "serious legal question." However, rather than a divergence of legal authority, in this instance, a survey of case law and legal scholarship indicates a general agreement with the proposition that a bankruptcy court has authority to order substantive consolidation. *In re Bonham,* 229 F.3d 750, 764 (9th Cir.2000) (expressly determining that "even though substantive consolidation was not codified in the statutory overhaul of the bankruptcy law in 1978, the equitable power undoubtedly survived enactment of the Bankruptcy Code."); 2 COLLIER ON BANKRUPTCY ¶ 105.09[1][b] (Lawrence P. King ed., 15 th ed. revised 2000); J. Stephen Gilbert, Note, *Substantive Consolidation in Bankruptcy: A Primer,* 43 VAND. L.REV.. 207, 220-31 (1990) (discussing in detail the evolution of the case law establishing the bankruptcy court's power to order substantive consolidation). In fact, contrary to the position taken by Andrews, the Fifth Circuit has acknowledged that the bankruptcy court has the authority to order substantive consolidation. *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*S.I. Acquisition, Inc.*), 817 F.2d 1142, 1145 n. 2 (5th Cir.1987) ("The bankruptcy court has authority to order de facto disregard of the corporate form through [substantive] consolidation proceedings.").

In support of his contention to the opposite, Andrews points to language contained in the Fifth Circuit's decision in *In re Smith,* specifically the passage stating:

Bankruptcy courts cannot use their equity powers under Section 105(a) to fashion substantive rights and remedies not contained in the Bankruptcy Code or Rules or to negate substantive rights or remedies that are available.

*In re Smith,* 21 F.3d 660, 666 (5th Cir.1994). Andrews's application of *Smith* is misplaced. To begin with, *Smith* did not specifically address the bankruptcy court's authority to order substantive consolidation under Rule 105(a). Instead, it dealt with a bankruptcy court's use of its equitable power to extend the filing deadline for proof of claim in contradiction of 11 U.S.C. § 523(a)(3). Hence, whether a bankruptcy court has the authority to order substantive consolidation under Rule 105(a) presents a distinguishable issue than the issue confronted in *Smith.* Unlike the action taken in *Smith,* substantive consolidation is not prohibited by statute, though it is not expressly authorized either. *See* FED. R. BANKR. P. 1015 advisory committee note (acknowledging that substantive consolidation "is neither [expressly] authorized or prohibited by the Bankruptcy Code").

[10] Rather than violate any provisions of the Bankruptcy Code, substantive consolidation facilitates the underlying purpose of bankruptcy proceedings by allowing the court to attach a pool of assets that should have been included since the commencement of the bankruptcy case. 2 COLLIER ON BANKRUPTCY ¶ 105.09[3] ("[I]f the separate existence of the two companies was a mere fiction, then consolidation simply recognizes the existing reality that ... all property was held in a single entity."). This is especially applicable to a case, such

as here, involving alter-ego corporations. In fact, the Supreme Court recognized that the consolidation of different but related estates is a vital tool in fulfilling a fundamental purpose of bankruptcy proceedings. *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904, 85 L.Ed. 1293 (1941), *reh'g denied,* 313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552 (1941) ("The power of the bankruptcy *517 court to subordinate claims or to adjudicate equities arising out of the relationship between several creditors is complete."). The statement in *Smith* cited by Andrews should not be read to limit a bankruptcy court's equity power under section 105(a) to only issuing orders already expressly allowed for by other provisions in the Bankruptcy Code. Such a reading would render any equity power under section 105(a) superfluous and redundant to already existing provisions.

Though the Fifth Circuit in *Smith* recognized that a bankruptcy court's equity power is not unlimited, it did not negate the notion that " '[f]or many purposes, courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity.' " *Bonham,* 229 F.3d at 763 (*quoting Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). Consistent with this notion, even in an era of limited equity power, no federal court has found that the bankruptcy court's power to order substantive consolidation falls outside these limits.

[11] Whatever the limits of the bankruptcy court's equity power, the power to order the substantive consolidation of two debtors does not fall outside its scope. Therefore, the Court finds that Andrews fails to show a likelihood of success on its argument that the bankruptcy court does not have the authority to order substantive consolidation.

## 2. Does the evidence support the substantive consolidation of PPI and PPDI?

Andrews next argues that even if substantive consolidation is permitted, the Bankruptcy Court erred

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in determining that substantive consolidation was proper on the facts presented. The Court disagrees.

[12] In determining whether Andrews has made a showing of a likelihood of success as to whether substantive consolidation was merited in this case, the Court is cognizant of the applicable standard of review that would apply to the Bankruptcy Court's decision to order consolidation. Because it is an exercise of a bankruptcy court's equitable power under section 105(a), an order for substantive consolidation is reviewed for abuse of discretion. *Reider v. FDIC (In re Reider* ), 31 F.3d 1102, 1104-05 (11th Cir.1994); *First Nat'l Bank of El Dorado v. Giller (In re Giller* ), 962 F.2d 796, 799 (8th Cir.1992). Andrews fails to show a likelihood of success in proving that the bankruptcy court abused its discretion in ordering the substantive consolidation of PPI and PPDI.

[13] The absence of any statutorily prescribed standard has meant that the responsibility for developing standards for determining whether substantive consolidation should be granted has been left largely to the courts. The courts, however, have not developed a universally accepted standard for substantive consolidation. *Bonham*, 229 F.3d at 765-66; 2 COLLIER ON BANKRUPTCY ¶ 105.09[2]. Rather, whether the circumstances warrant substantive consolidation is a highly fact specific analysis that must be made on case-by-case basis. *Bonham*, 229 F.3d at 765-66.

Under the more traditional test-the elements test-the existence of a combination of elements showing a strong relationship among the debtors is a prerequisite for substantive consolidation. The substantial relationship must also be coupled with additional elements such as commingling of separate assets and liability so as to make it prohibitively expensive or difficult to sort out the proper assignment and ownership of the assets and liabilities. *518 The elements most commonly cited by courts under this test are:

(1) the degree of difficulty in segregating and ascer-

taining individual assets and liability;

(2) the presence or absence of consolidated financial statements;

(3) the profitability of consolidation at a single physical location;

(4) the commingling of assets and business functions;

(5) the unity of interests and ownership between the various corporate entities;

(6) the existence of parent and inter-corporate guarantees on loans; and

(7) the transfer of assets without formal observance of corporate formalities.

*In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 410 (Bankr.E.D.Va.1980). No single element or group of elements is determinative as to whether substantive consolidation is warranted. 2 COLLIER ON BANKRUPTCY ¶ 105.09[2] [a].

More recent cases have distilled the elements test into a balancing test where the focus is on the impact of consolidation on creditors. *See, e.g., In re Snider Bros.*, 18 B.R. 230 (Bankr.D.Mass.1982). In *Snider*, the bankruptcy court concluded that:

while several courts have recently attempted to delineate what might be called "the elements of consolidation", ... the only real criterion is ... the economic prejudice of continued debtor separateness versus the economic prejudice of consolidation.

*Id.* at 234. Similar to the elements test, the party proposing consolidation must show identity between the entities to be consolidated. *Id.* at 236-38, 238. Then, there must also be a showing that consolidation is necessary to "prevent harm or prejudice, or to effect a benefit generally." *Id.; Reider*, 31 F.3d at 1107. An objecting creditor can still defeat a proposed consolidation by showing that he relied on the separateness of the debtor in extending

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

credit and would thereby suffer harm by consolidation. *Snider*, 18 B.R. at 238. Finally, the court will order substantive consolidation only if the benefits counterbalance or outweigh the harms. *Id.; See also Drablkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270, 276-77 (D.C.Cir.1987)("adopting the balancing test articulated in *Snider* but requiring a showing that the benefits of consolidation heavily outweigh the harms").

The Second Circuit formulated a simplified version of the balancing test emphasizing two core factors: (1) whether creditors dealt with the entities as a single economic unit and did not rely on the debtors' separate identity in extending credit; and (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2nd Cir.1988); *Bonham*, 229 F.3d at 766-67 (adopting the Second Circuit's balancing test). The presence of either factor provides a sufficient basis to order consolidation. *Bonham*, 229 F.3d at 765-66 (adopting and applying the test articulated in *Augie/ Restivo* ).

The failure of the Fifth Circuit to adopt a standard is not by itself a sufficient basis to order a stay pending appeal. The movant must still show a likelihood of success on the merits. Nor does the absence of a standard create a presumption that a serious legal question exists so as to warrant a lesser showing. Even then, the movant must still present a case with patent substantial merit and make a strong showing on the other factors. *First South*, 820 F.2d at 709 n. 10. Andrews fails to make such a showing. First, he fails to identify which standard the Fifth Circuit would adopt and how the facts in the case do not *519 meet that standard. Next, he fails to show that, in light of its factual findings, the Bankruptcy Court abused its discretion in ordering consolidation.

[14] Though a bankruptcy court's decision to order consolidation is reviewed for abuse of discretion,

the underlying findings of fact supporting that decision will be set aside only if "clearly erroneous." FED. R. BANKR. P. 8013. After extensive hearings and trial, the Bankruptcy Court found a substantial relationship between the two debtors PPI and PPDI based on extensive commingling, shared assets, and transfers of funds without any documentation. Additionally, PPI and PPDI occupied one physical premise and both were controlled by the same officers and directors. In fact, the evidence presented to Judge King indicates an extensive combination of business functions between the two debtors. In fact, the review of the accounting records and the business conduct of PPI and PPDI performed by Douglas Bunnell indicate that many of the unsecured creditors did not distinguish between PPI and PPDI. Also noteworthy, the evidence indicates that PPDI had only minimal capitalization and instead relied on PPI to provide additional working capital necessary until PPDI began to receive its income stream.

Next, there is sufficient evidence to establish that consolidation is necessary to avoid some harm. Judge King found that, under the unconsolidated plan, the unsecured creditors would receive significantly less than they would under a plan where the assets and liabilities of PPI and PPDI were consolidated. In addition, in the absence of consolidation, not only would the unsecured creditors-many of whom did not know that PPI and PPDI were not distinct entities-receive less, Andrews would receive a substantial distribution on his claim, which is based on his equity investment in PPDI. Courts have recognized that this type of distribution is the type of harm that should be remedied by substantive consolidation. *Eastgroup Properties v. Southern Motel Ass'c*, 935 F.2d 245, 250 (11th Cir.1991) (recognizing that consolidation may be warranted where "absent substantive consolidation, the majority of creditors will receive only a small portion of their claims, while the equity interest holder may receive a substantial distribution").

Judge King's finding concerning Andrews's sub-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stantial involvement in and knowledge of the operation and management of PPI and PPDI is significant on the above point. Unlike an ordinary creditor who can claim that he relied on the debtor as a separate and distinct entity in deciding to extend credit, Andrews was an insider to PPDI and extensively involved in the management of it. That Andrews received settlement from both PPI and PPDI on his claim, which was predicated on his investment in PPDI, only further indicates the absence of his reliance on PPDI as a separate and distinct entity. Therefore, Andrews "knew or should have known of the close association" between the debtors PPI and PPDI and is "estopped to assert prejudice caused by legal recognition, in the form of consolidation, of an otherwise homogeneous corporate framework." *Snider,* 18 B.R. at 235.

Given the above analysis, the evidence supports a determination that the benefits of consolidation counterbalance and outweigh any harm to Andrews, a former equity holder. Regardless of what standard is applied, the findings of fact support the Bankruptcy Court's decision to order the substantive consolidation of PPI and PPDI. Therefore, the Bankruptcy Court did not abuse its discretion in ordering the substantive consolidation of PPI and PPDI. As such, Andrews fails to show a *520 likelihood of success on the merits as to this point of error.

Though the lack of case law in the Fifth Circuit determining the precise application of substantive consolidation leaves many questions unresolved, the case presented by Andrews is not the right case to resolve these questions. The substantial relationship between the debtors PPI and PPDI along with Andrews's own insider role as a shareholder simply do not present a strong case against substantive consolidation. Given the factual finding made by the bankruptcy court supporting substantive consolidation, this Court cannot find that the bankruptcy court abused its discretion in ordering substantive consolidation.

### 3. *Res Judicata* and Law of the Case

[15] Andrews next argues that the reorganization plan, which subordinates Andrews's claim against PPDI to the claims of the unsecured creditors of PPI, violates the doctrines of *res judicata* and law of the case by contradicting the Bankruptcy Court's prior order denying the Unsecured Creditors Committee's objection to Andrews proof of claims. The Court notes that because this issue raises a question of law, it will be reviewed de novo on appeal. *Richmond Leasing,* 762 F.2d at 1307.

[16][17] Section 510(b) of the Bankruptcy Code states, in relevant part:

For the purpose of distribution under this title, a claim arising ... for damages arising from the purchase or sale of such a security ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security.

11 U.S.C. § 510(b). As a remedial statute, the Court reads section 510(b) broadly in order to effectuate the intent of Congress. *In re Granite Partners, L.P.,* 208 B.R. 332, 341 (Bankr.S.D.N.Y.1997). The court in *Granite Partners* noted that "[s]ection 510(b) prevents a shareholder from converting his interest into a claim and sharing *pari passu* with other unsecured creditors." *Id.* The fact that Andrews's claim is predicated on the settlement agreement does not alter the fact that the underlying claim is a claim for damages arising from the purchase of a security. The record indicates, and Andrews does not now dispute, that his claim for $2,840,000 represents his interest in PPDI as a shareholder. Therefore, Andrews's claim was properly subordinated pursuant to section 510(b).

[18] Andrews's misconstrues the doctrines of *res judicata* and law of the case. Judge King's order allowing Andrews's claim does not then preclude that claim from being subordinated to the claims of other unsecured creditors. Rather than having preclusive effects, the decision to allow a claim is a pre-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requisite to the eventual prioritization of that claim in the hierarchy of allowed claims. Therefore, the Court finds that Andrews fails to show a likelihood of success on this point.

### 4. Substantive Consolidation and the Texas Business Corporations Act

[19] Andrews marshals the argument that the order granting substantive consolidation is prohibited by the TEXAS BUSINESS CORPORATIONS ACT. see Tex. Bus. Corp. Act. Ann. art. 2.21 (West 1980 & Supp.2000) (requiring a showing that the shareholder or affiliate of the corporation "caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit" of the "shareholder or affiliate" before such shareholder or affiliate is liable to the corporation's creditors). Andrews misconstrues the protections of limited liability provided by article 2.21. Though it borrows from the doctrine of "piercing the corporate veil," substantive*521 consolidation does not seek to hold shareholders-such as Andrews-personally liable for the debts of the corporate entity. Any exposure faced by Andrews by substantive consolidation is limited to his initial investment into PPDI.

In addition, Andrews's argument that Texas law precludes substantive consolidation rests on the assumption that substantive consolidation is entirely without any statutory basis if not clearly contradictory to express provisions of the Bankruptcy Code. As discussed above, substantive consolidation does not make a wholesale substitution to underlying state or federal laws. Rather, courts have universally recognized substantive consolidation as a tool for properly defining the relevant group of assets and liabilities of the bankruptcy estate. *See, e.g., Bonham,* 229 F.3d at 765 (recognizing that "even though substantive consolidation was not codified in the statutory overhaul of bankruptcy law in 1978, the equitable power undoubtedly survived enactment of the Bankruptcy Code and that "[n]o case" has held to the contrary").

### 5. The Survival of Bank United's Lien

[20] Lastly, Andrews makes the argument that the Bankruptcy Court erred in providing for the payment of Bank United's lien in the consolidated reorganization plan in light of Bank United's failure to file a proof of claim. The Court disagrees.

The lien in question originates from a December 29, 1997 agreement where PPI granted to Bank United a first priority, perfected security interest in all of its inventory and equipment. Under this agreement, PPI could not sell or transfer any of its inventory or equipment without the prior written consent of Bank United except for sales of inventory to buyers in the ordinary course of business. On December 30, 1997, however, PPI sold several of its rigs to the shareholders of PPDI. Andrews paid $2,100,00 in cash and the remaining shareholders-Gerald Carmen, Tommy Carman and Charles Close-gave unsecured promissory notes. The shareholders' interests in the rigs were then transferred to PPDI in exchange for PPDI stock, which had been previously issued to them.

Andrews seeks to avoid the attachment of this lien to any assets held by PPDI. However, under the security agreement and TEX. BUS. & COM.CODE ANN. § 9.307(a) (West 2000), the shareholders cannot take interests in PPI's rigs free of Bank United's security interest unless they were buyers in the ordinary course of business. Texas law defines a buyer in the ordinary course of business as:

[A] person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind.

TEX. BUS. & COM.CODE ANN. § 1.201(9) (West 2000); *In re Winn's Stores, Inc.,* 177 B.R. 253, 256-57 (Bankr.W.D.Tex.1995). Judge King made the finding that sale of the rigs from PPI to the shareholders of PPDI and, eventually, to PPDI was not a sale to buyers in the ordinary course of busi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ness. The evidence presented at trial supports this finding. Therefore, Bank United's lien would attach to these subsequent transfers.

11 U.S.C. § 506(d)(2) provides that an otherwise valid lien is not avoided by bankruptcy proceedings if this claim is disallowed only for failure to file a proof of claim pursuant to 11 U.S.C. § 501. In the absence of any provision of the Bankruptcy Code invalidating Bank United's lien on PPI's inventory and equipment, this lien survives despite Bank United's failure to properly file a proof of claim in the bankruptcy proceedings. *Simmons v. Savell*\*522 (*In re Simmons* ), 765 F.2d 547, 556 (5th Cir.1985) ("It is clear under the [Bankruptcy] Code that any statutory lien that is valid under state law remains valid through bankruptcy unless invalidated by some provision of the Code."). Therefore, Andrews fails to show, to the standard required, that the Bankruptcy Court erred in including Bank United's lien in the plan for reorganization despite the failure to properly file a proof of claim.

### B. Irreparable Injury

[21][22] Generally, injunctive relief such as a stay is not appropriate to secure post-judgment legal relief in the form of money damages. *Federal Sav. & Loans Ins. Corp. v. Dixon*, 835 F.2d 554, 560 (5th Cir.1987). Purely monetary injury is not irreparable because the injured party has remedy by bringing suit to recover damages. *See Asheville Bldg. Assoc. v. Carlyle Real Estate Ltd.*, 93 B.R. 920, 923 (W.D.N.C.1988) ("[M]onetary injury ... [is] by its nature, not irreparable."). However, monetary injury resulting from the distribution of assets pursuant to a confirmed reorganization plan poses an exception to this general rule. *See Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci* ), 105 F.3d 837, 839-40 (2nd Cir.1997). In *Gucci*, the Second Circuit acknowledged that a party appealing a reorganization plan has limited remedy on appeal because the Court of Appeals does not have the power to affect the validity of a sale of property to a good faith purchaser pursuant to an unstayed authorization. *Id.* at

839 (recognizing that courts have regularly ruled that the appeal in such a case is moot). In such case, post-judgment legal relief to recover damages is not available because the assets of the debtor have already been sold and the proceeds distributed under the appealed plan. Such injury can constitute irreparable injury. *See Dixon*, 835 F.2d at 560 n. 1.

The Fifth Circuit addressed such a situation in *Barrier*. The unsecured creditors in *Barrier* appealed the bankruptcy court's order confirming the plan of reorganization. *Barrier*, 776 F.2d at 1299. In granting mandamus relief requiring the district court to enter a stay of the bankruptcy court's order, the Court of Appeals recognized that the likelihood that distribution would occur pursuant to the plan pending appeal and that the movant would receive nothing under the distribution, effectively undermining the utility of the movant's appeal. *Id.* at 1299 n. 1, 1300. The likelihood of deterioration of the debtor's assets, which then undermined the ability of the movant to propose an alternate plan if successful on appeal, constituted a serious risk of harm to the movant warranting the grant of a stay. *Id.* at 1300.

Therefore, the Court finds that the Bankruptcy Court abused its discretion in determining that Andrews would not suffer irreparable harm if the stay was not granted. However, in light of Andrews's failure to show a likelihood of success on the merits, the showing of irreparable harm does not provide a sufficient basis to grant a stay.

### C. Harm to Creditors

A fundamental purpose of the bankruptcy system is " 'to convert the assets of the bankrupt into cash for distribution among creditors.' " *Security Nat'l Bank v. Cotton (In re Atlanta Int'l Raceway, Inc.)*, 513 F.2d 546, 550 (5th Cir.1975) (*quoting Maynard v. Elliott*, 283 U.S. 273, 277, 51 S.Ct. 390, 75 L.Ed. 1028 (1931)). Delay in payment to creditors runs counter to this fundamental purpose and, therefore, harms creditors.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The bankruptcy proceedings of PPI and PPDI have been pending for nearly thirteen months. The claims of the unsecured creditors undoubtedly were in existence well prior to that date. As the evidence *523 indicates, the majority of the unsecured creditors of PPI-with claims totally over $2,200,000-are small, locally owned business. They have suffered substantial harm from the delay in payment occasioned by the bankruptcy of PPI and PPDI. Though the funds are in an interest bearing account, it is the further delay attending any stay pending appeal that exacerbates this harm already suffered by the remaining unsecured creditors.

### D. Public Interest

Beyond the standard argument that a successful appeal would benefit the bankruptcy system by clarifying certain unresolved issues of law, Andrews fails make any convincing argument that the public interest is served by allowing the stay. Every appeal that attempts to "correct" an erroneous ruling or order benefits the public interest in that the legal system is, by that correction, improved. However, Andrews presents no other real benefit to the public interest served by this stay. Even the benefits espoused by Andrews are contingent upon a successful appeal. As discussed above, the Court does not find a likelihood that Andrews would succeed on any of his points on appeal. This case simply is not the proper case through which resolution of these questions should be made. And the public interest is therefore not served by allowing a stay.

### Conclusion

The Court finds that the Movant Glynn Andrews has failed to show that his appeal has a likelihood of success on the merits, that the other creditors will not be harmed by a stay, or that the public interest is served by an order for a stay. Though Andrews shows that he will suffer irreparable injury, the other factors, especially the absence of a showing of a likelihood of success on the merits, counsel

against this Court issuing an order to stay the Bankruptcy Court's orders pending appeal.

It is therefore ORDERED that the Movant Glynn Andrews's Motion to Stay the Bankruptcy Court's Order for Substantive Consolidation and Order Confirming the Reorganization Plan be DENIED. So that there is time to appeal this matter to the Court of Appeals for the Fifth Circuit, it is ORDERED that the Bankruptcy Court's Order for Substantive Consolidation and Order Confirming the Reorganization Plan is STAYED through and until December 20, 2000. Because the proceeds in question are currently in an interest bearing, federally insured account, it is ORDERED that Andrews is not required to post a bond pending appeal to the Court of Appeals.

W.D.Tex.,2000.
In re Permian Producers Drilling, Inc.
263 B.R. 510

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# COLLIER ON BANKRUPTCY

## *Fifteenth Edition Revised*

Volume 4

ALAN N. RESNICK
*Benjamin Weintraub Distinguished Professor of Bankruptcy Law, Hofstra University
School of Law;
Of Counsel, Fried, Frank, Harris, Shriver & Jacobson LLP, New York City*

HENRY J. SOMMER
*Supervising Attorney, Consumer Bankruptcy Assistance Project, Philadelphia*

Editors-in-Chief

LAWRENCE P. KING
Editor-in-Chief, 1974–2001

**BANKRUPTCY CODE §§ 501–528**

 LexisNexis·

of the Treasury certifies that failure to liquidate such entry was due to an investigation pending on such date into assessment of antidumping or countervailing duties or fraud, or if information needed for the proper appraisement or classification of such merchandise was not available to the appropriate customs officer before such date; or

(G) Penalties related to a claim of a kind entitled to a section 507(a)(8) priority, but only if the penalty is in compensation for actual pecuniary loss.

Any otherwise applicable time period specified above will be suspended for (1) any period during which the taxing authority was prohibited under nonbankruptcy law from collecting the tax as the result of a request by the debtor for a hearing and an appeal of any collection action taken or proposed against the debtor plus 90 days, plus (2) any time a stay against collection of the tax was in place in a prior bankruptcy case, or during which collection was precluded by the existence of confirmed plan under the Code, plus 90 days.

NINTH PRIORITY: SECTION 507(a)(9)

*Commitments to Regulatory Agencies:* Claims based upon any commitment by the debtor to a federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution.

TENTH PRIORITY: SECTION 507(a)(10)

*Drunk Driving Claims:* Claims for death or personal injury resulting from the debtor's illegal operation of a motor vehicle or vessel while intoxicated.

¶ 507.02  **Function and Purpose of Priorities**

[1]  **Purpose of Priorities**

Many bankruptcy cases do not generate sufficient proceeds to pay in full all claims entitled to payment in the case. It becomes necessary, therefore, to allocate the insufficient proceeds among the holders of claims in some manner. Were the principle of equality among creditors the only guiding principle in a bankruptcy case, the allocation of proceeds would be apportioned among all holders of claims in proportion to the amount of their claims. Yet there are other principles that govern the bankruptcy process and those principles have led to the establishment of a hierarchy by which some claims are entitled to payment before others.

The structure of the Bankruptcy Code reflects a decision by Congress to prefer

certain categories of claims over other categories of claims. The preferred categories of claims are designated as having priority over other categories of claims and are entitled to payment in full before those not granted priority. Within the category of claims granted priority, there is a further ranking and those with higher priority are entitled to payment ahead of those with a lower priority.

### [a]   Purpose of First Priority

The 2005 Act established domestic support obligations as the highest priority for distribution in bankruptcy cases.[1] Prior to enactment of this legislation, bankruptcy administrative expenses were accorded the highest priority and domestic support obligations were granted seventh priority. The creation of this higher priority for domestic support obligations was part of a series of amendments created by the 2005 Act designed to enhance the status of domestic support obligations in bankruptcy cases and to prevent what Congress believed to be abuses of the bankruptcy process with respect to domestic support obligations. The series of domestic support amendments mark a clear congressional intent that domestic support obligations be considered paramount in bankruptcy cases.

There is, however, one limitation on this otherwise higher priority. Certain fees and expenses of the trustee will come ahead of domestic support obligations to the extent that the trustee administers assets that are available for the payment of claims. This limitation allows the trustee to recoup the trustee's costs and expenses incurred in administering assets for the benefit of the holder of a domestic support obligation.

The shift of domestic support obligations from seventh to first priority is not as significant as it would seem at first. Domestic support obligations will arise almost always arise in individual chapter 7 or chapter 13 cases. With the exception of administrative expenses, these cases are unlikely to have claims that would have qualified for priority ahead of domestic support obligations.

### [b]   Purpose of Second Priority

Some of the categories entitled to priority have been chosen for priority because they are believed to benefit all holders of claims by increasing the proceeds in the bankruptcy estate available for distribution. The second highest priority has been granted to claims incurred in connection with administration of the bankruptcy estate. These claims are generally postpetition claims. The belief is that allowing these "administrative expenses" a prior right to payment encourages the necessary parties to undertake the collection and distribution of the assets of the estate so as

---

¶ 507.02

[1] Pub. L. No. 109-8, § 212 (2005), effective in cases commenced on or after October 17, 2005, reprinted in App. Pt. 10(a) infra.

¶ 507.02[1][b]    COLLIER ON BANKRUPTCY    507-16

to be able to generate proceeds to distribute to pre-existing creditors.

*(Text continued on page 507-17)*

Incorporated within this belief is the notion that the administration of the bankruptcy case is for the collective benefit of the creditors and so it is the creditors who should, by virtue of a lower return, bear the cost of that administration. In cases involving the operation of a business, it is likewise believed that encouraging persons to transact business with the estate will enhance the proceeds that will be available to creditors.

### [c]—Purpose of Third Priority.

The same notion supports the third priority, which benefits persons extending credit to an involuntary bankruptcy estate during the period when it is being determined whether the involuntary petition will be sustained by the court. To some extent, the fourth and fifth priorities—for certain wages and employee benefits—have been established for the same reasons.

### [d]—Purpose of Fourth and Fifth Priorities.

By assuring employees of the debtor of a greater likelihood of payment for prepetition labor, it is believed that the employees are more likely to continue their employment, thus preventing dissipation of the debtor's business and preserving or increasing the proceeds that the case can generate for payment of creditors. There is, however, an added justification for the fourth and fifth priorities and that is for public policy reasons. Employees are viewed as having a special right to payment since their labor has helped to create the assets from which other creditors will be able to realize value and because their wages are often their only source of income. Creditors other than employees generally have not relied on the debtor as their sole source of income. In addition, other creditors typically have extended credit to the debtor on a voluntary basis, whereas employees in waiting for their paychecks do not consider themselves as extending credit to the debtor.

### [e]—Purpose of Other Priorities.

Other categories of priority claims can also be justified for public policy reasons. The eighth priority for taxes reflects a public policy decision that tax obligations owed to governmental units deserve priority of payment. The other categories of priority claims all have some public policy justification also, although in some there is a measure of political expediency as well.

(Rel.95—9/05  Pub.219)